IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| GILBERT P. HYATT, | |
| Plaintiff, | |
| v. | Civil Action No. _____ |
| UNITED STATES PATENT and TRADEMARK OFFICE, and ANDREI IANCU, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, in his official capacity, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

# TABLE OF CONTENTS

Nature of the Action ................................................................................................. 1

Parties ...................................................................................................................... 5

Jurisdiction and Venue ............................................................................................ 5

Facts ........................................................................................................................ 6

I.    The PTO Acts in Bad Faith To Deny Mr. Hyatt His Procedural and Substantive
      Rights Under the Patent Act ............................................................................ 6

      A.    Senior PTO Officials Decide that Mr. Hyatt Is a "Submariner," that His
            Applications Are "Submarine Applications," and that None Will Be Allowed
            To Issue .................................................................................................... 8

      B.    The PTO Takes the "Unprecedented" Step of Withdrawing Four of Mr.
            Hyatt's Patent Applications from Issuance ................................................ 14

      C.    The PTO Procedurally Blocks Mr. Hyatt's Applications from Being Issued as
            Patents ..................................................................................................... 17

      D.    The PTO Flags Mr. Hyatt's Applications Under the SAWS Program To
            Ensure They Would Not Issue and "Poison the Well" Against Mr. Hyatt ............. 18

      E.    The PTO "Recycles" Mr. Hyatt's Appeals To Delay His Applications, Block
            Issuance of Claims Deemed Allowable by the Appeal Board, and Deny Him
            Final Agency Action Necessary To Obtain Judicial Review ................................. 22

      F.    The PTO Delays Action on Mr. Hyatt's Patent Applications for Years ................. 26

            1.    The PTO Hid Mr. Hyatt's Patent Applications in "Shadow Art Units" that
                  Do Not Examine Applications ........................................................... 26

            2.    The PTO Put Mr. Hyatt's Applications "On Hold" for Years at a Time .......... 28

            3.    ██████████████████████████████████████████████████
                  ██████████████████████████ ................... 31

            4.    The PTO Excluded Mr. Hyatt's Applications from Generally Applicable
                  Procedures and Programs To Expedite Prosecution and Then Lied to Him
                  About It ......................................................................................... 31

            5.    The PTO Reported Mr. Hyatt's Application Files as "Lost" To Delay Their
                  Examination .................................................................................... 33

            6.    The PTO Simply Ignores Two Applications that Have Been Pending Now
                  for over 45 Years .............................................................................. 34

      G.    The PTO Assigns Mr. Hyatt's Applications to a Special "Hyatt Unit" Charged
            with Rejecting Them, Abandoning Them, and Preventing Them from Ever
            Issuing as Patents ......................................................................................... 35

            1.    The Hyatt Unit Restarts Prosecution from Scratch After 20 Years by
                  Dumping a "Boatload" of Office Actions on Mr. Hyatt All at Once ............... 37

            2.    The Hyatt Unit's Leader Instructs Examiners To Reject and Abandon Mr.
                  Hyatt's Applications Without Regard to Their Merit ................................ 42

3.  Hyatt Unit Examiners Are Paid To Reject and Abandon Mr. Hyatt's Applications ................................................................................. 46

4.  Hyatt Unit Leadership Instructs Examiners To Penalize Minutiae Like Typos and Erect Frivolous and Vexatious Barriers to the Prosecution of His Applications ................................................................................. 48

5.  The Hyatt Unit Piles on Unlawful Objections To Overload Mr. Hyatt, Abandon His Applications, and Ultimately Prevent Their Issuance ................. 51

6.  The PTO Unduly Delays Deciding Mr. Hyatt's Petitions, After Forcing Him To Petition for Relief from Spurious Objections, Improper Abandonments, and Bad Faith Requirements ................................... 55

H. The PTO Attempts To Punish Mr. Hyatt For Its Own Delays And Reaffirms That It Intends To Reject All of His Applications ................................. 57

II.  Legal Background on the Patent Act and Patent Term Adjustment ............................ 60

III. Mr. Hyatt Files and Diligently Prosecutes the '263, '450, and '669 Applications ........ 62

A. The '263 Application ............................................................. 62

B. The '450 Application ............................................................. 68

C. The '669 Application ............................................................. 72

IV. The PTO Is Incapable of Carrying Out Its Mandatory Statutory Duties To Fairly and Impartially Examine, and To Award Mr. Hyatt a Patent for Allowable Subject Matter, in the '263 Application or Any of Mr. Hyatt's Patent Applications .... 75

V.  PTO Delay Ran Out All Possible Patent Term for the Expired Applications ............. 75

VI. The PTO's Delay Deprived Mr. Hyatt of All Patent Rights and Value in the Inventions Claimed in the Expired Applications ......................................... 78

VI. The PTO's Actions Constitute a Continuing Violation of Mr. Hyatt's Rights ............ 79

Count I: Refund of Fees for the Expired Applications ......................................... 79

Count II: Just Compensation for Taking with Respect to the Expired Applications .......... 80

Count III: Refund of Fees Collected or Retained in Bad Faith ................................. 81

Count IV: Relief from the PTO's Unlawful Policies on Mr. Hyatt's Applications ............ 82

Count V: Injunctive Relief from Unlawfully Withheld and Unduly Delayed Agency Action on Mr. Hyatt's Applications ........................................................... 83

Count VI: Mandamus To Compel Action on Mr. Hyatt's Applications in Accordance with Law........................................................................................ 84

Count VII: Declaratory Relief for the '263 Application ........................................ 85

Count VIII: Injunctive Relief for the '263 Application ......................................... 85

Count IX: Mandamus for the '263 Application.................................................. 85

Prayer for Relief ................................................................................. 86

Jury Demand ..................................................................................... 88

## COMPLAINT

Plaintiff Gilbert P. Hyatt, for his Complaint against the United States Patent and Trademark Office ("PTO") and Andrei Iancu, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, in his official capacity only, alleges as follows:

### Nature of the Action

1.      In the mid-1990s, PTO Commissioner Bruce Lehman launched a war against perceived "submarine patents"—that is, patents with early filing dates that were intentionally kept from issuing by the inventor until the technology was in wide use—which he believed to be damaging to industry. But Commissioner Lehman and the PTO were indiscriminate in their targeting and mistakenly took aim at Gilbert P. Hyatt, a renowned inventor named in over 70 U.S. patents in many different technical disciplines issued from 1973 to 1997. At the forefront of computer technology for decades, Mr. Hyatt's patents have been licensed to leading technology companies including Philips, Sony, Toshiba, and Matsushita (Panasonic). Mr. Hyatt has been honored for his inventions and was described by Rep. Howard Berman at a congressional hearing as "a living legend in the patent community." Mr. Hyatt sought to obtain patents—not to delay their issuance—so that he could raise venture capital and bring his products to market, just as he had done with his previous company, Micro Computer, Inc. Despite all this, and despite his having built and documented experimental systems to develop many of the inventions disclosed in his pending applications, Commissioner Lehman and other PTO officials falsely branded Mr. Hyatt a "submariner" and unlawfully decided that the PTO would never issue him another patent, irrespective of his statutory entitlement to issuance of patentable subject matter. *See* 35 USC § 102 ("A person shall be entitled to a patent….").

2.      Having made that decision, the PTO proceeded to carry it out. It acted almost immediately to withdraw from issuance four patents either issued or in the final stages of being issued to Mr. Hyatt—actions in which the PTO has acknowledged the unusual

participation of Commissioner Lehman and other senior PTO officials. It applied unlawful secret procedures (since acknowledged by the PTO) to block the issuance of applications that examiners found patentable. Internal PTO documents reveal that these unlawful procedures prevented issuance of at least several patents to Mr. Hyatt. It put more than 80 of Mr. Hyatt's pending administrative appeals on ice for up to a decade before terminating them by reopening prosecution and restarting the examination process from scratch. It secretly used what PTO officials called "Shadow Art Units," "Phantom Art Units," and "parking lots" to stow Mr. Hyatt's applications and take them off the books. And it delayed actions across the board, with a degree of creativity that bespeaks the PTO's enmity for Mr. Hyatt: issuing suspensions amounting to over a millennium of aggregate delay; secretly assigning his applications to management personnel who do not examine applications; dismissing his petitions imploring the agency to act on the false basis that his applications were already being expedited; leaving approximately 100 of Mr. Hyatt's applications for a single examiner to process in his personal time, without pay; and manipulating its reporting systems to hide its failure to act on Mr. Hyatt's applications. All the while, PTO officials spread the word high and low throughout the agency that Mr. Hyatt was a "submariner" and that he would never get another patent, poisoning the well against him.

3. After the PTO's delay strategy became untenable, the PTO founded what the agency calls the "Hyatt Unit" in 2012 for the purpose of miring all of Mr. Hyatt's applications in administrative purgatory until Mr. Hyatt gives up or dies. The Hyatt Unit began its work by restarting prosecution from scratch, throwing out years of work and enormous effort by Mr. Hyatt in the process. It blanketed Mr. Hyatt in what its leader described as a "boatload" of hundreds of burdensome Office Actions in just a few months, forcing him to scramble to make any response. And now it is in the process of systematically abandoning and rejecting his applications, piling on numerous, overlapping rejections on every patent claim and entering frivolous "objections" that take years to correct due to the PTO's refusal to decide his administrative petitions for relief on a timely basis or at all. The Hyatt Unit's leader's

extensive guidance to his examiners contains not one word on allowing claims, only rejecting them, and the Hyatt Unit has never allowed a single one of Mr. Hyatt's claims in its more-than-5 years of existence. As things stand, Mr. Hyatt has no possibility of receiving timely, fair, and impartial consideration of his applications from the Hyatt Unit.

4.       If there were any doubt about the PTO's current goals, they were put to rest when the PTO asserted prosecution laches against Mr. Hyatt in a recent court case[1] in an attempt to wipe out all of his pending applications in one fell swoop by blaming him for the agency's own years of delay. That effort failed—at trial, the district court entered judgment on partial findings for Mr. Hyatt at the close of the PTO's prosecution laches case, before Mr. Hyatt had put on a single witness or piece of evidence. Faced then with the prospect that the district court might find that Mr. Hyatt was entitled to issuance of patents on four of his applications, the PTO claimed the right to restart prosecution from the beginning no matter what the court held. Mr. Hyatt only became aware of the full extent of the PTO's bad faith in that litigation, which permitted limited discovery into the PTO's conduct. What he learned through discovery prompted Mr. Hyatt to seek judicial enforcement of his statutory entitlements to fair and impartial examination of his applications and issuance of patents on his applications and his constitutional rights.

5.       One specific consequence of the PTO's bad faith is the inexplicable withholding from issuance of patent claims that the PTO determined are patentable in Mr. Hyatt's patent application No. 08/456,263 (the "'263 Application"). This '263 application has languished for more than 15 years, even though the PTO represented to a federal district court in 2000 that it would act "promptly" on the application following the conclusion of a then-pending administrative appeal. The Board of Patent Appeals and Interferences (collectively with its successor, the Patent Trial and Appeal Board, the "Appeal Board") decided that appeal largely in Mr. Hyatt's favor in 2003, but the PTO has taken no action to advance the

---

[1] *Hyatt v. Iancu*, Nos. 05-2310, 09-1864, 09-1869, 09-1872 (D.D.C.).

application to issuance of the patentable claims since then, declining even to respond to Mr. Hyatt's petitions that it act, thereby blocking him from obtaining judicial review. Through its delay, the PTO has denied Mr. Hyatt, who is 80 years old, valuable patent rights to which he is entitled, and it intends to wait out his natural life. Even if the PTO did deign to act at this late date, Mr. Hyatt has no hope of receiving a fair and impartial hearing from the agency— it will, per its Hyatt policy, just pile on the rejections and objections, no matter Mr. Hyatt's statutory entitlement to a patent.

6.     Another consequence of the PTO's bad faith is the expiration of any potential patent term for two of Mr. Hyatt's patent applications, No. 08/599,450 (the "'450 Application") and No. 08/762,669 (the "'669 Application")—collectively, the "Expired Applications." These applications were filed in 1996, during the five-year period after patent terms began to be calculated from the application-filing date, rather than the issuance date, but before Congress comprehensively provided patent term adjustments for PTO-caused delays. So the PTO ran out the clock, suspending examination repeatedly, ignoring petitions from Mr. Hyatt requesting that it act, and then effectively starting examination over from scratch in 2013—fully 17 years after the Expired Applications were filed and just three years before any possible patent term would expire. In 2016, any possible patent term ran out, and Mr. Hyatt was left with two patent applications that claimed valuable inventions but were completely worthless because, even if the PTO were to issue them as patents, they would have no patent term remaining and could never be enforced.

7.     Mr. Hyatt brings this suit to obtain relief from the PTO's unlawful actions. In particular, he seeks: (1) specific relief, in the form of a fee refund, for the PTO's unlawful refusal to timely examine the Expired Applications in good faith and in compliance with the Patent Act and PTO regulations; (2) just compensation for the PTO's taking of Mr. Hyatt's property rights in the Expired Applications, their claims, and any patents to which they entitled him; (3) a refund of the fees that the PTO collected from Mr. Hyatt and retained in bad faith or for activities that it subsequently abrogated when it restarted prosecution of Mr.

Hyatt's applications over from the beginning; (4) relief from the PTO's unlawful treatment of his applications in violation of his rights under the Patent Act, PTO regulations, and the Due Process Clause of the Fifth Amendment to the United States Constitution; and (5) a determination that Mr. Hyatt is entitled to a patent on the '263 Application.

8.      No judgment could ever fully remedy the injuries that the PTO has inflicted on Mr. Hyatt through its illegal mistreatment of him, but in this action Mr. Hyatt seeks at least to stop the PTO from inflicting its greatest injury yet upon him: delaying the vindication of his rights until he dies.

## Parties

9.      Plaintiff Gilbert P. Hyatt is an engineer, scientist, and inventor who has obtained more than 70 issued patents. Mr. Hyatt has numerous patent applications pending before the PTO, which has delayed reaching final agency action on them for years. He is 80 years of age and resides in Clark County, Nevada. Mr. Hyatt filed, and is the sole owner of, the '263, '450, and '669 Applications.

10.      Defendant United States Patent and Trademark Office is the federal agency responsible for examining patent applications and for issuing U.S. patents. The PTO's headquarters is located in Alexandria, Virginia. The PTO is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

11.      Defendant Andrei Iancu is Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office. He has overall responsibility for the administration and operation of the PTO, including the patent examination process. He is named as a defendant in his official capacity only.

## Jurisdiction and Venue

12.      This is an action seeking (1) specific relief in the form of refunds under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706; (2) monetary relief under the Fifth Amendment's Takings Clause, U.S. Const. amend. V; (3) an order under the APA

setting aside the PTO's unlawful policies regarding Mr. Hyatt's applications; (4) an order under the APA and writ of mandamus under the All Writs Act, 28 U.S.C. § 1651, directing Defendants to act on Mr. Hyatt's applications in accordance with law; (5) a declaration under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, finding that Mr. Hyatt is entitled to receive a patent on the '263 Application; (6) an order under the APA and writ of mandamus under the All Writs Act directing Defendants to issue such patent upon Mr. Hyatt's compliance with any prerequisites to issuance. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1361.

13.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391 and Local Civil Rule 3(C) because the Defendants reside in Alexandria, Virginia.

<u>Facts</u>

## I.     The PTO Acts in Bad Faith To Deny Mr. Hyatt His Procedural and Substantive Rights Under the Patent Act

14.     Mr. Hyatt is an accomplished inventor, with nearly 75 patents issued by the PTO. Some of his patents and applications cover microcomputer structure, computer memory architecture, incremental processing, illumination devices, display devices, graphics systems, image processing, and sound and speech processing.

15.     Mr. Hyatt is also the owner and inventor of nearly 300 patent applications currently pending before the PTO, as well as more than 90 applications that the PTO has unlawfully abandoned through actions that he is challenging. Most of Mr. Hyatt's applications have been pending for over 20 years, with about a dozen pending for over 35 years and three applications pending for over 40 years.

16.     In the mid-1990s, then-Commissioner Bruce Lehman resolved to address what he perceived to be a major problem with "submarine patents." In congressional testimony, he stated that some patent applicants and owners were abusing the patent system and were engaged in "an extortion game. It's nothing more than that, pure and simple, an extortion game." Media at the time reported that Mr. Lehman launched a major campaign to crack

down on perceived "submarine patents," and senior PTO personnel from that period confirm that targeting perceived "submariners" was a top priority for Mr. Lehman and, as a result, for the PTO.

17.     Falsely perceived as a "submariner" by Mr. Lehman and other senior PTO officials, Mr. Hyatt is a casualty of that campaign.

18.     Because they believed that Mr. Hyatt was a "submariner," PTO officials decided that the agency would not issue any more patents to Mr. Hyatt.

19.     Multiple PTO officials—including former PTO Commissioner Bruce Lehman, former Deputy Commissioner Lawrence Goffney, former Group Director Gerald Goldberg, Supervisory Patent Examiner ("SPE") Richard Hjerpe, and Examiner Jose Couso—verbally informed Mr. Hyatt that the PTO would no longer issue patents to him.

20.     To carry out that decision, the PTO took the unprecedented step of withdrawing from issuance four of Mr. Hyatt's patent applications that examiners had determined were patentable and that were at the PTO's publication department for issuance, applied procedures to block patent examiners from issuing patents to Mr. Hyatt, stranded some 80 administrative appeals on his applications in limbo for up to a decade, and took increasingly unusual and creative measures to delay action on his applications, including having them "parked" in "Phantom Art Units" where no work was ever done and assigning them to group directors and other management personnel who do not examine applications and were not even informed about these assignments.

21.     More recently, the PTO has established a special Art Unit, which PTO personnel refer to as the "Hyatt Unit," to devise and implement specialized policies the PTO applies only against Mr. Hyatt so as to further delay final agency action on Mr. Hyatt's applications, to reject them, and to force their abandonment. To date, it has unlawfully forced the abandonment of more than 90 of Mr. Hyatt's applications.

22.     According to former PTO Patent Program Administrator Howard Goldberg, senior PTO officials stated numerous times that they are waiting for Mr. Hyatt to give up.

23.     According to former PTO Director of Public Affairs Richard Maulsby, Commissioner Lehman and his senior staff believed that, while future submarine applications would be prevented by legislative changes to the Patent Act, pending applications that they considered to be submarine applications would have to be delayed by the PTO until the applicants either gave up or died.

24.     ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

25.     The PTO seeks to prevent the issuance of any patents on any of Mr. Hyatt's applications until Mr. Hyatt, who is presently 80 years old, dies.

26.     The PTO's conduct toward Mr. Hyatt demonstrates the agency's bad faith and bias, its intention to deny his right to fair and impartial examination of his applications to conclusion as required by the Patent Act and PTO rules and procedures, its intention to abandon all of his applications, its intention to reject all of his claims, and ultimately its intention to deny his entitlement to the issuance of patents.

### A.     Senior PTO Officials Decide that Mr. Hyatt Is a "Submariner," that His Applications Are "Submarine Applications," and that None Will Be Allowed To Issue

27.     Beginning in the 1990s, senior PTO officials including Commissioner Lehman labeled Mr. Hyatt a "submariner" and his applications as ones seeking "submarine patents"—that is, patents with early filing dates covering technologies in wide use at the time of their issuance.

28.     According to Mr. Maulsby, Commissioner Lehman sought to put an end to what he viewed as "submarine patents," and he and his senior staff communicated that objective down the line to Group Directors and SPEs.

29.     Group Director Gerald Goldberg told Mr. Hyatt in late 1998 that senior PTO officials believed that he was a "submariner" and that the PTO was not going to issue another patent to him.

30.     Deputy Commissioner Lawrence Goffney, during a visit to Las Vegas in the late 1990s, met with Mr. Hyatt and told him that the PTO would not issue him another patent because Commissioner Lehman had designated him a "submarine" applicant and would not permit the issuance of additional patents to him.

31.     According to former PTO Patent Program Administrator Howard Goldberg, it was well known by senior PTO management that Mr. Hyatt was considered to be a submariner and his applications were considered to be submarine applications. According to Mr. Goldberg, PTO management was concerned about all things relating to Mr. Hyatt.

32.     According to Howard Goldberg, Mr. Hyatt was known by name as a submarine applicant by most managers in the technology groups.

33.     According to Howard Goldberg, Mr. Hyatt's applications were treated as undesirable submarine applications and against PTO policy.

34.     According to Jessica Harrison, who was on assignment to the Commissioner's office in the mid-1990s, Commissioner Lehman, Michael Thesz, and Stephen Kunin in particular were outspoken about Mr. Hyatt being a "submariner" and specifically characterized Mr. Hyatt in a negative light. Messrs. Thesz and Kunin were members of Commissioner Lehman's senior staff.

35.     Mr. Thesz instructed Ms. Harrison not to entertain requests for guidance by Mr. Hyatt because he was a "submariner" and the "microprocessor guy"—an apparent reference to the patent that Mr. Hyatt was issued for the single-chip microprocessor.

36.     According to PTO Deputy Commissioner for Patent Examination Policy Joseph Rolla, Mr. Hyatt's patent applications had a "stigma" by the mid- to late-1990s of being perceived as submarine applications among PTO managers and personnel.

37.     PTO officials and other personnel routinely lumped Mr. Hyatt in with other persons it labeled "submariners," such as Jerome Lemelson.

38.     Former PTO Commissioner Lehman has recently said that the "submarine" label was a "scarlet letter" for applicants and applications, warning PTO personnel not to permit the issuance of patents.

39.     Mr. Hyatt's applications were assigned to a special "Bulk Filers Group," the name itself casting disparagement on Mr. Hyatt and his applications.

40.     A January 1999 article by a patent examiner published in the *Journal of the Patent and Trademark Office Society*, a publication widely read by patent examiners and the contents of which were influenced by senior PTO officials, characterized Mr. Hyatt as a submariner and devoted an entire section to "Lieutenant Commander Gilbert Hyatt."

41.     At regular Tuesday meetings of PTO Group Directors beginning in the mid-1990s, Mr. Hyatt was discussed and referred to by name as a submariner.

42.     At one such meeting in or around 2000, Assistant Commissioner of Patents Nicholas Godici discussed Mr. Hyatt and his alleged submarine patents.

43.     According to Howard Goldberg, Mr. Hyatt and his applications were discussed—always in a negative light—at many PTO meetings, including the Commissioner's staff meetings held on Thursdays.

44.     In the late 1990s and early 2000s, Richard Hjerpe was the SPE supervising the examination of nearly all of Mr. Hyatt's patent applications.

45.     After initially promising to work collaboratively with Mr. Hyatt to advance Mr. Hyatt's patent applicants, Mr. Hjerpe informed Mr. Hyatt that Commissioner Lehman believed Mr. Hyatt's applications were "submarine applications" and that Mr. Lehman would not permit them to issue as patents.

46.     SPE Michael Razavi was Mr. Hjerpe's successor and was responsible for supervising the processing of nearly all of Mr. Hyatt's applications.

47.     In mid-2000s, Mr. Razavi told Mr. Hyatt during a meeting that senior PTO management believed that Mr. Hyatt's patent applications were "submarine applications" and that they would not be issued.

48.     In a subsequent meeting, Mr. Razavi told Mr. Hyatt that the PTO Group Directors instructed Mr. Razavi not to cause Mr. Hyatt's patent applications to be examined because they were "submarine applications."

49.     In response to these communications, Mr. Hyatt did everything that he could within the system to advance prosecution of his patent applications. He responded diligently and exhaustively to Office Actions, filed petitions, filed appeals, and contacted numerous PTO personnel to ask questions and, in certain instances, to ask them to intercede. He believed at the time that the PTO would ultimately carry out its legal duty to examine his patent applications and issue any claims to which he is entitled or that, at the least, he would be able to prevail in court by appealing adverse PTO rejections and thereby break the logjam at the PTO. He feared that speaking out or otherwise causing a stir could backfire by either hardening the PTO's resistance or leading to retaliation against him.

50.     The PTO's disparagement of Mr. Hyatt as a "submariner" continues to this day.

51.     ███████████████████████████████ a PTO software utility called the "Submarine Tracker" █████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

52.     PTO officials' regular disparagement of Mr. Hyatt as a "submariner" has "poisoned the well" against him and his applications, causing PTO personnel to be biased against him and preventing his applications from receiving fair and impartial consideration from PTO personnel.

53.     For example, on February 26, 2003, Mr. Hjerpe emailed a number of PTO officials, including current and former Group Directors and the now-current Deputy Commissioner for Patent Operations to mock Mr. Hyatt regarding his litigation against the California Franchise Tax Board:

> Yuk, Yuk, Yuk…
> Gilbert trying to defend himself in the US Supreme Court???…there is some humor in here somewhere….maybe justice will prevail after all!
> I have new-found respect for the wonderful state of California and tax collectors everywhere!

54.     At the time of this email, Mr. Hjerpe was responsible for all or nearly all of Mr. Hyatt's applications.

55.     The recipients of this email included Group Director Joseph Rolla, Group Director Allen MacDonald, SPE Wellington Chin, SPE Tommy Chin, SPE Michael Razavi, SPE Steven Saras, SPE Bipin Shalwala, SPE Mark Zimmerman, and Examiner Matthew Bella. A related email was sent to SPE Andrew Faile, SPE Mark Powell, SPE William Grant, and SPE Kevin Teska. A number of these individuals were involved at the time in the PTO's processing of Mr. Hyatt's applications.

56.     On information and belief, these recipients were included in the email because Mr. Hjerpe believed that they shared his disdain of Mr. Hyatt and therefore would be receptive to, and not offended by, the mocking of a patent applicant engaged in proceedings before the agency.

57.     █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████

[REDACTED]

58.     In a March 2016 email to all members of the PTO's current "Hyatt Unit," an examiner in that Unit, Walter Briney, circulated a link to a salacious twenty-year-old news article about Mr. Hyatt's divorce, which Mr. Briney stated "provides a unique glimpse into Hyatt's mind."

59.     In sworn deposition testimony in litigation, Mr. Briney stated that another examiner in the "Hyatt Unit," Hien Dieu Thi (Cindy) Khuu, had responded to Mr. Briney's initial email.

60.     On information and belief, Ms. Khuu's email disparages Mr. Hyatt, as indicated by the PTO's representation in Mr. Hyatt's Freedom of Information Act litigation to obtain the email that its disclosure would "likely" prompt Mr. Hyatt to harass Ms. Khuu.

61.     The PTO had no factual basis to represent that *Mr. Hyatt* would "likely" harass Ms. Khuu. Nonetheless, the PTO made that representation in a public court filing.

62.     In Mr. Hyatt's litigation with the PTO, the PTO improperly withheld or redacted other discoverable evidence reflecting bias against Mr. Hyatt. For example, the email by Mr. Hjerpe described above was largely redacted when initially produced by the PTO, and the PTO produced an unredacted copy only after Mr. Hyatt threatened to move the district court to compel production.

63.     [REDACTED]

[REDACTED]

████████████████████████████████████████

██████████████████████

64.     On information and belief, the PTO withheld from production other discoverable evidence of bias against Mr. Hyatt.

**B.     The PTO Takes the "Unprecedented" Step of Withdrawing Four of Mr. Hyatt's Patent Applications from Issuance**

65.     Shortly after the PTO determined that it would cease issuing patents to Mr. Hyatt, it withdrew from issuance four patent applications that had been allowed by examiners and were being issued to Mr. Hyatt after he had paid the issue fee.

66.     PTO policy and practice is that, when the PTO withdraws a patent application from issuance, the "examiner at once writes a letter in the case" to explain the basis for the withdrawal and then proceeds promptly to act on the application. Manual of Patent Examining Procedure ("MPEP") § 1308.01 (6th ed., rev. 2, July 1996). The MPEP is binding on examiners but serves only as guidance to the public, including applicants.

67.     But the PTO withdrew Mr. Hyatt's patents from issuance without reasoned explanations and then took no further action on several of those applications for years, despite Mr. Hyatt's repeated urging for action in petitions and status inquiries.

68.     Under PTO regulation, "[o]nce the issue fee has been paid, the Office will not withdraw the application from issue at its own initiative for any reason except" certain enumerated circumstances. 37 C.F.R. § 1.313(b).

69.     Contrary to its own binding regulation, the PTO withdrew Mr. Hyatt's patent applications from issuance after the issue fee had been paid and without identifying the applicability of any of the enumerated circumstances provided in 37 C.F.R. § 1.313(b).

70.     On October 10, 1997, the PTO withdrew from issuance application No. 05/849,812.

71.     The PTO stated in an interrogatory response that Commissioner Lehman, the highest-ranking patent official, was personally involved in this withdrawal from issuance.

72.     The PTO has acknowledged that involvement of the Commissioner and other senior PTO officials on an individual application is highly unusual.

73.     Another withdrawal from issuance occurred in November 1998 in application No. 07/357,570, which had been assigned U.S. Patent No. 5,847,379 and that was to issue to Mr. Hyatt on December 8, 1998.

74.     That withdrawal from issuance was implemented by Group Director Rolf Hille and signed by Gerald Goldberg, Director of Technology Center 2700.

75.     Shortly after signing that withdrawal, Gerald Goldberg told Mr. Hyatt that Commissioner Lehman had instructed him to withdraw the application from issue because it was a submarine application.

76.     Mr. Hille explained that he withdrew the '570 application from issuance as instructed by the Office of Patent Legal Administration ("OPLA"), which provided as an explanation that it was a Hyatt application.

77.     OPLA ordered that withdrawal because it would be issued to Mr. Hyatt, contrary to the PTO's policy against issuing additional patents to Mr. Hyatt.

78.     OPLA is typically responsible for the promulgation and implementation of policies developed by PTO leadership.

79.     Another withdrawal from issuance occurred on April 21, 1997, in Hyatt application No. 07/763,395, which had been assigned U.S. Patent No. 5,625,761. This patent application was to be issued, and a part of it was published in the PTO's *Official Gazette*, on April 29, 1997.

80.     After withdrawing this allowed, published application from issuance in 1997, the PTO took no action on it for 16 years, despite Mr. Hyatt's subsequent petitioning for action. This application is still pending 21 years after it was allowed for issuance. Despite withdrawing this application from issuance as a published patent, and despite the continued status of this application as confidential, the PTO maintains its full file history open to the

public on its online Public PAIR system, violating Mr. Hyatt's statutory right of secrecy and prejudicing his patent rights.

81.    Another withdrawal from issuance of an allowed application occurred in application No. 08/433,307. That patent application was withdrawn from issuance in May 1997.

82.    The examiner of that application was never consulted or informed about the decision to withdraw the patent from issuance, and it was never returned to him for further examination.

83.    ███████████████████████████████████████████████████ ███████████████████████ but despite Mr. Hyatt's subsequent petitioning for action, the PTO still took no action on the application until 2013, at which point it subjected the application to the generic "Requirements" described below, effectively restarting examination from the beginning—over 16 years after the application had been approved for issuance following a complete examination.

84.    SPE Richard Hjerpe, who was then responsible for Mr. Hyatt's applications, at the time ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████

85.    For each application withdrawn from issuance, a patent examiner had determined that patent claims in Mr. Hyatt's application were allowable and that Mr. Hyatt had a statutory entitlement to issuance of a patent.

86.    Withdrawals from issuance at the PTO's initiative are exceedingly rare.

87.    According to former Group Director Janice Falcone, it was extremely rare for one issuing patent of an applicant to be withdrawn from issue by the PTO, and it was without precedent for four issuing patents of the same applicant to be withdrawn from issue by the PTO. Ms. Falcone has never seen a situation that would be even close to withdrawal of four issuing patents of the same applicant in her nearly 32 years at the PTO.

**C.    The PTO Procedurally Blocks Mr. Hyatt's Applications from Being Issued as Patents**

88.    Because senior PTO officials deemed Mr. Hyatt a "submariner," the PTO adopted a secret and unlawful policy of blocking the issuance of patents to Mr. Hyatt irrespective of merit, even where examiners who had actually reviewed the applications determined that he was entitled to a patent and sought to issue notices of allowance.

89.    According to testimony by Michael Razavi, who examined Hyatt applications in the late 1990s and was subsequently the SPE responsible for all or nearly all of them,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

90.    ███████████████████████████████████████████████████

███████████████

91.    For example, in a May 2002 email concerning application No. 05/302,771, Robert Nappi, a patent examiner, informed Do Hyun Yoo, an SPE in Technology Center 2100, Art Unit 2187, that Mr. Hyatt was entitled to issuance of a patent on that application:

> We are done with the case, it is ready for issue complete with that most ancient form of allowance a blue slip…. I have been waiting for a resolution concerning whether it is cleared for issue by "*the powers to be*" who have been holding up the issue for the past several years….If you know anything more please let me know I'd love to get the thing out of the office.

(emphasis added).

92.    ███████████████████████████████████████████████████

███████████████████████████████████ from "Steve Kunin's shop," referring to the Office of the Deputy Commissioner for Patent Examination Policy██████████████

█████████████

93.    Shortly after █████████████████ the PTO reopened prosecution in this application in December 2002 and restarted examination all over again.

94.     The PTO subsequently suspended prosecution in this application on December 31, 2008, September 25, 2009, and August 11, 2011.

95.     No patent has issued on application No. 05/302,771. That application, which was filed on November 1, 1972—more than 45 years ago—remains pending before the PTO.

96.     Similarly, in or around 2005, Jose Couso, an examiner assigned some of Mr. Hyatt's applications, told Mr. Hyatt that he had believed that Mr. Hyatt was entitled to issuance of several of those applications but that his supervisor would not allow them to issue. Mr. Couso also said that his supervisor would not allow him to respond to Mr. Hyatt's extensive argumentation regarding priority dates.

97.     According to Mr. Couso, Mr. Hyatt's applications were "blacklisted."

98.     Similarly, after Mr. Hyatt spoke to a class conducted by Brian Werner, who as an examiner had formerly been assigned a number of Mr. Hyatt's applications, at the PTO Patent Academy at Mr. Werner's invitation, Mr. Werner told Mr. Hyatt that his efforts to prosecute his applications were futile because the PTO would not permit his patent applications to issue.

###     D.     The PTO Flags Mr. Hyatt's Applications Under the SAWS Program To Ensure They Would Not Issue and "Poison the Well" Against Mr. Hyatt

99.     Under Commissioner Lehman, the PTO established a secret program called the "Sensitive Application Warning System," or "SAWS," for flagging applications it deemed "sensitive" to ensure that they would not issue even if they were allowed by an examiner.

100.    The criteria for setting the SAWS flag were based on no statutory patentability requirement, nor any PTO regulation. Criteria included "applications with pioneering scope" and applications "which if issued would potentially generate extensive media coverage" embarrassing to the PTO. Examiners were also instructed to flag under SAWS long-pending applications filed prior to June 8, 1995, and applications deemed by the PTO to be "submarine" applications.

101.    The SAWS program operated in total secrecy. Examiners were instructed that the application file "shall ***not*** indicate it has been identified as a SAWS application" and that "[t]he Office shall ***not*** notify Applicant or any other party that any particular application has been identified as a SAWS application."

102.    The PTO instructed examiners to write an Impact Report for SAWS applications, projecting likely impact on industry and on the PTO should the application issue. Such SAWS applications and Impact Reports would be referred to senior PTO officials, who may then say "no way"—the allowed application "had to be withdrawn from issue."

103.    Under the patent law, "[w]henever, on examination any claim for a patent is…object[ed to], the [PTO] shall notify the applicant thereof, stating the reasons for such…objection." 35 U.S.C. § 132(a). All examiner actions must be "complete as to all matters," 37 C.F.R. § 1.104(b), including identification of the "reasons for any adverse action or any objection." *Id.* § 1.104(a)(2).

104.    The PTO's flagging an application under SAWS to prevent issuance without notice to the applicant "stating the reasons" is unlawful under statute and PTO rules because it is an "adverse action" against the application and an "objection" to allowance or issuance.

105.    Under the PTO's regulations, "[o]nce the issue fee has been paid, the Office will not withdraw the application from issue at its own initiative for any reason except" enumerated circumstances that do not include the PTO's deeming the application "sensitive" or flagged under SAWS. 37 C.F.R. § 1.313(b).

106.    The PTO's withdrawal from issuance of an allowed application for which the issue fee had been paid because the application is deemed "sensitive" or flagged under SAWS is unlawful because it violates 37 C.F.R. § 1.313(b).

107.    The Appeal Board was informed through *ex parte* communications of the SAWS status of applications that came before it on appeal. SAWS Impact Reports pertaining to such applications prepared in the respective Technology Center ("TC") were forwarded to Michael Fleming and Gary Harkcom of the Appeal Board, as well. The Appeal Board's

Standard Operating Procedures contained a section on SAWS which expressly required "paying particular attention to the special [SAWS] issues raised by the TC."

108.    Because the Appeal Board does not issue patents and is limited in its review to examiner rejections based solely on the record and the patent law, and because examiners do not reject applications under SAWS—only flag them, off the record—there can be no legitimate reason for the Appeal Board to be informed of the SAWS status of an application.

109.    Informing the Appeal Board about SAWS flags prejudiced applicants whose applications were flagged under SAWS.

110.    The PTO flagged all of Mr. Hyatt's patent applications under SAWS to ensure they would not issue.

111.    According to PTO Deputy Commissioner Joseph Rolla, all of Mr. Hyatt's patent applications were subject to the SAWS program or to equivalent restrictions.

112.    Unlike typical patent applications filed by other applicants, Mr. Hyatt's patent applications could not be issued without the affirmative permission of high-ranking PTO officials.

113.    If an examiner had approved one of Mr. Hyatt's patent applications for issuance, the SAWS flag would have prevented its issuance.

114.    Mr. Hyatt was not informed that his applications were flagged under SAWS or that they were blocked from issuance. For that reason, Mr. Hyatt had no ability to challenge the SAWS flagging of his patent applications as being unlawful and arbitrary and capricious.

115.    According to PTO Deputy Commissioner Rolla, the PTO executive staff received periodic reports identifying SAWS-flagged patent applications. These reports described the location and status of each SAWS-flagged patent application so that the executive staff could manage and control SAWS patent applications.

116.    According to former PTO Group Director Janice Falcone, Mr. Hyatt's patent applications appeared in the regular SAWS reports circulated among PTO executive staff.

117.    The inclusion of Mr. Hyatt's patent applications in those periodic reports served as a notice and reminder to PTO personnel that Mr. Hyatt's applications were considered illegitimate or abusive and were blocked from issuance.

118.    Indeed, former PTO Commissioner Lehman has referred to the SAWS flag as a "scarlet letter" for patent applications.

119.    On information and belief, when Mr. Hyatt appealed Office Actions containing rejections of applications to the Appeal Board, PTO officials undertook *ex parte* communications with the Appeal Board to inform it that Mr. Hyatt's applications were flagged under SAWS, thereby prejudicing his appeals.

120.    ██████████████████████████  ████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████

121.    Mr. Hyatt was not informed of these *ex parte* communications with the Appeal Board and so had no ability to challenge them or even to address them before the Appeal Board.

122.    The PTO announced that the SAWS program was terminated in March 2015, in the midst of public revelations of its operation and a pending Senate inquiry.

123.    On information and belief, the SAWS program or its equivalent is still in operation.

124.    For example, Mr. Hyatt's '263 Application with allowed claims, which the PTO admitted has been SAWS flagged, has continued to be held up by the PTO with no action for more than three years after the purported "retirement" of the SAWS program.

125.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████ An application's sensitivity and potential for publicity were criteria for SAWS flagging.

126.    John Le Guyader, who was Project Lead of the SAWS Strategic Planning Committee, is now Director of the PTO Technology Center that contains the Hyatt Unit.

127.    In addition to flagging Mr. Hyatt's applications to block their issuance, the PTO has buried Mr. Hyatt's applications in vexatious rejections and objections so as to delay prosecution, delay final agency action subject to judicial review, and prevent their issuance.

128.    Federal Circuit judge Kimberly Moore observed the disproportional number of meritless rejections the PTO issued in Mr. Hyatt's applications, noting that "[a]n average of 21 rejections per claim is hardly proportional. Mr. Hyatt was forced to appeal 45 independent issues to the Board when the average [for all other appeals] is two." *Hyatt v. Doll*, 576 F.3d 1246, 1289 (Fed. Cir. 2009) (Moore, J., dissenting), *reh'g en banc granted, opinion vacated sub nom. Hyatt v. Kappos*, 366 F. App'x 170 (Fed. Cir. 2010).

129.    Judge Moore further observed that "Mr. Hyatt prevailed on 92% of all the examiner's rejections at the Board level." *Id.* at 1288. For comparison, at the time Judge Moore made that observation, 2009, the Appeal Board reversed an average of only 25 percent of examiners' decisions.

**E.    The PTO "Recycles" Mr. Hyatt's Appeals To Delay His Applications, Block Issuance of Claims Deemed Allowable by the Appeal Board, and Deny Him Final Agency Action Necessary To Obtain Judicial Review**

130.    In some instances, Mr. Hyatt was able to obtain reversal on appeal to the Appeal Board of rejections of his claims. However, instead of following its established procedure of preparing for issue and issuing these applications, the PTO "recycled" these applications by reopening prosecution and examining all over again the claims that the Appeal Board found to be patentable.

131.    In other instances when Mr. Hyatt was able to file an administrative appeal to the Appeal Board, the PTO adopted and carried out a policy of preventing the Appeal Board from considering Mr. Hyatt's appeals of examiner Office Actions containing rejections.

132.    An applicant can appeal an Office Action containing rejections of claims in an application to the Appeal Board once he receives a second Office Action containing rejections on claims in the application. 35 U.S.C. § 134(a).

133.    After an applicant files his Appeal Brief, the PTO may then issue its responding brief, called an "Examiner's Answer."

134.    PTO rules provide that the Appeal Board does not assume jurisdiction over an appeal unless and until the PTO issues its Examiner's Answer. *See* 37 C.F.R. § 41.35(a).

135.    According to the PTO guidance to examiners in MPEP § 1207.02, an Examiner's Answer should be issued within 2 months after the Appeal Brief.

136.    The PTO refused to issue Examiner's Answers in more than 80 of Mr. Hyatt's appeals between 2000 and 2013.

137.    This caused Mr. Hyatt's appeals to languish "in limbo," as one judge of this Court put it, and another federal judge characterized the PTO's course of conduct as a "preposterous" effort to strand Mr. Hyatt's appeals in "never never land."

138.    On information and belief, the PTO refused to issue Examiner's Answers in Mr. Hyatt's appeals to prevent Mr. Hyatt from receiving adjudication from the Appeal Board, to prevent him from obtaining reversal of PTO Office Actions containing rejections by the Appeal Board or final agency action subject to judicial review pursuant to 35 U.S.C. § 141 or § 145, and ultimately to prevent the issuance of patents to Mr. Hyatt.

139.    For example, in application No. 08/436,854, the examiner issued final and advisory Office Actions containing rejections under Section 112 in 2003 and 2004, respectively. Mr. Hyatt filed an appeal in 2004 and an Appeal Brief in 2006, but the PTO declined to issue an Examiner's Answer. Instead, in 2006, it issued a request for information under 37 C.F.R. § 1.105 ("Rule 105") with exhaustive interrogatories covering the same claim

support issues that the examiner had raised in his final rejection, despite the fact that prosecution was closed. Mr. Hyatt filed a response to the information request and a supplemental Appeal Brief in 2006. Because the PTO did not issue an Examiner's Answer, Mr. Hyatt petitioned for it to do so in 2006, 2007, and 2009, but the PTO did not decide those petitions or even issue an action addressing Mr. Hyatt's Rule 105 response. The PTO declined to provide an Examiner's Answer for a total of 9 years, at which point, in 2013, it issued a second request for information under Rule 105. Mr. Hyatt's second response to a requirement for information was filed in 2013, and the PTO forced abandonment of the case in 2016 for alleged failure to properly respond to the 2013 Rule 105 requirement, without ever considering the merits of Mr. Hyatt's Appeal Brief or his two comprehensive responses to the Rule 105 requirements.

140.   In another application, No. 08/463,118, Mr. Hyatt filed his Appeal Brief in 2004 and then, after years of PTO delay, petitioned the PTO in 2007 and 2009 to issue its Examiner's Answer. The PTO took no action in response to those petitions.

141.   Ultimately, rather than allow Mr. Hyatt's appeals to proceed to the Appeal Board, the PTO reopened prosecution, defeating Mr. Hyatt's appeals and denying him final agency action subject to judicial review.

142.   The PTO's actions to prevent Mr. Hyatt's appeals from reaching the Appeal Board were unlawful, violating 35 U.S.C. §§ 6(b)(1) and 134(a) and binding Supreme Court precedent, *United States ex. rel. Steinmetz v. Allen*, 192 U.S. 543 (1904).

143.   Mr. Hyatt's appeals had languished without Examiner's Answers for up to a decade, before being defeated by the PTO's reopening of prosecution without identifying any new ground of rejection to warrant the reopening.

144.   The PTO violated its own rules and guidance, which do not permit reopening prosecution after it is closed without at least making a *prima facie* case of a new ground of rejection. 37 C.F.R. § 41.39; MPEP § 1207.04.

145.    Reopening prosecution effectively restarted the examination of Mr. Hyatt's applications from the beginning, even though these applications had been pending at that point for approximately 18 years and had been fully examined by patent examiners.

146.    On the rare occasions in early years when Mr. Hyatt did obtain Appeal Board jurisdiction, he obtained reversals of patent examiners' rejections. But the PTO had a Hyatt-specific policy of "recycling" his patent applications by reopening prosecution and subjecting them to further examination, rather than issuing them as patents, which is what the PTO typically does after an applicant prevails before the Appeal Board.

147.    Andrew Christensen, who was then a Technology Center Director with ultimate authority for the Technology Center to which some of Mr. Hyatt's applications were assigned, told Mr. Hyatt that the PTO had a policy of "recycling" his applications:

> The Applicant described the issue of the PTO "recycling" of his patent applications that have rejections reversed by the Board and particularly described the history of two patent applications that were in T.C. 2600; including the instant application. The Applicant pointed out "the scenario of applications going round and round from the examining groups to the Board and then back to the examining groups and then back to the Board." The Director confirmed that this was the policy that the PTO was following.

(emphasis added).

148.    Mr. Christensen told Mr. Hyatt that the "recycling" policy was adopted in response to a directive by senior PTO officials to Technology Center directors that they not issue any patents to Mr. Hyatt, notwithstanding any Appeal Board decisions in Mr. Hyatt's favor.

149.    The PTO's policy of recycling Mr. Hyatt's patent applications violated its generally applicable policy that the Appeal Board's reversal of rejections places patent claims in condition for allowance, wherein "jurisdiction over an application…passes to the examiner…to carry into effect the decision." 37 C.F.R. § 41.54.

**F.      The PTO Delays Action on Mr. Hyatt's Patent Applications for Years**

150.    According to former PTO Patent Program Administrator Howard Goldberg, senior PTO officials stated numerous times that they are waiting for Mr. Hyatt to give up.

151.    In furtherance of that goal, the PTO has regularly violated its own rules, regulations, and generally applicable policies to delay action on Mr. Hyatt's patent applications.

### 1.      The PTO Hid Mr. Hyatt's Patent Applications in "Shadow Art Units" that Do Not Examine Applications

152.    Patent applications are typically assigned by the PTO to technology-specific "Art Units" for examination.

153.    Beginning in the 1990s, the PTO assigned Mr. Hyatt's patent applications to special Art Units that PTO officials called "Shadow Art Units" or "Phantom Art Units"

154.    In these "Shadow Art Units," group directors and supervisors were regularly named as examiners for Mr. Hyatt's patent applications.

155.    These PTO management officials do not examine patent applications.

156.    In some or all instances, these PTO management officials were named as examiners without their knowledge or approval.

157.    While stranded in these "Shadow Art Units," Mr. Hyatt's applications were not examined or otherwise acted upon.

158.    The assignment of Mr. Hyatt's patent applications to "Shadow Art Units" and to management personnel who do not examine patents was undertaken to conceal the PTO's delays on Mr. Hyatt's applications, to ensure that the PTO's inaction on Mr. Hyatt's applications would not penalize any examiner, and ultimately to prevent them from being examined in the normal course and from proceeding to issuance or other final agency action.

159.    According to former Group Director Rolf Hille, the Group Directors were informed that the Phantom Art Units were used to place applications in so that examiners, SPEs, and Directors were not held accountable for delays in the prosecution of these "parked"

patent applications. He also explained that these Phantom Art Units were not included in the biweekly reports or the eight-month reports.

160.     The "Shadow Art Units" were excluded from normal PTO work reports and so removed Mr. Hyatt's applications from statistical and timeliness reports, including the eight-month reports used by PTO officials to identify dormant applications requiring action.

161.     Because the PTO's pendency statistics and reports, such as the eight-month reports, were also relied upon by the Government Accountability Office ("GAO") and the Inspector General of the Department of Commerce ("IG"), excluding Mr. Hyatt's applications from those statistics and reports hid the PTO's inaction on Mr. Hyatt's applications from the GAO and IG, thereby preventing them from inquiring as to why PTO had stalled on Mr. Hyatt's applications.

162.     Moreover, even though IG personnel routinely monitored and investigated PTO operations, the PTO hid from them the existence of its "Shadow Art Units," its exclusion of Mr. Hyatt's applications from its statistics and reports, and the long pendencies of Mr. Hyatt's applications.

163.     PTO senior officials, including former Deputy Commissioner for Patent Examination Policy Stephen Kunin, knew about these special Art Units and specifically referred to them as "Shadow Art Units" or "Phantom Art Units."

164.     The public, however, was kept in the dark about the existence of these "Shadow Art Units," which the PTO omitted from its publications listing and describing Art Units.

165.     Congress was also kept in the dark. The PTO omitted these secret "Shadow Art Units" when it provided information on the PTO and on patent examination to Congress.

166.     The PTO did not inform Mr. Hyatt that it had established these "Shadow Art Units" or that his applications were assigned to them. For that reason, Mr. Hyatt was unable to challenge the assignment of his applications to these "Shadow Art Units."

167.     Indeed, when Mr. Hyatt's applications were assigned to these "Shadow Art Units," the PTO misrepresented to Mr. Hyatt in its correspondence that his applications were assigned to proper Art Units and proper examiners.

## 2.     The PTO Put Mr. Hyatt's Applications "On Hold" for Years at a Time

168.     By the 2000s, the PTO had established a policy of "holding" Mr. Hyatt's applications, which meant not acting on them.

169.     In internal PTO correspondence, Michael Razavi—a SPE whose job responsibilities included supervising the examiners purportedly examining many of Mr. Hyatt's patent applications—informed a PTO quality assurance official that the PTO was not considering patent applications where Mr. Hyatt had prevailed before the Appeal Board because those applications were "on hold."

170.     ████████████████████████████████████████████████████
████████████████████████████

171.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

172.     One of the ways that the PTO implemented its policy of delaying advancement of Mr. Hyatt's patent applications was by issuing "suspensions" on its own initiative.

173.     "Suspension of action at the initiative of the Office should be avoided, if possible, because such suspension will cause delays in examination, will increase pendency of the application, and may lead to a shortening of the effective patent term…." MPEP § 709. "Once a suspension of action has been initiated, it should be terminated immediately once the reason for initiating the suspension no longer exists, even if the suspension period has not expired." *Id.* The PTO regards suspending prosecution of an application more than once as *extraordinary*: "If, in an extraordinary circumstance, a second or subsequent suspension is necessary, the examiner must obtain the TC director's approval…." *Id.*

174.    But the PTO's suspension of Mr. Hyatt's applications more than three times was rather *ordinary* across all his applications.

175.    Indeed, four of Mr. Hyatt's applications were suspended more than ten times apiece, more than 180 were suspended seven to nine times, and more than 120 were suspended five or six times.

176.    Contrary to its own written policy against issuing suspensions, the PTO issued over 2,500 suspensions on Mr. Hyatt's applications; between 2007 and 2012 alone, the PTO issued 2,200 suspensions—amounting to 1,100 years of aggregate delay—on Mr. Hyatt's patent applications.

177.    By issuing suspensions, the PTO prevented Mr. Hyatt's applications from appearing on reports identifying applications requiring attention and excluded them from certain pendency reports.

178.    In other instances, the PTO simply took no action to advance examination of Mr. Hyatt's applications, often delaying for years at a time, without issuing a suspension or an action on the merits.

179.    For example, PTO documents stating that examination of Mr. Hyatt's applications was "on hold" were authored during periods of time when the PTO had no suspensions pending on Mr. Hyatt's applications.

180.    Another way that the PTO implemented its policy of putting examination of Mr. Hyatt's applications on hold was by assigning his applications to SPEs or Group Directors, rather than to patent examiners.

181.    In many instances, the PTO then churned Mr. Hyatt's applications among managerial personnel, to avoid scrutiny of its delay strategy.

182.    SPEs and Group Directors are PTO management officials whose job responsibilities do not include examining patent applications.

183.    No examination of Mr. Hyatt's patent applications occurred when they were assigned to SPEs or group directors.

184.   ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████   At the PTO, a "ceiling" refers to the time limit for personnel to take an action, such as for an examiner to issue an Office Action. Such "ceilings" are used for internal reporting, statistical, performance evaluation, and other purposes.

185.   According to former PTO Deputy Commissioner Joseph Rolla, this practice was referred to as "parking" applications with supervisors.

186.   In fact, unbeknownst to him at the time, Mr. Rolla—a managerial official who did not examine applications himself—was assigned as the examiner for many of Mr. Hyatt's applications.

187.   The PTO did not inform Mr. Hyatt that examination of his applications was "on hold."

188.   The file records of Mr. Hyatt's applications did not and do not indicate that the applications were placed "on hold."

189.   One manifestation of the PTO's policy of putting Mr. Hyatt's applications on hold is its extreme delay in taking any action at all on seven applications that Mr. Hyatt filed in December 2004. A decade after those applications were filed, the PTO had not even issued a first Office Action on any of them. By contrast, according to PTO statistics, other patent applications filed in 2004 received a first Office Action in less than 23 months on average.

190.   There is no other publicly known instance where the PTO failed to issue the *first* Office Action on an application ten years after its filing.

191.   The PTO, as a result of, and in furtherance of its policy of delaying action on Mr. Hyatt's applications, issued almost no Office Actions on the merits between 2003 and 2013 on his applications, preventing their prosecution from advancing.

**3.** 

192.

193.

194.

195.

196.     The final Office Actions that Mr. Werner issued on Mr. Hyatt's applications account for most of the final Office Actions taken on them from 2004 through 2012.

197.     Mr. Werner invited Mr. Hyatt to speak to his class at the PTO Patent Academy. After the class, Mr. Werner told Mr. Hyatt that his efforts to advance his applications were futile because the PTO would not allow his patent applications to issue.

**4.      The PTO Excluded Mr. Hyatt's Applications from Generally Applicable Procedures and Programs To Expedite Prosecution and Then Lied to Him About It**

198.     The PTO excluded Mr. Hyatt's applications from generally applicable procedures, policies, and programs to expedite processing of applications.

199.     The PTO Director may authorize expedited treatment of certain pending applications. 37 C.F.R. § 1.102(a). Under this authority, applications deemed "special" for expedited action and advancement out of turn include those "pending more than 5 years," MPEP § 708.01. The PTO is bound by this rule and must place applications having a "special" status at the top of PTO employees' dockets. *See* MPEP § 1704.

200.   Mr. Hyatt's patent applications were "special" because of the PTO's long delays in examining them, and the PTO was therefore required to examine Mr. Hyatt's applications ahead of other applications.

201.   Notwithstanding its legal obligation, the PTO did not give priority to Mr. Hyatt's patent applications. To the contrary, for a decade, it did essentially nothing to advance prosecution of Mr. Hyatt's applications.

202.   In response, Mr. Hyatt filed over one thousand petitions for action on his applications and numerous requests for status updates from the PTO.

203.   The PTO dismissed (rather than denied) most of Mr. Hyatt's petitions, in an attempt to preclude Mr. Hyatt from obtaining final agency action subject to judicial review. *See* MPEP § 1002.02.

204.   In many of its responses to Mr. Hyatt's petitions, the PTO stated that his applications were already entitled to priority in examination because they were "special" under PTO policy, dismissed the petitions as moot, and promised that the examiner would be told that Mr. Hyatt's applications are "appropriate for expedited action."

205.   After it dismissed approximately 184 of Mr. Hyatt's petitions in this way in or around 2005, the PTO did not expedite action on Mr. Hyatt's applications and did not forward them to examiners for years. Instead, it continued to do nothing and then formalized its inaction by suspending prosecution. This willful misrepresentation was systematic across all these 184 petition decisions, which were mostly decided by Kenneth Wieder and Leo Boudreau.

206.   In this way, the PTO misrepresented that Mr. Hyatt was already obtaining relief—expedited processing of his applications—when in fact the PTO was actually implementing a policy of refusing to act on his applications.

207.   In 2011, the PTO established an initiative called "working the tail off the dragon," and then renamed "Clearing the Oldest Patent Applications" ("COPA"), to

prioritize examination of applications awaiting first action for more than one year and three quarters.

208.    At that time, seven of the applications in Mr. Hyatt's "900 Series" filed in December 2004 had been pending for more than 6 years without a first Office Action, such that they should have been subject to COPA.

209.    The PTO excluded those applications from COPA and did not issue a first Office Action on the 900 Series applications for a decade. Moreover, the PTO excluded these applications from COPA reports, thereby concealing its inaction.

210.    The PTO also excluded Mr. Hyatt from generally applicable policies so as to prejudice him and compel him to pay additional fees.

211.    For example, after Mr. Hyatt responded to burdensome Rule 105 Requirements for Information issued in 2006 in approximately 30 of Mr. Hyatt's applications, the PTO stated that Mr. Hyatt's responses were not *bona fide*, requiring him to respond to supplemental Requirements and to pay large fees for extensions of time in order to do so. Mr. Hyatt called the responsible examiner to explain that he had put considerable time and resources into the initial responses, that he believed those responses to be *bona fide*, and that denying him additional time (without the need to pay an extension fee) to respond to the supplemental Requirements was unwarranted. The examiner stated that he agreed that Mr. Hyatt's initial responses were *bona fide* and explained that his SPE required him to state the opposite, to issue supplemental Requirements, and not to afford Mr. Hyatt additional time to respond to them.

### 5.    The PTO Reported Mr. Hyatt's Application Files as "Lost" To Delay Their Examination

212.    The file histories of Mr. Hyatt's applications were repeatedly reported "lost" by the PTO in circumstances that indicate a purpose of delaying their examination.

213.    The PTO has reported "lost" more than 50 of Mr. Hyatt's patent application file histories at least once, amounting to more than 10 percent of his applications that were pending.

214.    The PTO "lost" and "found" individual file histories as many as 11 times for a single application, and some were "lost" several times in a single year.

215.    The PTO continued to report Mr. Hyatt's file histories as "lost" even after they were scanned into electronic files and tracked by computer.

216.    According to PTO records, the PTO has reported that a Hyatt application was "lost," in whole or in part, more than 200 times. That includes two applications which have been reported "lost" more than 20 times in total during the more than 45 years that they have been pending before the PTO.

217.    According to the Department of Commerce Inspector General, "the loss of two applications submitted by the same individual is troublesome."

218.    The Inspector General found that the file histories of less than 0.3 percent of all pending applications have been lost. By contrast, Mr. Hyatt's file histories were reported "lost" at more than thirty times that rate.

219.    According to Jessica Harrison, who worked in the Office of the Commissioner for Patents, examiners were told how to temporarily lose an application so as to extend the time to generate an Office Action.

220.    The unusually high percentage of Mr. Hyatt's applications reported as "lost" by the PTO, and the frequency of such reports, indicate that some or all of these reports were intended to delay examination of those applications.

### 6.    The PTO Simply Ignores Two Applications that Have Been Pending Now for over 45 Years

221.    The PTO's intention to wait out Mr. Hyatt is demonstrated by its treatment of two applications—No. 05/134,958 and No. 05/135,040—that he filed in 1971, more than 45 years ago, and that remain pending before the agency.

34

222.    The PTO's online "Transaction History" for these applications indicates that they were both docketed to Examiner Bentsu Ro in Group Art Unit 2837 on April 23, 2007.

223.    The PTO did not notify Mr. Hyatt of these assignments.

224.    The PTO has not generated an Office Action on the merits for either of these two applications in more than 25 years.

225.    The PTO's "Transaction History" states that the '958 application has been reported "lost" 11 times and that the '040 application has been reported "lost" 10 times. Each time, the applications were subsequently "found."

226.    The PTO issued a Notice of Abandonment in 2003 stating that Mr. Hyatt had failed to respond to a October 1989 letter from PTO, but neither Mr. Hyatt's records nor the PTO's have any record of such a letter. Instead, both sets of records show that Mr. Hyatt timely responded to a November 1989 final Office Action by filing a Notice of Appeal in April 1990 and then an Appeal Brief in October 1990.

227.    Twenty-seven years later, Mr. Hyatt is still waiting for the PTO to file an Examiner's Answer in response to his Appeal Brief.

G.    **The PTO Assigns Mr. Hyatt's Applications to a Special "Hyatt Unit" Charged with Rejecting Them, Abandoning Them, and Preventing Them from Ever Issuing as Patents**

228.    Since October 2012, Mr. Hyatt's patent applications have been assigned to "Art Unit 2615," initially called the "Bulk Filers" Unit and now known as the "Hyatt Unit."



229.

230.



231.    In or around 2014, Mr. Hyatt contacted the head of the Hyatt Unit, Gregory Morse, by telephone with a question and spoke with him for the first time. Mr. Morse responded aggressively, stating that Mr. Morse knew all about Mr. Hyatt, that Mr. Hyatt had beaten the PTO in the Supreme Court and the Federal Circuit, but that now the PTO would "deal with" Mr. Hyatt. Mr. Hyatt was alarmed by Mr. Morse's stern tone and message.

232.    Since the founding of the Hyatt Unit, its examiners have not allowed a single claim in any of Mr. Hyatt's roughly 400 pending applications.

233.    That is consistent with Mr. Morse's written and oral guidance to Hyatt Unit examiners, none of which addresses the allowance of claims in Mr. Hyatt's applications, only their rejection and abandonment.

234.    

235.    As reflected in an October 2, 2017 Office Action by Hyatt Unit Examiner Walter Briney III in application No. 08/472,031, the PTO has adopted Hyatt-specific policies for forcing his applications into abandonment.

236.    Forced abandonment is a serious and severe penalty in which an application ceases pendency therefore cannot mature into issuance. Abandonment terminates an application.

237.    On information and belief, the purpose and mission of the Hyatt Unit is to wait out Mr. Hyatt, abandon his applications, and thereby prevent his patent applications from issuing as patents.

238.    The most senior PTO officials continue to be involved in making decisions and setting policies with respect to Mr. Hyatt's applications. ███████████████████████

████████████████████████████████████████████████████████████████████████████

████

###### 1.    The Hyatt Unit Restarts Prosecution from Scratch After 20 Years by Dumping a "Boatload" of Office Actions on Mr. Hyatt All at Once

239.    The assignment of Mr. Hyatt's applications to a single Art Unit is a departure from the PTO's general policy of assigning patent applications to different Technology Centers and Art Units that specialize in the technologies disclosed in those applications.

240.    Mr. Hyatt's applications are based on 11 separate disclosures, which involve different technologies, and would be assigned to multiple Technology Centers and Art Units were they filed by other applicants.

241.    Indeed, prior to the formation of the Hyatt Unit, Mr. Hyatt's pending patent applications were assigned to approximately 16 Art Units in three Technology Centers in accordance with their respective technologies.

242.    The PTO has represented that this Art Unit was organized to work on pending pre-GATT applications—that is, those filed before the GATT Amendments became effective in 1995. "GATT" refers to the 1994 General Agreement on Trade and Tariffs.

243.    Yet, according to public PTO data, from October 1, 2012, to March 5, 2018, the PTO issued 67 pre-GATT patents examined by other Art Units, but none from the Hyatt Unit.

244.    In addition, the PTO has assigned to the Hyatt Unit post-GATT applications (i.e., those filed after the GATT Amendments became effective) filed by Mr. Hyatt, including the Expired Applications and the 900 Series applications. What the PTO calls the "Hyatt

Unit" is, in fact, an Art Unit focused principally on Mr. Hyatt's applications, not pre-GATT applications generally.

245.    At the time the Hyatt Unit was constituted, the PTO had issued few actions on Mr. Hyatt's patent applications over the preceding decade. Nevertheless, nearly all of Mr. Hyatt's patent applications had been fully examined before the PTO stopped work on them, with more than 80 applications having been appealed to the Appeal Board and briefed by Mr. Hyatt. Rather than pick up where examination had left off, the PTO in 2013 effectively restarted prosecution of Mr. Hyatt's applications, discarding years of examination and other progress, more than one thousand Office Actions, more than 80 Appeal Briefs filed by Mr. Hyatt, and more than approximately 130 Appeal Board decisions. The PTO took this action nearly 20 years after nearly all of these applications had been filed.

246.    This action effectively wiped out all the examination, briefing, Appeal Board decisions, and other progress of the preceding twenty years, giving zero value to all the time, effort, and money that Mr. Hyatt had invested to respond to Office Actions, file Appeal Briefs, and otherwise prosecute his applications.

247.    After a decade of delay, the Hyatt Unit issued what its head, Mr. Morse, characterized as a "boatload" of nearly 400 Office Actions to Mr. Hyatt in a coordinated, several-month campaign in 2013 to swamp him in paperwork.

248.    The quantity of paper related to this "boatload" of Office Actions was sufficiently large that it backed up the PTO's printing facilities.

249.    The purpose of the Hyatt Unit's coordinated effort to swamp Mr. Hyatt in a "boatload" of Office Actions all at once was to prejudice his ability to timely respond in an effective manner.

250.    Despite issuing a "boatload" of Office Actions to Mr. Hyatt in a short period, the Hyatt Unit shortened the statutory response period. As a result, Mr. Hyatt was forced to purchase extensions of time at significant expense so that he could respond to the "boatload" of Office Actions.

251.    After the PTO's decade of delay on his applications, Mr. Hyatt no longer had the assistance of many of his former personnel who were familiar with his applications.

252.    The "boatload" of Office Actions required Mr. Hyatt to review an enormous amount of material and file over 50,000 pages in reply.

253.    ████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

254.    These and other Office Actions required Mr. Hyatt to provide reams of information that duplicated information that Mr. Hyatt had previously provided to the PTO. In particular, the PTO completely disregarded Mr. Hyatt's extensive responses to approximately 30 Rule 105 Requirements for Information that the PTO issued in 2005 and 2006.

255.    The "boatload" Office Actions were nearly or entirely identical across nearly all 400 of Mr. Hyatt's applications regardless of their prosecution status. They included what the PTO designated as Requirements 5(a) and 5(b), purportedly to "allow efficient and effective examination."

256.    Requirement 5(a) required Mr. Hyatt to, *inter alia*, select for restarted examination only a limited subset of his claims across each family of applications, on pain of abandonment for failure to comply.

257.    Neither the Patent Act nor the PTO rules authorize the PTO to set an arbitrary limit to the number of claims that an applicant may present for examination, provided the applicant pays the extra claims fees. Nor does any statutory or regulatory authority permit the PTO to deem multiple applications a "group" or to apply any requirements aggregated across all applications in the "group" that are not grounded on an individual examination of each application.

258.    If the PTO determines that the claims in a particular application are "unduly multiplied," it may *reject* the claims for that reason. 37 C.F.R. § 1.75(b). The applicant can

then respond either by voluntarily cancelling certain claims or by amending the claims so they "differ substantially from each other and are not unduly multiplied." *Id*. Office Actions containing rejections for "undue multiplicity" of claims are appealable to the Appeal Board.

259.    By contrast, the PTO's claim-selection requirement as a purported remedy for "undue multiplicity" of claims, as well as abandonment of any application for failure to comply with it, can be challenged only by filing petitions, which the PTO then delays in deciding, when it decides them at all. The result is to further delay any advancement of Mr. Hyatt's applications and to deny him the ability and the right to have the Appeal Board independently decide whether claims are "unduly multiplied."

260.    In each such application, Mr. Hyatt responded to Requirement 5(a) by selecting under protest only a subset of his claims for repeated examination to meet the arbitrary cap for the number of claims set by the PTO. Mr. Hyatt expended much time and resources to analyze all the claims in each family of applications to determine which claims across each family were to be selected for repeated examination subject to the aggregate number of claims cap.

261.    The PTO uses Requirement 5(a) in bad faith to recycle Mr. Hyatt's applications so that they never advance to final agency action. It does so after it examined all claims in an application without rejecting any of them for undue multiplicity, and then more than a decade later it asserts that the claims are "unduly multiplied" and requires Mr. Hyatt to select claims for repeated examination.

262.    The "boatload" Office Actions also included Requirement 5(b), requiring Mr. Hyatt under Rule 105 to, *inter alia*, identify written description support for each claim within a single 20-page portion of the specification that contains all claim elements and the relationship among them or, where that is not possible, written description support for the interrelationship of the elements within a single five-page portion of the specification.

263.    Contrary to this requirement, the Patent Act requires the PTO to consider the specification as a whole when assessing written description support.

264.    Rule 105(a)(2) limits the domain of such requests to "factual information known to the applicant." Requirement 5(b) demands information that is not merely factual but inherently requires legal analysis, comparing claim terms to text in the specification. Indeed, it demands exactly what MPEP § 704.11 proscribes: "opinions that may be held or would be required to be formulated by applicant."

265.    If the PTO determines that the claims in a particular application lack "clear support or antecedent basis in the description," it may *reject* the claims for that reason. 37 C.F.R. § 1.75(d)(1). Office Actions containing rejections for lack of written description support for claims are appealable to the Appeal Board.

266.    By contrast, the PTO's "boatload" written description Requirement, as well as abandonment of any application for failure to comply with it, can be challenged only by filing petitions, which the PTO then delays in deciding. The result is to further delay advancement of Mr. Hyatt's applications and to deny Mr. Hyatt the ability and right to have the Appeal Board independently decide the issue of written description.

267.    The PTO's "boatload" written description Requirement demonstrates the PTO's bad faith and intention to force the abandonment of Mr. Hyatt's applications because the agency was well aware that those applications' specifications were not drafted to comply with such arbitrary textual proximity requirements and because written description analysis had already been undertaken by an examiner more than a decade earlier when considering rejection of the claims for lack of written description support.

268.    After requiring Mr. Hyatt to respond to a "boatload" of Office Actions in a short period of time, the Hyatt Unit delayed years before taking action on his responses and, in some cases, has failed to respond to this day. As one PTO official put it, PTO statistics on Mr. Hyatt's applications showed that the "applicant responded, and the examiners let the cases sit."

269.    Requirements 5(a) and 5(b) were imposed more than a decade after examiner rejections were made and the underlying issues of undue multiplicity and written description

could have been raised or had been raised. As such, the Requirements contravene the PTO rule requiring that all examiner actions must be "complete as to all matters," 37 C.F.R. § 1.104(b).

270. For example, in Mr. Hyatt's application No. 08/471,695, the PTO issued a detailed 160-page final Office Action on February 2, 2005, rejecting all the claims. Mr. Hyatt appealed and filed on February 1, 2006, a detailed 492-page Appeal Brief addressing all rejections. The PTO sat on this appeal for more than 7 years, never provided an Examiner's Answer, and never forwarded the appeal to the Appeal Board despite several petitions from Mr. Hyatt imploring it to do so. Instead, the PTO reopened prosecution and issued the Requirements for this case on October 24, 2013. Mr. Hyatt responded with the requested material on March 24, 2014. To this day—four years later—the PTO has yet to act on this application.

271. The PTO similarly "let the cases sit" after forcing Mr. Hyatt to rush to respond to numerous, voluminous Office Actions in a number of applications, including the following applications for which Mr. Hyatt has been waiting for a PTO response for about 4 years: Nos. 07/774,159, 08/599,450, 08/464,085, 08/471,138, 08/470,084, 08/471,587, 08/470,882, 08/463,583, 08/465,198, 08/469,077, and 08/469,407.

### 2. The Hyatt Unit's Leader Instructs Examiners To Reject and Abandon Mr. Hyatt's Applications Without Regard to Their Merit

272. The head of the Hyatt Unit, Mr. Morse, issued "guidance" to the Unit's examiners that consisted entirely of guidance on how to reject or object to Mr. Hyatt's patent applications.

273. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████

274. ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████

275.   ███████████████████████████████████████

██████████████████████████████████████████████

███████████████   Unlike PTO regulations and MPEP provisions, these policies and instructions were not disclosed to the public, and they were not disclosed to Mr. Hyatt, ████

█████████████████████████████████

276.   The Hyatt-specific policies adopted by the Hyatt Unit were, in multiple instances, contrary to the MPEP.

277.   Mr. Morse testified that he could not recall a single instance when he issued any guidance, written or otherwise, to Hyatt Unit examiners on finding allowable subject matter in Mr. Hyatt's patent claims.

278.   ███████████████████████████████████████

███████████████████████████

279.   ███████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

280.   ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

281.   After Mr. Hyatt was required to select for repeated examination only a limited subset of claims per family of applications, under penalty of abandonment of his applications,

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

282.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

283.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

284.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

285.   ████████████████████████████████████████

██████████████████████████████████

286.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

287.     █████████████████████████████████████████████████

████████████████████████████████████████████████

288.     Official PTO policy is for examiners to work with applicants to identify allowable subject matter. MPEP § 707.07(d) ( "The examiner…should suggest any way in which he or she considers that rejected claims may be amended to make them allowable."); MPEP § 707.07(j)(II) ("The examiner's action should be constructive in nature….").

289.     But Hyatt Unit examiners have not worked with Mr. Hyatt at all and certainly not to identify allowable subject matter.

290.     To the contrary, the Hyatt Unit penalizes Mr. Hyatt for following its instructions.

291.     For example, the Hyatt Unit demanded that Mr. Hyatt reduce any "overlap" and improve the "demarcation" between claims in different applications, but then penalized him for making amendments to do so by abandoning and rejecting his applications.

292.     Likewise, the Hyatt Unit arbitrarily required Mr. Hyatt to select only a limited subset of his claims in each family of applications for repeated examination, but then abandoned and rejected applications after he canceled some claims and added others to improve "demarcation" while keeping within the arbitrary claim limit.

293.     Hyatt Unit examiners would not identify as allowable subject matter in Mr. Hyatt's applications subject matter that would otherwise be allowable for applicants other than Mr. Hyatt.

294.     The PTO will not issue to Mr. Hyatt any patents based on subject matter in his applications that satisfies the statutory criteria for patentability.

295.     Mr. Hyatt has no possibility of receiving timely, fair, and impartial consideration of his applications from the Hyatt Unit.

### 3. Hyatt Unit Examiners Are Paid To Reject and Abandon Mr. Hyatt's Applications

296. ███ █████ ████████████ ███ █ █ ███████
█████████████████████████████████████████
███████

297. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

298. Unlike examiners in other Art Units, ████████████
████████████████████████████████████████
██████████████████

299. In general, the performance of PTO examiners is assessed through a Performance Appraisal Plan ("PAP") that requires examiners, *inter alia*, (1) to achieve specified "Production" goals on applications and (2) to act on applicants' submissions and amendments within a certain time, on average, subject to a ceiling for individual applications known as Docket Management ("DM"). In this way, the PTO holds examiners accountable for advancing prosecution and to determine eligibility for promotions and bonuses.

300. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

301. ████████████████████████████████████
████████████████████████████████████████
█████████████

302. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ because the purpose of the Hyatt Unit is not to advance

prosecution of Mr. Hyatt's applications, but to ensure that they do not issue as patents.

303. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

304. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████

305. ███████████████████████████████████████

████████████████████████

306. ███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

307. ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

308. ███████████████████████████████████████

███████████████████████████████

309. Mr. Hyatt's applications were removed from generally applicable performance

requirements ███████████████████████████████████████

███████████████████████████████████████████████████████

██████

310.   This decision to waive performance requirements was made despite PTO officials acknowledging that what had occurred with these applications was that the "applicant responded, and the examiners let the cases sit."

311.   Removing applications from performance requirements eliminates incentives for PTO personnel to timely act on and advance those applications.

312.   Removing applications from performance requirements causes those applications to be excluded from PTO reports identifying applications requiring attention and from statistics or reports relied upon by the IG and Government Accountability Office for audits and investigations.

313.   █████████████████████████████████████████████

███████████████████████████████████

314.   At other times, PTO officials joked that Mr. Hyatt's applications were "parked"

████████████████████████

315.   The PTO also excluded Mr. Hyatt's applications from generally applicable performance requirements in the past. Former PTO Patent Program Administrator Howard Goldberg stated that senior PTO management regularly told PTO management to ignore the delays with Mr. Hyatt's applications because delays with Mr. Hyatt's applications would not count against them.

**4.    Hyatt Unit Leadership Instructs Examiners To Penalize Minutiae Like Typos and Erect Frivolous and Vexatious Barriers to the Prosecution of His Applications**

316.   Hyatt Unit examiners regularly deny Mr. Hyatt's routine requests, which would be granted to other applicants as a matter of course.

317.   The Hyatt Unit head, Mr. Morse, instructed Hyatt Unit examiners ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████

318.    Mr. Morse also instructed Hyatt Unit examiners ████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

319.    PTO rules and policy permit and encourage examiners to make corrections "in the interest of expediting prosecution and reducing cycle time." MPEP § 714(II)(E).

320.    Under these rules, examiners routinely make corrections, such as to typographical errors, for applicants other than Mr. Hyatt.

321.    Hyatt Unit examiners refuse entry of Mr. Hyatt's amendments cancelling claims, which would simplify appeals, forcing him to file formal petitions just to cancel claims.

322.    The PTO sits on these petitions and has yet to render a single decision on them.

323.    The PTO refuses to permit Mr. Hyatt to cancel claims even though it has issued Office Actions containing undue multiplicity rejections in almost all of Mr. Hyatt's applications based, in large part, on the number of claims in and across those applications. In other words, the PTO asserts that Mr. Hyatt has too many claims as a basis for rejection, but then refuses to permit him to cancel claims.

324.    Examiners routinely permit applicants other than Mr. Hyatt to cancel claims, without the need for a petition.

325.    As a result, Mr. Hyatt has to petition to cancel claims, but the PTO sits on his petitions without deciding them. The PTO uses its delay on Mr. Hyatt's petitions to justify its refusal to file Examiner's Answers in Mr. Hyatt's administrative appeals to the Appeal Board—a variation on the technique that the PTO used during the 2000s to block Mr. Hyatt from pursuing approximately 80 administrative appeals.

326.   Likewise, the PTO refuses to permit Mr. Hyatt to amend his applications to account for changes in governing case law and PTO rules and procedures over the decade or more that it delayed acting on them.

327.   Instead, the PTO cites his attempts at amendment as grounds for abandonment.

328.   Likewise, Mr. Hyatt's routine requests are denied as a matter of policy. For example, in a telephone conference with Mr. Hyatt, a Hyatt Unit examiner stated that Mr. Hyatt's request for the examiner to withdraw the finality of an Office Action was reasonable because it contained a new ground of rejection and that it would be granted after the examiner cleared it with his supervisor, Mr. Morse. The examiner told Mr. Hyatt that he would call Mr. Hyatt to confirm as much that afternoon. But, after apparently discussing the request with Mr. Morse, the examiner abstained from further response to Mr. Hyatt, refusing even to respond to Mr. Hyatt's voicemail inquiries. Later, Mr. Hyatt received a correspondence in the mail denying his request.

329.   Another example of the PTO's vexatious barriers to Mr. Hyatt's prosecution of his patent applications is a standard component of the "boatload" of Office Actions referred to as "Requirement 5(b)." Without any legal basis, that Requirement arbitrarily requires Mr. Hyatt to identify written description support for his claims while limiting the portions of the specification that he is allowed to cite as support, even though the law requires the PTO to consider the specification as a whole. In particular, Requirement 5(b) states, "Should the elements of the claim (and the claimed relationship between the elements) not appear in the same limited (i.e., less than 20 consecutive pages) portion of the specification in question, each claim element and relationship between the elements must be identified individually, ideally by no more than five pages of the specification."

330.   As PTO was well aware when issuing Requirement 5(b), Mr. Hyatt's specifications were drafted decades ago without its arbitrary textual proximity limitation in mind.

331.    Moreover, Requirement 5(b) addresses written description support, an issue that would otherwise be subject to rejection, appeal to the Appeal Board, and then judicial review. By incorporating written description support into Requirement 5(b), the PTO is able to enter objections on the same basis, force the abandonment of his applications, and delay or deprive Mr. Hyatt of his statutory right to Appeal Board review of that issue independently. Instead, Mr. Hyatt must proceed through the PTO's petition process, which results in long delays and is administered by interested PTO personnel.

332.    For several years, the PTO denied Mr. Hyatt access to its "Private PAIR" computer system, which allows applicants to access the file histories of their applications, even though access to that system is generally available to individual inventors and even though Mr. Hyatt followed the PTO's procedures to obtain access to it. The PTO asserted that he was not allowed access because many of his applications were subject to "Powers of Attorney" designations, but it rejected Mr. Hyatt's attempts to revoke them. The PTO afforded Mr. Hyatt access to Private PAIR only after one of Mr. Hyatt's attorneys threatened to raise the issue in his litigation with the agency.

333.    ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

334.    These and other Hyatt-specific policies have severely prejudiced the prosecution of Mr. Hyatt's patent applications, causing delay, burdening Mr. Hyatt, and imposing costs on him.

### 5.    The Hyatt Unit Piles on Unlawful Objections To Overload Mr. Hyatt, Abandon His Applications, and Ultimately Prevent Their Issuance

335.    The Hyatt Unit singles out Mr. Hyatt's applications for vexatious rejections and objections on essentially every imaginable ground so as to delay or prevent their issuance,

including rejections and objections on novel grounds contrived specifically for Mr. Hyatt's applications.

336.   Mr. Morse specifically instructed Hyatt Unit examiners ████████████ ████████████████████████████████

337.   From 1971 to 1995, rejections in Mr. Hyatt's applications contained Section 101, lack of novelty, obviousness, and non-statutory double patenting rejections, and found allowable subject matter, at about the same rates as for other applicants. For example, during that period, approximately 10 percent of rejections in Mr. Hyatt's applications contained non-statutory double patenting rejections, which is comparable to the rate for non-Hyatt applications, based on PTO data.

338.   Since the Hyatt Unit started rejecting Mr. Hyatt's applications in 2013, Office Actions in Mr. Hyatt's applications have not identified any allowable subject matter.

339.   Since the Hyatt Unit started rejecting Mr. Hyatt's applications in 2013, Office Actions containing rejections in Mr. Hyatt's applications have contained objections, Section 101 rejections, lack of novelty rejections, obviousness rejections, and non-statutory double patenting rejections at rates that far exceed those for other applicants. For example, while only approximately a third of pre-1995 Hyatt Office Action rejections and 27 percent of other applicants' Office Action rejections also contain objections, approximately 95 percent of such Office Actions in Mr. Hyatt's applications since 2013 contain objections.

340.   The Hyatt Unit has a practice of entering objections on Mr. Hyatt's applications on the same issues it enters rejections, which then requires Mr. Hyatt to overcome the objections through a petitioning process, in addition to overcoming the rejections by appealing to the Appeal Board.

341.   This practice is contrary to PTO policy that disfavors filing petitions when there are outstanding rejections on the same issues.

342.   As a result of the PTO issuing Office Actions containing objections and rejections on similar or identical grounds, Mr. Hyatt is forced to waste his time and resources

to petition to have objections withdrawn and also to appeal to overcome rejections entered on the same basis.

343.   Specific examples of this practice include the PTO's issuance of more than 460 Office Actions containing an objection to the specification contending that the specification fails to provide proper antecedent basis for the claimed subject matter. The Office Actions improperly cite 37 CFR § 1.75(d)(1) as authority for these objections.

344.   37 CFR § 1.75(d)(1) imposes requirements only on the *claims* in an application, not on the *specification*. The examiner may reject the claims for lack of support in the specification, but a parallel objection to the specification has no basis in law and serves no purpose other than to burden the applicant.

345.   For applications other than those filed by Mr. Hyatt, the PTO addresses lack of support in a specification for claimed subject matter by rejecting the claims for written description, which permits the applicant to appeal the rejection to the Appeal Board.

346.   Hyatt Unit examiners, by contrast, enter parallel objections and rejections for alleged lack of written description support, with the objections cross-referencing the rejections.

347.   Moreover, in many instances, the PTO's objections concern specifications and figures that are the same as in patents that were previously issued to Mr. Hyatt before the PTO turned against him in the mid-1990s. The PTO did not object to these same specifications and figures in its examination of those applications before issuing them as patents.

348.   The PTO's objections to the figures threaten abandonment of Mr. Hyatt's applications if he does not make substantive amendments to the figures, effectively depriving him of his ability and right to appeal rejections entered on the same basis to the Appeal Board.

349.   Another specific example is the PTO's issuance of more than 900 Office Actions containing objections to drawings and contending that the drawings do not show every feature of the invention specified in the claims. These Office Actions generally assert

that corrected drawing sheets "are required in reply to the Office action" on pain of abandonment of the application and that the "objection to the drawings will not be held in abeyance."

350.  At the time Mr. Hyatt filed his applications, drawing corrections were deferrable until claim allowance.

351.  In a January 13, 2003 decision on a petition by Mr. Hyatt, the PTO recognized that a 2000 rule amendment permitting abandonment based on an applicant's failure to respond to an objection to drawings does not apply to applications that were filed before that rule became effective on November 29, 2000, and that such applications "can not be held abandoned for failure to comply with the [drawing] requirement."

352.  Contrary to the 2003 petition decision, Mr. Morse expressly instructed Hyatt Unit examiners to enforce the 2000 rule against Mr. Hyatt in his pre-2000 patent applications.

353.  Such enforcement is unlawful.

354.  Mr. Hyatt has now spent years challenging the enforcement of a rule that the PTO has recognized for years does not apply to his pending applications.

355.  Another specific example of sham objections is the PTO's issuance of Office Actions in approximately 22 of Mr. Hyatt's applications that object to abstracts of the disclosures on the basis that they exceed an arbitrary length recommended in the MPEP.

356.  For example, in application No. 08/434,424, the PTO's Office Action of May 9, 2013 states: "The abstract of the disclosure is objected to because it is not concise and exceeds 150 words in length (applicant's abstract is 177 words in length). Correction is required. *See* MPEP § 608.01(b)."

357.  The MPEP states that it does not have the force of law, and it is not binding on patent applicants.

358.  No PTO rule imposes a word-length limitation on abstracts, and, in any event, the recommendation in MPEP § 608.01(b) (6th ed. Jan. 1995) at the time Mr. Hyatt filed these applications specified that abstracts should be between 50 to 250 words. Mr. Hyatt's abstracts

range from 75 to 252 words apiece—with the abstracts of only one family of applications exceeding 250 words, by just two words—which was consistent with standard and accepted practice at the time of his applications' filing.

359.    In effect, the Hyatt Unit concocted a new "rule" limiting the length of abstracts and then acted to enforce retroactively this made-up rule against Mr. Hyatt.

360.    Similarly, the Hyatt Unit has a practice of entering objections to the labeling of blocks or cables in figures and to trademark notations in the written description that have no bearing on the subject matter claimed in the application and that were not the subject of objections during the extensive prior prosecution of Mr. Hyatt's applications in the years shortly after they were filed.

361.    Requesting reconsideration of an objection and then petitioning for relief typically takes years, forcing Mr. Hyatt to waste time and resources.

362.    On information and belief, the Hyatt Unit generated the extensive spurious objections and rejections to unduly delay and withhold final agency action on Mr. Hyatt's patent applications.

363.    On information and belief, the Hyatt Unit generated the extensive spurious objections and rejections to force Mr. Hyatt to extensively amend the specification and the drawings, which could create prosecution estoppels that reduce Mr. Hyatt's incentive to continue prosecuting his patent applications.

> **6.    The PTO Unduly Delays Deciding Mr. Hyatt's Petitions, After Forcing Him To Petition for Relief from Spurious Objections, Improper Abandonments, and Bad Faith Requirements**

364.    Mr. Hyatt has petitioned to challenge many of the PTO's unlawful objections and adverse decisions, but the PTO has delayed deciding Mr. Hyatt's petitions for long periods of times—years in most cases, with many long-pending petitions still undecided.

365.    For example, the PTO abandoned application No. 08/428,737 on the improper basis that Mr. Hyatt exceeded the claim number limit set by a PTO Requirement, when it in

fact did not. On December 6, 2016, Mr. Hyatt petitioned under 37 C.F.R. § 1.181(a) to correct the PTO's error and withdraw the holding of abandonment. More than 510 days later, the PTO has rendered no decision on this petition even though the average time to decide such petitions for other applicants is 160 days, according to PTO statistics, and even though Mr. Hyatt's applications are "special" and therefore entitled to priority over other applications.

366.    Another example is in application Nos. 08/459,152, 08/469,592, and 08/471,042, in which Mr. Hyatt cancelled certain claims at the time he filed administrative appeals in each case to simplify the issues on appeal. The PTO refused to enter the amendments cancelling the claims and then refused to consider Mr. Hyatt's Appeal Briefs because they do not address those cancelled claims. On December 16, 2016, Mr. Hyatt filed petitions under 37 C.F.R. § 1.181(a) in each application to enter the amendments cancelling the claims. More than 500 days later, the PTO has rendered no decision on these petitions, even though the average time to decide such petitions for other applicants is about 120 days, according to PTO statistics.

367.    The PTO has used Mr. Hyatt's outstanding petitions to cancel claims as an excuse to delay issuing Examiner's Answers and thereby delay Mr. Hyatt's appeals to the Appeal Board, and to prevent him from obtaining independent Appeal Board review of his applications and final agency action subject to judicial review on his entitlement to issuance of patents.

368.    Mr. Morse testified that the PTO is treating Mr. Hyatt's applications differently than those of other applicants because of the PTO's expectation that Mr. Hyatt will bring Section 145 actions in district court to challenge Appeal Board decisions upholding rejections of his claims.

369.    On information and belief, PTO officials and Hyatt Unit personnel are responsible for the undue delays and denial of timely action in the processing of Mr. Hyatt's petitions.

370. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ As a result, Mr. Hyatt is

unable to obtain independent supervision of Hyatt Unit actions. In effect, the Hyatt Unit is

supervising itself.

### H.    The PTO Attempts To Punish Mr. Hyatt For Its Own Delays And Reaffirms That It Intends To Reject All of His Applications

371.    In September 2016, the PTO adopted a new strategy to blame Mr. Hyatt for its

own inaction by asserting the affirmative defense of prosecution laches based on its claims

about Mr. Hyatt's prosecution conduct across all of his pending patent applications. Although

the PTO raised this affirmative defense in the context of four Section 145 appeals that Mr.

Hyatt had brought to contest claim rejections upheld by the Appeal Board, it did not focus its

defense on those four applications, instead seeking to obtain a judicial declaration that what

it called Mr. Hyatt's "pattern of delay in prosecuting his nearly 400 patent applications from

1969 through the present day" amounted to prosecution laches. In this way, the PTO sought

to obtain a basis to prevent issuance of all of Mr. Hyatt's pending applications.

372.    The PTO raised its prosecution laches defense after its motions for summary

judgment were denied in part. The PTO informed the Court that, no matter what the Court

decided, "if these cases are ever remanded to the USPTO, the USPTO will reject these

applications for prosecution laches." To prevent any misunderstanding, it also stated, "the

USPTO would reject these applications for prosecution laches if these applications were

currently pending at the USPTO, and will do so if this Court remands these cases to the

USPTO for further processing."

373.    The PTO's prosecution laches defense sought to penalize Mr. Hyatt for actions

that he took at the behest or guidance of PTO employees and officials, including those

designated to provide guidance to applicants. Jessica Harrison, who was formerly on detail

with the PTO's Office of the Commissioner for Patents tasked with addressing patent applicants' inquiries, gave Mr. Hyatt much of the guidance that subsequently formed the basis for the PTO's assertion of prosecution laches.

374.    The PTO's prosecution laches defense sought to penalize Mr. Hyatt for the decade that the PTO stopped nearly all work on Mr. Hyatt's applications.

375.    The PTO argued that Mr. Hyatt's applications were "impossible" to examine, even though nearly all of them had been examined (many to the point of final action and administrative appeal) before the PTO slowed and then stopped work on them in the early 2000s.

376.    The PTO's briefing stated that it intended to reject "all of his [Mr. Hyatt's] pending applications at the USPTO."

377.    A PTO Solicitor stated to the Court that, after *Kappos v. Hyatt*, 566 U.S. 431 (2012), was decided, the PTO decided that it "had no choice" but to reject Mr. Hyatt's applications, rather than perform a "complete examination" of those applications.

378.    A PTO Solicitor stated to the Court that the PTO's objective was to "stop" further prosecution of Mr. Hyatt's applications.

379.    A PTO Solicitor stated to the Court that Mr. Hyatt should "let…go" of his claims but did not do so because "[a]ll these little claims are like his little children."

380.    The PTO's briefing described Mr. Hyatt's pending patent applications as "throwing plates of spaghetti at the wall to see what would stick."

381.    The PTO's briefing stated that it was "[n]ot surprising[]" that "Hyatt has been identified by commentators as a 'submarine' patent applicant…."

382.    The PTO's briefing characterized Mr. Hyatt's responses to Hyatt Unit Office Actions as "unhelpful and obfuscatory."

383.    The PTO's briefing characterized Mr. Hyatt's prosecution of his patent applications as "abusive conduct."

384.     In response to the PTO's affirmative defense, Mr. Hyatt sought to prove that the PTO had treated him in bad faith, such that it had unclean hands and was not entitled to equitable relief.

385.     The Court permitted limited discovery, which Mr. Hyatt sought to use to obtain evidence of the PTO's bad faith in its treatment of him and handling of his applications.

386.     In support of its argument to prevent Mr. Hyatt from introducing in court evidence of the PTO's bad faith in the examination of his applications from 2003 to 2013, the PTO conceded that Mr. Hyatt should not be held responsible for delays in examining his applications during that period.

387.     The PTO ultimately took the position that the agency would prefer that the district court reject its prosecution laches defense at the close of its case rather than permit Mr. Hyatt to put on his case of the PTO's bad-faith conduct before the district court at trial.

388.     The district court rejected the PTO's prosecution laches affirmative defense at the close of the PTO's affirmative case, before Mr. Hyatt could put on his case and evidence on the PTO's bad faith.

389.     The PTO stated that it would respond to any decision by the district court in Mr. Hyatt's favor finding that he is entitled to the issuance of patents, which would place four of his applications in a position for allowance and issuance, by reopening prosecution rather than issuing patents to him.

390.     The PTO identified no defect with those applications that it had not already identified nor shortcoming in their examinations that would constitute new grounds for rejection justifying reopening prosecution.

391.     Despite conceding that Mr. Hyatt was not responsible for significant delay, and despite the district court's rejection of its prosecution laches defense, the PTO has continued to make prosecution laches rejections in Mr. Hyatt's patent applications.

392.    The PTO has issued Office Actions containing prosecution laches rejections in more than 180 of Mr. Hyatt's applications and intends to enter prosecution laches rejections in all of Mr. Hyatt's applications.

393.    The PTO has prejudged Mr. Hyatt's patent applications. It intends to abandon or reject them all.

## II.    Legal Background on the Patent Act and Patent Term Adjustment

394.    The PTO has a nondiscretionary duty to examine patent applications and to issue patents on applications that present patentable claims. 35 U.S.C. § 131.

395.    Likewise, an applicant who satisfies the conditions for patentability "shall be entitled to a patent." 35 U.S.C. § 102(a).

396.    To implement the 1994 General Agreement on Trade and Tariffs ("GATT"), Congress amended the patent laws governing patent terms.

397.    Before that amendment became effective, the term of a patent was 17 years from the date the patent was issued by the PTO.

398.    The patent term for a patent issued from an application filed after the GATT amendment came into force is 20 years from the effective filing date of the patent application. *See* 35 U.S.C. § 154(a)(2).

399.    Thus, before the GATT amendment came into effect, it was impossible for the PTO to deprive a patent applicant of all his application's value by running out the term of a patent on any patentable claims through agency delay. The inventor received a 17-year patent term from the date that the patent was issued, and the term was therefore not affected by PTO delay.

400.    But after the GATT amendment became effective, the patent term ran from the date of filing, so that agency delay reduced the patent term.

401.    Thus, the GATT amendment had the unintended effect (until Congress enacted further amendments in 2000) of permitting the PTO to deprive a patent applicant of all term

through agency delay, because delay during the pendency of an application could cause the entirety of the patent term to run out, such that there would be no term left at all if the application were to be issued as a patent. Such a patent could never be enforced and so would be worthless.

402.    One post-GATT provision, then codified at 35 U.S.C. § 154(b) ("Former § 154(b)"), allowed for term adjustment based on delays caused by interference actions, secrecy orders, and appellate review. But that provision did not allow term adjustments for other kinds of delay in proceedings before the PTO.

403.    Subsequently, Congress closed that loophole by enacting the current version of 35 U.S.C. § 154(b) (2012) ("Current § 154(b)"), which generally provides for blanket "adjustment" of a patent term by one day for each day of PTO delay after an application has been pending before the PTO for more than three years.

404.    Although not applicable to most of Mr. Hyatt's applications, Congress later recognized the adverse effects of post-GATT PTO delays on applicants and provided protection even from specific PTO delays during all phases of prosecution, compensating applicants day per day for PTO delay in action exceeding 14 months from filing to issuing first action, 35 U.S.C. § 154(b)(1)(A)(i), and in action exceeding 4 months from the date an examiner receives an applicant's reply or an applicant's Appeal Brief, *id.* § 154(b)(1)(A)(ii), or from the decision in an administrative appeal, *id.* § 154(b)(1)(A)(iii).

405.    But any patent application that was filed between June 8, 1995, and May 28, 2000, remains subject to Former § 154(b), and cannot take advantage of the term adjustments provided by Current § 154(b).

406.    As a result, PTO-caused delay on an application filed between June 8, 1995, and May 28, 2000, can cause the deprivation of all patent term, without any possibility of term adjustment, thereby rendering the application, its claims, and any patent to which the applicant may be entitled completely worthless.

III.    **Mr. Hyatt Files and Diligently Prosecutes the '263, '450, and '669 Applications**

A.    **The '263 Application**

407.    On May 31, 1995, Mr. Hyatt filed patent application No. 08/456,263.

408.    The '263 Application includes claims directed to a duty cycle modulated illumination control system.

409.    The '263 Application contains claims directed to a novel invention.

410.    The '263 Application contains claims directed to an invention that was non-obvious to skilled artisans at the time the invention was made.

411.    The '263 Application discloses and claims an invention that has utility.

412.    The '263 Application, as of the date of its filing, contained enabling disclosure and sufficient written description to enable a person skilled in the art to make and use the claimed invention without undue experimentation.

413.    Accordingly, the '263 Application satisfied every statutory requirement for a patent to issue on the claims therein. Mr. Hyatt was therefore entitled to allowance and, upon payment of the required fee, issuance.

414.    On May 31, 1995, Mr. Hyatt paid $2,166.00 in application and claims fees with the transmittal of the '263 Application.

415.    Mr. Hyatt transmitted an Information Disclosure Statement to PTO on July 10, 1995, continuing to prosecute the '263 Application.

416.    The PTO issued an Office Action containing non-final rejections of the '263 Application on October 16, 1995.

417.    Mr. Hyatt timely responded to that Office Action containing non-final rejections on April 22, 1996, by traversing the rejections in an amendment and requesting reconsideration of the rejections under 37 C.F.R. § 1.111.

418.    Mr. Hyatt paid $900.00 in additional fees for the consideration of his amended claims by PTO.

419. The PTO issued an Office Action containing final rejections of the '263 Application on July 3, 1996.

420. Mr. Hyatt timely filed a Notice of Appeal on January 9, 1997.

421. Mr. Hyatt paid $1,230.00 in additional fees required at the time he filed his Notice of Appeal.

422. Mr. Hyatt further requested the finality of the rejection be withdrawn under 37 C.F.R. § 1.129(a) and amended his application to cancel claims 1–28, 30–35, 37–51, and 57–68, and to include new claims 69–249 on May 9, 1997.

423. Mr. Hyatt paid $8,600.00 in additional fees for the consideration of his amended claims.

424. Mr. Hyatt submitted supplemental amendments to his claims on January 21, 1998, amending his previous claims and adding claims 250–366.

425. Mr. Hyatt paid $2,738.00 in additional fees for the consideration of his amended claims.

426. In a March 4, 1998 non-final Office Action, the examiner entered a restriction requirement under 37 C.F.R. § 1.142(b) and MPEP § 821.03 to restrict non-elected claims 71–249 and 252–366, and rejected elected claims 29, 36, 52–56, 69, 70, 250, and 251.

427. On March 17, 1998, Mr. Hyatt petitioned for notification for reasons for entering a restriction requirement that was prohibited by 37 C.F.R. § 1.129(b).

428. On March 18, 1998, Mr. Hyatt petitioned for withdrawal of the constructive nonelection of his amended claims pursuant to 37 C.F.R. § 1.129(b).

429. On May 8, 1998, Mr. Hyatt petitioned for reconsideration or withdrawal of the improper restriction requirement under 37 C.F.R. §§ 1.144, 1.181.

430. On August 4, 1998, Mr. Hyatt responded to the non-final Office Action under 37 C.F.R. § 1.111.

431. Mr. Hyatt paid $400.00 in additional fees for the consideration of his response.

432.     On September 5, 1998, the PTO decided the March and May petitions and affirmed the examiner's restriction requirement.

433.     That decision specifically noted the existence of three linking claims—36, 69, and 70—in the group of rejected claims elected for examination and stated that the nonelected restricted claims would have to be rejoined to the original application in the event that one of the linking claims contains allowable subject matter.

434.     Mr. Hyatt petitioned for reconsideration of that decision on October 7, 1998.

435.     Mr. Hyatt submitted supplemental amendments to his claims on October 9, 1998, and added claims 367 and 368 to the '263 Application and paid $604.00 in additional fees for the consideration of his amended claims.

436.     Mr. Hyatt transmitted an Information Disclosure Statement to PTO on February 19, 1999, thereby continuing to prosecute the '263 Application.

437.     On May 25, 1999, the PTO reconsidered the petition decision and the TC Director affirmed his prior decision, including the conclusion on the linking claims.

438.     On June 21, 1999, the PTO issued a final Office Action rejecting claims 29, 36, 52–56, 69, 70, 250, 251, 367, and 368, and making final the decision to restrict claims 71–249 and 252–366.

439.     Mr. Hyatt petitioned the Director of the PTO for review of the TC Director's decision on the withdrawal of the restriction requirement on July 23, 1999.

440.     On December 21, 1999, Mr. Hyatt filed a Notice of Appeal regarding the final rejection of claims 29, 36, 52–56, 69, 70, 250, 251, 367, and 368.

441.     Mr. Hyatt paid $1,170.00 in additional fees for the consideration of his response and appeal.

442.     On May 9, 2000, the Assistant Commissioner responded to Mr. Hyatt's request for review of the TC Director's petition decision on withdrawing the restriction requirement. He dismissed the petition for review noting that if the Appeal Board were to find

64

any of the linking claims to be allowable, withdrawal of the restriction requirement "will necessarily follow" per MPEP § 809.

443.    Mr. Hyatt further amended his claims on June 21, 2000, under 37 C.F.R. § 1.116.

444.    Mr. Hyatt filed an Appeal Brief to the Appeal Board on June 21, 2000, paying an additional $1,660.00 in fees for consideration of his Appeal Brief.

445.    On July 10, 2000, Mr. Hyatt sought a writ of mandamus (the "Mandamus Action") to compel the Director of the PTO to withdraw the restriction requirement and examine all claims of the application in accordance with law. *See generally* Complaint, *Hyatt v. U.S. P.T.O.*, No. CV-s-00-0874-PMP (D. Nev. filed July 10, 2000).

446.    In seeking dismissal of the Mandamus Action, the PTO argued that, "Since [Mr. Hyatt's] appeal to the Board of Patent Appeals and Interferences concerning the rejection decision is presently pending—and could effectively undo the USPTO's restriction decision— the Plaintiff's Complaint is not fit for judicial review." Defs.' Mem. In Supp. Of Defs.' Mot. to Dismiss, *Hyatt v. U.S. P.T.O.*, No. CV-s-00-0874-PMP, at 3–4 (D. Nev. filed Sept. 8, 2000).

447.    The PTO further represented to the Court that resolution of Mr. Hyatt's administrative appeal would lead "promptly" to withdrawal of the restriction requirement and examination of the '263 Application: "if the Board affirms the rejection of the linking claims, then a <u>final</u> petition decision will promptly issue, denying Plaintiff's petition on the restriction requirement. On the other hand, if the Board reverses the rejection of the linking claims, then the restriction requirement will be withdrawn and the examiner will examine the claims in Plaintiff's application that had previously been restricted." *Id.* at 7.

448.    In January 2001, the District of Nevada court dismissed the action as unripe, specifically relying on the PTO's representations: "If the Board of Patent Appeals and Interferences reverses the rejection of Hyatt's 'linking claims' then the restricted claims will be examined in Hyatt's patent application and he will have suffered no cognizable injury with

regard to this particular patent application." Order, *Hyatt v. U.S. P.T.O.*, No. CV-s-00-0874-PMP, at 2 (D. Nev. Jan. 18, 2001).

449.   Mr. Hyatt transmitted an Information Disclosure Statement to PTO on August 17, 2000, for entry in the file of the '263 application.

450.   On January 11, 2001, the examiner furnished an Examiner's Answer in which he withdrew many of his rejections and allowed Claims 53 and 368. Claims 29, 36, 52, 54-56, 69, 70, 250, 251 and 367 remained on appeal.

451.   Mr. Hyatt filed a reply brief with the Appeal Board on March 12, 2001, paying an additional $270.00 in fees for consideration of his reply brief, and a supplemental reply brief on August 29, 2001.

452.   Mr. Hyatt transmitted an Information Disclosure Statement to PTO on September 7, 2001.

453.   On June 24, 2003, the Appeal Board reversed the remaining examiner's rejections on claims 29, 36, 52, 54, 56, 70, 250, 251, and 367, and affirmed rejections for claims 55 and 69. Accordingly, linking claims 36 and 70 were found allowable by the Appeal Board decision.

454.   The Appeal Board affirmed that decision on rehearing on October 14, 2003.

455.   Once linking claims 36 and 70 were found patentable by the Appeal Board, the PTO was required to withdraw the restriction requirement and examine claims 71–249 and 252–366 for patentability under MPEP § 809, as noted by the TC Director and Assistant Commissioner in prior petition rulings on the restriction requirement and as represented by the PTO to a federal district court in litigation.

456.   On July 6, 2004, Mr. Hyatt informed the PTO by letter that he would not seek judicial review of the 2003 Appeal Board decision and requested that the '263 Application "be returned to the examiner for immediate action."

457.    In an April 2006 email, Michael Razavi, the SPE responsible for Mr. Hyatt's applications, informed a PTO quality control official that the '263 Application was "on hold" along with other of Mr. Hyatt's applications that received Appeal Board decisions.

458.    In the fifteen years since the Appeal Board decision, contrary to its representations to the U.S. District Court for the District of Nevada and its own decisions, the PTO has taken no action on the application, let alone "immediate" or "expedited" action. The PTO has not even acted to withdraw the restriction requirement, flouting its promise to the court.

459.    During this period, the '263 Application qualified as "special," because it had been "pending for more than 5 years," and was therefore entitled to expedited action and advancement out of turn. MPEP § 708.01(I).

460.    On April 25, 2007, the PTO examiner issued a 6-month suspension of prosecution of the '263 Application.

461.    On August 28, 2007, Mr. Hyatt petitioned for action on the merits under 37 C.F.R. § 1.181(a)(3), noting that his application is entitled to be treated as "special"—i.e., required to be advanced out of turn for examination—as it had been pending for more than five years.

462.    On December 31, 2008, the PTO examiner issued a second 6-month suspension of prosecution of the '263 Application.

463.    On March 30, 2008, Mr. Hyatt again petitioned for action on the merits under 37 C.F.R. § 1.181(a)(3), again noting the "special" status of his application, entitling it to be advanced out of turn for examination as it had been pending for more than five years.

464.    On September 25, 2009, the PTO examiner issued a third 6-month suspension of prosecution of the '263 Application.

465.    On April 19, 2010, the PTO examiner issued a fourth 6-month suspension of prosecution of the '263 Application.

466.     On September 23, 2011, the PTO examiner issued a fifth 6-month suspension of prosecution of the '263 Application.

467.     On August 31, 2013, the PTO stated in an action on a sister application that the '263 Application was "awaiting action after decision of the [Appeal Board] and has a limited number of pending claims…. An action on that application will be mailed in due course."

468.     Nearly 5 years after this promise for action, the PTO has still not taken any action on this application.

469.     The PTO admitted that the '263 Application was flagged under SAWS.

470.     Mr. Hyatt has paid a total of $19,738.00 in fees for the processing of the '263 Application.

**B.     The '450 Application**

471.     On January 16, 1996, Mr. Hyatt filed patent application No. 08/599,450.

472.     The '450 Application includes claims directed to an imaging system for continuous display of moving three dimensional images.

473.     The '450 Application contains claims directed to patentable subject matter, that is, a new and useful process.

474.     The '450 Application contains claims directed to a novel invention.

475.     The '450 Application contains claims directed to an invention that was non-obvious to skilled artisans at the time the invention was made.

476.     The '450 Application discloses and claims an invention that has utility.

477.     The '450 Application, as of the date of its filing, contained enabling disclosure and sufficient written description to enable a person skilled in the art to make and use the claimed invention without undue experimentation.

478.   Accordingly, the '450 Application satisfied every statutory requirement for a patent to issue on the claims therein. Mr. Hyatt was therefore entitled to allowance and, upon payment of the required fee, issuance.

479.   On January 19, 1996, Mr. Hyatt paid $441.00 in application fees with the transmittal of the '450 Application.

480.   The PTO issued an Office Action containing non-final rejections of the '450 Application on April 7, 1998, and Mr. Hyatt filed a timely response on September 8, 1998, that included amending the claims.

481.   Mr. Hyatt paid $5,939.00 in additional fees for the consideration of his amended claims by the PTO.

482.   The PTO issued an Office Action containing final rejections of the '450 Application on February 11, 1999, and Mr. Hyatt timely filed a Notice of Appeal on August 16, 1999, and requested reconsideration under 37 C.F.R. § 1.116 of the examiner's final rejections.

483.   Mr. Hyatt paid $585.00 in additional fees upon filing his Notice of Appeal.

484.   The PTO responded to Mr. Hyatt's after-final request for reconsideration by an Advisory Action on August 30, 1999, maintaining all rejections.

485.   On February 11, 2000, Mr. Hyatt filed an amendment and paid $5,460.00 in additional fees for so doing.

486.   Mr. Hyatt transmitted two Information Disclosure Statements to the PTO on September 7, 2000 and filed additional Information Disclosure Statements on November 21, 2001, and February 8, 2002.

487.   The PTO issued an Office Action containing non-final rejections on February 26, 2002. This would be the PTO's last action on the merits in the '450 application.

488.   Mr. Hyatt filed four additional Information Disclosure Statements between May and July 2002.

489.     On August 26, 2002, Mr. Hyatt responded to the non-final rejection under 37 C.F.R. § 1.111.

490.     My Hyatt paid an additional $460.00 in fees for consideration of his Response.

491.     Mr. Hyatt submitted 12 Information Disclosure Statements between January 16, 2003, and December 21, 2004.

492.     On November 9, 2004, Mr. Hyatt requested information on the status of his application from the PTO, because no PTO action had been received for a year. The PTO did not respond.

493.     On January 20, 2005, Mr. Hyatt petitioned for action on the merits pursuant 37 C.F.R. § 1.181(a)(3) and requested advancement of his application out of turn because it had a "special" status, as it had been pending for more than five years.

494.     On March 9, 2005, the PTO dismissed that petition as moot, stating that the '450 Application was already considered "special" under PTO policy requiring expedited review of application pending for more than five years, and therefore entitled to expedited review.

495.     Mr. Hyatt filed another Information Disclosure Statement on March 29, 2005, and two more Information Disclosure Statements on July 8, 2005.

496.     On March 28, 2007, Mr. Hyatt again petitioned for action on the merits pursuant to 37 C.F.R. § 1.181(a)(3).

497.     Rather than expedite or even resume examination, the PTO examiner handling the '450 Application issued a first 6-month suspension on May 11, 2007.

498.     On August 28, 2007, Mr. Hyatt again petitioned for action on the merits pursuant to 37 C.F.R. § 1.181(a)(3), noting that the examiner's stated reason for suspension had dissipated.

499.     On March 14, 2008, the PTO examiner issued a second 6-month suspension.

500.     On December 29, 2008, the PTO examiner issued a third 6-month suspension.

501.    On March 30, 2009, Mr. Hyatt again petitioned for action on the merits pursuant to 37 C.F.R. § 1.181(a)(3), and requested a status update.

502.    On September 23, 2009, the PTO examiner issued a fourth 6-month suspension.

503.    On April 15, 2010, the PTO examiner issued a fifth 6-month suspension.

504.    On September 20, 2011, the PTO examiner issued a sixth 6-month suspension.

505.    On October 24, 2013, the PTO examiner issued lengthy and arduous Requirements in the application and shortened the statutory period for a response.

506.    The practical effect of the Requirements was to restart prosecution from the beginning, discarding any and all progress that had been made over the preceding 17 years.

507.    Since issuance of the Requirements, the PTO has taken no action on the merits of the '450 Application.

508.    On November 22, 2013, Mr. Hyatt responded to the Requirements, requesting a correction under MPEP § 710.06. The PTO denied the request on January 14, 2014.

509.    On December 23, 2013, Mr. Hyatt petitioned for supervisory review of the Requirements. The PTO dismissed the petition on January 24, 2014.

510.    On January 24, 2014, Mr. Hyatt responded in full to the Requirements.

511.    On May 12, 2014, Mr. Hyatt petitioned for supervisory review of the January 24, 2014, decision dismissing his petition for review of the October 2013 Requirements. The PTO denied the petition on December 16, 2014.

512.    Since 2015, Mr. Hyatt has continued to update his information so that the PTO can enter a final Office Action on the '450 Application, but has otherwise exhausted any action he may take to further advance prosecution.

513.    Mr. Hyatt has paid a total of $12,885.00 in fees for the processing of the '450 Application.

514.    The '450 Application and its claims had value in an amount to be determined at trial.

C.    The '669 Application

515.    On December 9, 1996, Mr. Hyatt filed patent application No. 08/762,669.

516.    The '669 Application includes claims directed to image processing architecture.

517.    The '669 Application contains claims directed to patentable subject matter, that is, a new and useful incremental image processing system.

518.    The '669 Application contains claims directed to a novel invention.

519.    The '669 Application contains claims directed to an invention that was non-obvious to skilled artisans at the time the invention was made.

520.    The '669 Application discloses and claims an invention that has utility.

521.    The '669 Application contains claims that were not previously disclosed to the public.

522.    The '669 Application, as of the date of its filing, contained enabling disclosure and sufficient written description to enable a person skilled in the art to make and use the claimed invention without undue experimentation.

523.    Accordingly, the '669 Application satisfied every statutory requirement for a patent to issue on the claims therein. Mr. Hyatt was therefore entitled to allowance and, upon payment of the required fee, issuance.

524.    On December 9, 1996, Mr. Hyatt paid $952.00 in application fees with the transmittal of the '669 Application.

525.    On September 2, 1998, Mr. Hyatt amended his claims, paying an additional $4932.00 for consideration of his amended application.

526.    On October 1, 1999, the PTO issued an Office Action containing non-final rejections of the '669 Application and required formal drawings to be submitted.

527.    On April 3, 2000, Mr. Hyatt continued prosecution by amending his claims and paying a fee of $435.00.

528.    On September 7, 2000, Mr. Hyatt furthered prosecution by submitting an Information Disclosure Statement.

529.    The PTO issued an Office Action containing final rejections on November 9, 2000, and Mr. Hyatt timely filed a Notice of Appeal on May 14, 2001, and requested reconsideration under 37 C.F.R. § 1.116, paying a fee of $600.00.

530.    On November 9, 2001, Mr. Hyatt amended his claims to better place them in condition for allowance or appeal, paying a fee of $880.00.

531.    Between November 21, 2001, and December 29, 2003, Mr. Hyatt submitted eight Information Disclosure Statements while waiting for the PTO to respond to his November 9, 2001 amendment.

532.    The PTO issued a first 6-month suspension on October 23, 2002.

533.    Despite the suspension, Mr. Hyatt filed an Information Disclosure Statement on January 16, 2003.

534.    The PTO issued a second 6-month suspension on April 23, 2003.

535.    On March 3, 2004, the PTO issued an Office Action containing non-final rejections in response to the November 9, 2001 amendment.

536.    Mr. Hyatt submitted two Information Disclosure Statements on March 16, 2004, and June 10, 2004.

537.    On June 29, 2004, Mr. Hyatt amended his application and submitted new drawings, continuing prosecution.

538.    On September 3, 2004, Mr. Hyatt filed a Response to the March 3, 2004 non-final rejection pursuant to 37 C.F.R. § 1.111, paying $475.00 in fees.

539.    On September 15, 2004, Mr. Hyatt filed an Information Disclosure Statement.

540.    On October 20, 2004, Mr. Hyatt amended his claims, paying $176.00 in fees.

541.    On December 21, 2004, Mr. Hyatt filed an Information Disclosure Statement.

542.    Mr. Hyatt filed additional Information Disclosure Statements on March 29, 2005, April 14, 2005, and July 8, 2005.

543.    On May 3, 2007, the PTO issued a third 6-month suspension.

544.     On August 28, 2007, Mr. Hyatt petitioned for action on the merits under 37 C.F.R. § 1.181(a)(3).

545.     On March 17, 2008, the PTO issued a fourth 6-month suspension.

546.     On December 31, 2008, the PTO issued a fifth 6-month suspension.

547.     On March 30, 2009, Mr. Hyatt again petitioned for action on the merits under 37 C.F.R. § 1.181(a)(3), and requested status. The PTO did not respond.

548.     On September 25, 2009, the PTO issued a sixth 6-month suspension.

549.     On April 19, 2010, the PTO issued a seventh 6-month suspension.

550.     On September 23, 2011, the PTO issued an eighth 6-month suspension.

551.     On October 24, 2013, the PTO examiner issued lengthy and burdensome Requirements in the application, and shortened the statutory period for a response.

552.     The practical effect of the Requirements and the Office Actions that followed was to restart prosecution, discarding any and all progress that had been made over the preceding 17 years.

553.     On November 22, 2013, Mr. Hyatt responded to the Requirements, requesting a correction under MPEP § 710.06. PTO denied the request on December 13, 2013.

554.     On December 23, 2013, Mr. Hyatt petitioned for supervisory review of the Requirements. The PTO dismissed the petition on February 14, 2014.

555.     Mr. Hyatt responded to the Requirements in full on January 27, 2014.

556.     On April 11, 2014, Mr. Hyatt petitioned for supervisory review of the February 14, 2014 decision dismissing his petition for review of the October 2013 Requirements. The PTO denied the petition on December 16, 2014.

557.     On December 21, 2015, Mr. Hyatt submitted a Supplemental Amendment/Response to the October 13 Requirements.

558.     On June 16, 2016, the PTO issued an Office Action containing non-final rejections on the '669 Application.

559.    On December 27, 2016, Mr. Hyatt filed a Response to the non-final rejection and paid $700.00 in fees.

560.    On March 24, 2017, the PTO issued an Office Action containing non-final rejections on the '669 Application.

561.    On November 29, 2017, the PTO issued a notice of abandonment on the '669 Application.

562.    Mr. Hyatt has paid in total $9,150.00 in various fees for processing of the '669 Application.

563.    The '669 Application and its claims had value in an amount to be determined at trial.

**IV.    The PTO Is Incapable of Carrying Out Its Mandatory Statutory Duties To Fairly and Impartially Examine, and To Award Mr. Hyatt a Patent for Allowable Subject Matter, in the '263 Application or Any of Mr. Hyatt's Patent Applications**

564.    Based on its bad faith toward Mr. Hyatt, the PTO is incapable of fairly and impartially prosecuting the '263 Application or any of Mr. Hyatt's other patent applications.

565.    Based on its bad faith toward Mr. Hyatt and nearly 15 years of delay on the '263 Application, the PTO will never issue a patent to Mr. Hyatt based on any subject matter in the '263 Application that satisfies the statutory requirements for patentability.

566.    The same is true for Mr. Hyatt's other applications.

**V.    PTO Delay Ran Out All Possible Patent Term for the Expired Applications**

567.    The Expired Applications were filed in the period between June 8, 1995, and May 28, 2000, and are therefore ineligible for day-for-day adjustment of term length under Current § 154(b).

568.    The Expired Applications are subject to the version of that statutory subsection in effect in 1996, Former § 154(b), which has no provision for term adjustment to account for the PTO's delay in processing the Expired Applications.

569.    The Expired Applications are therefore ineligible for patent-term adjustment.

570.    The '450 Application was entitled to a patent term of 20 years from the effective filing date that is no later than the application-filing date of January 16, 1996.

571.    All possible patent term for the '450 Application expired no later than January 16, 2016.

572.    The patent term for the '669 Application was 20 years from the effective filing date that is no later than the application-filing date of December 9, 1996.

573.    All possible patent term for the '669 Application expired no later than December 9, 2016.

574.    The PTO's delay has run out all possible patent term for the '450 and '669 Applications. If those applications were issued as patents tomorrow, they could never be enforceable, because no patent term remains.

575.    Mr. Hyatt diligently prosecuted both applications, such that they could and should have issued as patents in a timely fashion had the PTO not caused excessive delay.

576.    The PTO, on multiple occasions, assigned the Expired Applications to management personnel who do not examine applications, without notifying Mr. Hyatt of such assignments at the time.

577.    The PTO dismissed Mr. Hyatt's 2005 petition imploring it to act on the '450 Application, stating: "The examiner will be notified that this application should be considered as 'special' and appropriate for expedited action."

578.    Despite representing to Mr. Hyatt in 2005 that "expedited action" on the application would be forthcoming, the PTO did not in fact examine that application on the merits from the time that it dismissed Mr. Hyatt's petition to the expiration of any possible patent term for the application.

579.    For both applications, the PTO issued lengthy and burdensome Requirements fully 17 years after they had been filed, when there was at most about three years remaining of possible term.

580.    For both applications, the PTO restarted prosecution from the beginning fully 17 years after they had been filed, when there was at most about three years remaining of possible term.

581.    The PTO assigned the Expired Applications to the Hyatt Unit and subjected them to the same Requirements as Mr. Hyatt's pre-GATT applications and misrepresented that they share "[a] common filing date" with Mr. Hyatt's pre-GATT applications, even though they are post-GATT applications and were filed at a later date than Mr. Hyatt's pre-GATT applications—something that PTO acknowledges elsewhere in its Requirements.

582.    The Requirements issued for the Expired Applications contain extensive boilerplate regarding the complexity of the Expired Applications' priority chains, and misrepresent that both claim priority to prior applications, when in fact neither claims priority to prior patent applications. The Requirements imposed on the Expired Applications disregarded their substance, features, and merit.

583.    The Requirements issued for the Expired Applications imposed requirements on the Expired Applications concerning priority-date issues—for example, identifying the priority date for each claim—that are irrelevant to the Expired Applications. And yet the PTO nonetheless demanded Mr. Hyatt's response under pain of abandonment.

584.    The PTO asserted in the Requirements that each of the Expired Applications "claims priority through a complicated and extensive line of cases back to a set of applications filed in the early 1970s," when in fact neither claims priority at all. Likewise, the PTO asserted that the Expired Applications' claims were subject to, respectively, 51 and 19, different possible priority dates, when the only applicable priority for each application is the date of its filing.

585.    By issuing Requirements for the Expired Applications, the PTO unjustifiably impeded their advancement for years, until all possible patent term ran out.

586.    The PTO's delay was intentional. It had no intention of allowing issuance of the '450 and '669 Applications. Instead, acting in bad faith, it repeatedly delayed action and otherwise retarded progress on the '450 and '669 Applications.

587.    The PTO's intentional delay caused all possible patent term for the '450 and '669 Applications to lapse.

588.    Accordingly, further administrative proceedings on each of the Expired Applications became futile as of the date that its possible term expired.

## VI.    The PTO's Delay Deprived Mr. Hyatt of All Patent Rights and Value in the Inventions Claimed in the Expired Applications

589.    Many of Mr. Hyatt's patented inventions have been licensed.

590.    Mr. Hyatt intended to commercially exploit or license the inventions claimed in the Expired Applications and expected to receive substantial income for so doing.

591.    Mr. Hyatt will never be able to license the Expired Applications, because they have no patent term remaining and cannot be enforced.

592.    Likewise, because the Expired Applications have no patent term remaining and cannot be enforced, Mr. Hyatt cannot commercially develop the inventions while excluding others from doing so, as is a patent-holder's right under the Patent Act.

593.    The Expired Applications and any patents to which they entitle Mr. Hyatt are worthless. Even if the PTO acted to issue patents on all of their claims today, those patents would have zero value.

594.    The PTO has thereby deprived Mr. Hyatt of the fair and impartial patent-examination services for which he paid substantial fees and to which he was entitled; deprived him of the issuance of patents to which he was entitled; and deprived him of the complete value of the Expired Applications and the complete value of any patents issuing on those applications to which he was entitled.

VI.     **The PTO's Actions Constitute a Continuing Violation of Mr. Hyatt's Rights**

595.    The PTO's actions with regard to Mr. Hyatt and Mr. Hyatt's patent applications constitute a continuing violation of his rights under the Patent Act, PTO regulations, the Administrative Procedure Act, and the Due Process Clause of the Fifth Amendment to the United States Constitution to fair, impartial, and timely examination of his applications in accordance with law, to allowance of patentable subject matter, to issuance of patents claiming such patentable subject matter upon payment of the issue fee, to receive timely action on his petitions, and to obtain timely final agency action from the Appeals Board on examiner rejections.

596.    The Patent Act, PTO regulations, the Administrative Procedure Act, and the Due Process Clause of the Fifth Amendment to the United States Constitution impose a continuing obligation on the PTO to examine Mr. Hyatt's patent applications in a fair, impartial, and timely manner in accordance with law, to allow patentable subject matter, to issue patents claiming such patentable subject matter upon payment of the issue fee, to provide timely action on Mr. Hyatt's petitions, and to permit Mr. Hyatt to obtain timely final agency action from the Appeals Board on examiner rejections.

## Count I: Refund of Fees for the Expired Applications

597.    The Plaintiff repeats and re-alleges the averments of the paragraphs above as if fully set forth herein.

598.    The APA authorizes this Court to hear and decide claims against federal agencies seeking "relief other than money damages." 5 U.S.C. § 702. Specific relief is such a remedy. *See generally Bowen v. Massachusetts*, 487 U.S. 879 (1988).

599.    Mr. Hyatt paid fees to the PTO for timely, fair, and impartial examination of the Expired Applications in accordance with the Patent Act and PTO rules and procedures, and he was entitled to that.

600.    The PTO unlawfully denied Mr. Hyatt, unlawfully withheld from Mr. Hyatt, and unreasonably delayed timely, fair, and impartial examination of the Expired Applications in accordance with the Patent Act and PTO rules and procedures.

601.    The PTO's actions violated Mr. Hyatt's constitutional rights to due process and to just compensation for a taking of his property.

602.    The PTO's actions on the Expired Applications were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and also contrary to constitutional right, power, privilege, or immunity.

603.    The PTO's actions on the Expired Applications were undertaken in bad faith.

604.    Mr. Hyatt is therefore entitled to specific relief: a refund of the fees he paid to PTO for examination of the Expired Applications.

<b><u>Count II: Just Compensation for Taking<br>with Respect to the Expired Applications</u></b>

605.    The Plaintiff repeats and re-alleges the averments of the paragraphs above as if fully set forth herein.

606.    The Fifth Amendment provides that "private property shall not be taken for public use, without just compensation." U.S. Const. amend. V.

607.    Patent applications are property.

608.    The PTO took the complete value of Mr. Hyatt's property rights in the Expired Applications, their claims, and any patents to which Mr. Hyatt was entitled, without providing Mr. Hyatt any compensation.

609.    The PTO took the complete value of Mr. Hyatt's statutory rights to examination of the Expired Applications and issuance of claims on allowable subject matter contained in the Expired Applications as patents, without providing Mr. Hyatt any compensation.

610.    In carrying out its policy of preventing any of Mr. Hyatt's patent applications from issuing as patents, the PTO took Mr. Hyatt's property rights associated with the Expired Applications.

611.    Mr. Hyatt is therefore entitled to just compensation for the PTO's taking of his property, in an amount to be determined at trial.

### Count III: Refund of Fees Collected or Retained in Bad Faith

612.    The Plaintiff repeats and re-alleges the averments of the paragraphs above as if fully set forth herein.

613.    The APA authorizes this Court to hear and decide claims against federal agencies seeking "relief other than money damages." 5 U.S.C. § 702. Specific relief is such a remedy. *See generally Bowen v. Massachusetts*, 487 U.S. 879 (1988).

614.    Mr. Hyatt paid fees to the PTO for timely, fair, and impartial examination of his applications in accordance with the Patent Act and PTO rules and procedures, and he was entitled to that.

615.    The PTO unlawfully denied Mr. Hyatt, unlawfully withheld from Mr. Hyatt, and unreasonably delayed timely, fair, and impartial examination of Mr. Hyatt's patent applications in accordance with the Patent Act and PTO rules and procedures.

616.    The PTO, acting in bad faith and in violation of Mr. Hyatt's constitutional and statutory rights under the Patent Act and APA, required Mr. Hyatt to pay numerous fees to avoid abandonment of his applications or other consequences that would be detrimental to his applications or any patents that may eventually be issued to him, including without limitation fees for extensions of time, for issue fees on applications that it did not issue, and for filing administrative appeals.

617.    The PTO collected fees from Mr. Hyatt for examination-related activities and appeals and retained those fees even after it restarted prosecution on Mr. Hyatt's applications

in 2013, wiping out any results of the activities and appeals for which Mr. Hyatt had paid those fees.

618.   The PTO's assessment, acceptance, and retention of these fees was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and also contrary to constitutional right, power, privilege, or immunity, and was inequitable.

619.   Mr. Hyatt is therefore entitled to specific relief: a refund of those fees.

### Count IV: Relief from the PTO's Unlawful Policies on Mr. Hyatt's Applications

620.   The Plaintiff repeats and re-alleges the averments of the paragraphs above as if fully set forth herein.

621.   The APA provides a cause of action to challenge final agency action. 5 U.S.C. § 704.

622.   The PTO has acted to adopt *de facto* or *de jure* policies to frustrate and delay Mr. Hyatt's prosecution of his patent applications before the PTO, to force the abandonment of his applications, and to prevent the issuance of patents to him.

623.   The PTO has acted to adopt a *de facto* or *de jure* policy to prevent Mr. Hyatt from obtaining final agency action subject to judicial review.

624.   Mr. Hyatt therefore has no other remedy in a court for these agency actions.

625.   These actions violate Mr. Hyatt's rights under the Patent Act, PTO regulations, the Administrative Procedure Act, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

626.   These agency actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; and in excess of statutory jurisdiction, authority, or limitations, within the meaning of 5 U.S.C. § 706.

627.   Mr. Hyatt is therefore entitled to an order setting aside these agency actions.

**Count V: Injunctive Relief from Unlawfully Withheld**
**and Unduly Delayed Agency Action on Mr. Hyatt's Applications**

628.    The Plaintiff repeats and re-alleges the averments of the paragraphs above as if fully set forth herein.

629.    The Patent Act, PTO regulations, and the Due Process Clause of the Fifth Amendment to the United States Constitution entitle Mr. Hyatt to fair and impartial examination of each of his applications to determine whether he is entitled to a patent under the law, to allowance of allowable subject matter, to timely decisions on his petitions, to issuance of patent claims on such subject matter as a patent following payment of the issue fee, and to final agency action from the Appeal Board on examiner rejections. *See* 35 U.S.C. §§ 102(a), 131, 151, 6, 134(a).

630.    Defendants have a duty to fairly, impartially, and timely examine Mr. Hyatt's applications in accordance with the requirements of the Patent Act, PTO regulations, and the Due Process Clause; to allow patentable subject matter; to issue patent applications claiming such patentable subject matter as patents upon payment of the issue fee; to decide Mr. Hyatt's petitions; and to permit Mr. Hyatt to obtain final agency action from the Appeal Board on examiner rejections.

631.    Defendants have unlawfully withheld and unreasonably delayed agency action on Mr. Hyatt's patent applications, instead miring them in administrative purgatory and preventing Mr. Hyatt from obtaining fair and impartial examination of his applications in accordance with law and ultimately from receiving patents to which he is entitled.

632.    Mr. Hyatt is therefore entitled to an injunction enjoining Defendants from treating Mr. Hyatt's applications in bad faith, capriciously, and contrary to law and compelling them expeditiously to conduct a fair, impartial, and timely examination of his applications in accordance with law, to allow patentable subject matter, to issue patents claiming such patentable such subject matter upon payment of the issue fee, to provide timely

action on Mr. Hyatt's petitions, and to permit Mr. Hyatt to obtain timely final agency action from the Appeal Board on examiner rejections

### Count VI: Mandamus To Compel Action on Mr. Hyatt's Applications in Accordance with Law

633.    The Plaintiff repeats and re-alleges the averments of the paragraphs above as if fully set forth herein.

634.    The Patent Act, PTO regulations, and the Due Process Clause of the Fifth Amendment to the United States Constitution entitle Mr. Hyatt to fair and impartial examination of each of his applications to determine whether he is entitled to a patent under the law, to allowance of allowable subject matter, to decisions on his petitions, to issuance of patent claims on such subject matter as a patent following payment of the issue fee, and to final agency action from the Appeal Board on examiner rejections. *See* 35 U.S.C. §§ 102(a), 131, 151, 6, 134(a).

635.    Defendants have a duty to fairly, impartially, and timely examine Mr. Hyatt's applications in accordance with the requirements of the Patent Act, PTO regulations, and the Due Process Clause; to allow patentable subject matter; to issue patent applications claiming such patentable subject matter as patents upon payment of the issue fee; to decide Mr. Hyatt's petitions; and to permit Mr. Hyatt to obtain final agency action from the Appeal Board on examiner rejections.

636.    Given the PTO's bad-faith treatment of Mr. Hyatt's applications and Mr. Hyatt's advanced age, no other adequate remedy is available.

637.    Mr. Hyatt is therefore entitled to a writ of mandamus compelling Defendants expeditiously to conduct a fair, impartial, and timely examination of his applications in accordance with law, to allow patentable subject matter, to issue patents claiming such patentable such subject matter upon payment of the issue fee, to provide timely action on Mr. Hyatt's petitions, and to permit Mr. Hyatt to obtain timely final agency action on rejections from the Appeal Board.

## Count VII: Declaratory Relief for the '263 Application

638. The Plaintiff repeats and re-alleges the averments of the paragraphs above as if fully set forth herein.

639. The Patent Act entitles Mr. Hyatt, upon payment of the issue fee, to receive a patent on the '263 Application.

640. An actual controversy exists between Mr. Hyatt and the Defendants regarding his entitlement to receive a patent on the '263 Application.

641. Mr. Hyatt is entitled to a declaration of rights that he is entitled to allowance of the '263 Application and, upon payment of the issue fee, to receive a patent on the '263 Application.

## Count VIII: Injunctive Relief for the '263 Application

642. The Plaintiff repeats and re-alleges the averments of the paragraphs above as if fully set forth herein.

643. The PTO has unlawfully withheld or unreasonably delayed timely, fair, and impartial examination of the '263 Application in violation of 5 U.S.C. § 706(1).

644. The PTO has unlawfully withheld or unreasonably delayed allowance of the '263 Application in violation of 5 U.S.C. § 706(1).

645. Mr. Hyatt is entitled to an injunction compelling Defendants to allow the '263 Application and, upon payment of the issue fee, to issue a patent for the invention claimed in the '263 Application.

## Count IX: Mandamus for the '263 Application

646. Plaintiff Hyatt repeats and re-alleges the averments of the paragraphs above as if fully set forth herein.

647. Mr. Hyatt is entitled to allowance and, upon payment of the issue fee, to issuance of a patent on the '263 Application.

648. Defendants have a duty to allow and, upon payment of the issue fee, to issue a patent on the '263 Application.

649.    The PTO has no discretion to deny allowance and issuance of a patent on an application that satisfies the statutory criteria for patentability.

650.    Given the PTO's bad-faith treatment of Mr. Hyatt's applications and Mr. Hyatt's advanced age, no other adequate remedy is available.

651.    Mr. Hyatt is entitled to a writ of mandamus compelling Defendants to allow the '263 Application and, upon payment of the issue fee, to issue a patent for the invention claimed in the '263 Application.

### **Prayer for Relief**

Plaintiff Hyatt respectfully requests that this court enter judgment against Defendants and grant the following relief:

A.    A finding that the PTO improperly accepted and retained Mr. Hyatt's fees for the Expired Applications;

B.    A finding that Mr. Hyatt is entitled to specific relief, in the form of a refund of those fees;

C.    An order directing the PTO to provide Mr. Hyatt with specific relief, in the form of a refund of those fees;

D.    A finding that the PTO took Mr. Hyatt's property with respect to the Expired Applications, without providing just compensation, in violation of the Fifth Amendment;

E.    An award of just compensation for this taking of Mr. Hyatt's property;

F.    A finding that the PTO improperly and inequitably accepted and retained Mr. Hyatt's fees for applications other than the Expired Applications;

G.    A finding that Mr. Hyatt is entitled to specific relief, in the form of a refund of those fees;

H.    An order directing the PTO to provide Mr. Hyatt with specific relief, in the form of a refund of those fees;

I.     An order setting aside the PTO's actions adopting unlawful policies for the treatment of Mr. Hyatt's applications;

J.     An injunction enjoining Defendants from treating Mr. Hyatt's applications in bad faith, capriciously, and contrary to law and compelling them expeditiously to conduct a fair, impartial, and timely examination of his applications in accordance with law, to allow patentable subject matter, to issue patents claiming such patentable such subject matter upon payment of the issue fee, to provide timely action on Mr. Hyatt's petitions, and to permit Mr. Hyatt to obtain timely final agency action from the Appeal Board on examiner rejections;

K.     A writ of mandamus compelling Defendants expeditiously to conduct a fair, impartial, and timely examination of his applications in accordance with law, to allow patentable subject matter, to issue patents claiming such patentable such subject matter upon payment of the issue fee, to provide timely action on Mr. Hyatt's petitions, and to permit Mr. Hyatt to obtain timely final agency action from the Appeal Board on examiner rejections;

L.     A declaration that the '263 Application satisfies the statutory conditions for patentability and that Mr. Hyatt is entitled to allowance of the '263 Application and, upon payment of the issue fee, to receive a patent on the '263 Application;

M.     An injunction compelling Defendants to allow the '263 Application and, upon payment of the issue fee, to issue a patent for the invention claimed in the '263 Application;

N.     A writ of mandamus compelling Defendants to allow the '263 Application and, upon payment of the issue fee, to issue a patent for the invention claimed in the '263 Application;

O.     Retain jurisdiction in order to ensure compliance with the Court's orders and writs; and

P.      All other relief to which the Plaintiff may show himself to be entitled.

## Jury Demand

Plaintiff Hyatt respectfully demands a trial by jury of all issues triable by a jury in his Complaint.

Date: May 7, 2018                                          Respectfully submitted,


                                                           /s/ Mark W. DeLaquil
                                                           MARK W. DELAQUIL
                                                             V.A. Bar No. 68088
                                                           ANDREW M. GROSSMAN*
                                                           PAUL M. LEVINE*
                                                           BAKER & HOSTETLER LLP
                                                           1050 Connecticut Ave., N.W.
                                                           Suite 1100
                                                           Washington, DC 20036
                                                           Phone: (202) 861-1527
                                                           Fax: (202) 861-1783
                                                           mdelaquil@bakerlaw.com

                                                           *Attorneys for Plaintiff Gilbert P. Hyatt*

*Pro hac vice* motion forthcoming