## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| **GILBERT P. HYATT,**<br>　　　　**Plaintiff,** | ) <br> ) <br> ) |
| **v.** | ) <br> )      **Civil Action No. 1:18-cv-546** |
| **UNITED STATES PATENT AND**<br>**TRADEMARK OFFICE, and**<br>**ANDREI IANCU, Under Secretary of**<br>**Commerce for Intellectual Property and**<br>**Director of the United States Patent and**<br>**Trademark Office, in his official capacity,**<br>　　　　**Defendants.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### MEMORANDUM OPINION

Plaintiff Gilbert P. Hyatt is a prolific inventor who has filed hundreds of patent applications over the years in fields such as computer technology, machine control, image processing, and audio processing. Most of plaintiff's applications are of unprecedented, inordinate length, complexity, and interrelatedness. Although plaintiff has achieved some significant success—more than 70 of his applications have resulted in the issuance of patents—many of his applications have remained pending for years, and indeed, plaintiff contends that the defendant, the United States Patent and Trademark Office ("PTO")[1] has deliberately determined not to process, examine, or issue patents for any of plaintiff's pending patent applications. Thus, plaintiff's Administrative Procedure Act[2] challenge to the PTO's handling of plaintiff's patent

---

[1] Plaintiff filed suit against both the PTO and Andrei Iancu, the Director of the PTO, in his official capacity. Defendants are hereinafter collectively referred to as the "PTO."

[2] 5 U.S.C. § 706 ("APA").

applications in this case focuses on a single question:[3]

> Whether the PTO has a current, *de facto* rule, order, or policy to refrain from issuing plaintiff Gilbert P. Hyatt any patents based on his currently existing applications and to prevent plaintiff from obtaining judicial review of his currently existing applications regardless of the merits of his patent applications.

In other words, plaintiff contends that the PTO has adopted a *sub rosa* rule, order, or policy to decline to issue patents for or to take any final PTO action on plaintiff's patent applications. The PTO argues that no such rule, order, or policy exists and that plaintiff is the author of his own misfortune because plaintiff's extraordinarily lengthy, complex applications and his prosecution conduct are the cause of the delays and slow pace of the examination process.

Given the nature of the claims and the question presented, plaintiff was permitted to conduct limited deposition discovery of PTO personnel. Following this limited discovery, the Administrative Record including this limited discovery was assembled. The parties then orally argued the merits of plaintiff's challenge. Accordingly, this matter is now ripe for disposition on the basis of the Administrative Record.

## I.

Because plaintiff brings this case under the APA, judicial review is conducted on the administrative record. 5 U.S.C. § 706 (requiring courts to review APA claims "on the whole record, or those parts of it cited by the parties"). The Administrative Record assembled here

---

[3] Plaintiff's Complaint initially brought the following claims: Counts I and III sought refunds of fees paid in connection with patent applications; Count II asserted a Fifth Amendment claim for the taking of patent applications without just compensation; Counts IV–VI, brought under § 706 and as a request for mandamus, sought relief from the PTO's alleged unlawful policy toward plaintiff's patent applications; and Counts VII–IX sought declaratory, injunctive, and mandamus relief compelling the allowance of a particular patent application. By Order dated March 26, 2019, the PTO's motion to dismiss was granted with respect to all of plaintiff's claims except insofar as Counts IV–VI allege the existence of the *de facto* rule, order, or policy described above. *Hyatt v. U.S.P.T.O.*, 1:18-cv-546 (E.D. Va. March 26, 2019) (Order).

focuses on the PTO's recent activity related to certain of plaintiff's patent applications, as that recent activity or lack thereof is probative of the truth or falsity of plaintiff's claim that the PTO, in violation of its statutory duties, has a current, *de facto* rule, order, or policy to refrain from issuing plaintiff any patents based on his currently existing applications and to prevent plaintiff from obtaining judicial review of his currently existing applications regardless of the merits of his patent applications.

Essential to an understanding of the instant dispute is (A) a brief summary of the patent prosecution process, (B) a description of the nature of plaintiff's patent applications and their unprecedented length and complexity, (C) a summary of pertinent past and ongoing litigation between plaintiff and the PTO, and (D) a review of the proceedings to date.

A.[4]

The PTO is responsible for "the granting and issuing of patents," which the PTO does after conducting a thorough examination of patent applications in a process known as prosecution. 35 U.S.C. §§ 2(a)(1), 131. Prosecution begins when an applicant submits a "specification" that contains a written description of the invention sought to be patented and of the manner and process of making and using the invention. 35 U.S.C. §§ 111, 112. A specification must conclude with "one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112.

On receiving a patent application, the PTO is statutorily required to "cause an examination to be made of the application and the alleged new invention." 35 U.S.C. § 131. Typically, a patent examiner with relevant scientific or technical competence performs this

---

[4] A similar summary of the patent examination process appears in *Hyatt v. United States Patent & Trademark Office*, 146 F. Supp. 3d 771, 774–75 (E.D. Va. 2015), hereinafter referred to as *Hyatt I*.

3

examination by reviewing each proposed claim in the application for novelty, support in the specification's written description, and compliance with other patentability requirements and statutes. *See* 37 C.F.R. § 1.104(a)(1). After the initial examination, the examiner sends the applicant an "office action," which may allow or reject the patent claims. *See* 37 C.F.R. §§ 1.104, 1.111(a). If any claims are rejected, the applicant may respond with amendments, evidence of patentability, arguments in favor of patentability, or some combination thereof. 37 C.F.R. § 1.111(b) (stating that the applicant's reply must "specifically point[ ] out supposed errors in the examiner's action and must reply to every ground of objection and rejection in the prior Office action"). If, after the PTO issues an office action in an application, an applicant fails to respond within six months after "notice has been given or mailed to the applicant," then the application "shall be regarded as abandoned by the parties thereto." 35 U.S.C. § 133. An applicant may respond to an abandonment notice by filing a petition (i) to revive an abandoned application or (ii) to withdraw an examiner's holding of abandonment. 37 C.F.R. §§ 1.137, 1.181(a).

In the event the examiner concludes that the applicant is entitled to a patent, the examiner will issue a notice of allowance giving the applicant three months in which to pay an issue fee and a publication fee, payment of which generally results in final issuance of the patent. *See* 37 C.F.R. §§ 1.311, 1.314. In the course of prosecution, the examiner may issue a Requirement for Information directing the applicant to submit "such information as may be reasonably necessary to properly examine or treat the matter." 37 C.F.R. § 1.105(a)(1). In sum, patent examination is typically a back-and-forth, iterative process resulting ultimately in the patent examiner allowing or rejecting one or more of the claims in the patent application.

When an examiner rejects one or more of the claims in the patent application on two

occasions, the applicant may appeal to the Patent Trial and Appeal Board.[5] 35 U.S.C. § 134; 37

C.F.R. § 41.31. To appeal, the applicant must file a notice of appeal and then an appeal brief

within two months of filing the notice. 37 C.F.R. §§ 41.31(a)(1), 41.37(a). Upon the appeal

brief's filing, the patent examiner may, "within such time as may be directed by the Director,"

file an "examiner's answer" setting forth the grounds on which the application was rejected

and—potentially—"a new ground of rejection." 37 C.F.R. § 41.39(a). Section 1207.02 of the

Manual of Patent Examination Procedure ("MPEP") recommends that a patent examiner "should

furnish" this answer "within 2 months after the receipt of the [appeal] brief by the examiner."

But significantly, there is no firm statutory or regulatory deadline for the filing of the examiner's

answer. Once the examiner's answer is filed, the applicant must file a reply brief within two

months. 37 C.F.R. § 41.41(a). Pursuant to PTO regulations, jurisdiction over the appeal does not

pass to the Board until the applicant files a reply brief or the time expires for filing a reply brief,

whichever occurs first. 37 C.F.R. § 41.35(a). Because there is no deadline or requirement for an

examiner to file an answer, the examiner can halt an appeal simply by not filing an answer. Nor

is this the sole means of stopping the appeal process. After an applicant has filed an appeal brief

but before jurisdiction passes to the Board, either the applicant or the examiner may reopen

examination and prevent the Board from gaining jurisdiction over the application. *See* 37 C.F.R.

§ 41.35(b); MPEP § 1207.04. In either case, the Board's jurisdiction never vests.

   In the event the examination is not reopened and the Board acquires jurisdiction and

affirms the examiner's rejection, that decision constitutes a final agency action which the patent

applicant may then appeal to the Court of Appeals for the Federal Circuit or challenge in a civil

---

[5] On September 16, 2012, the Patent Trial and Appeal Board replaced the Board of Patent Appeals and
Interferences. *See* Leahy-Smith America Invents Act, Pub. L. No. 112-29 §§ 7, 35, 125 Stat. 284, 313, 341
(September 16, 2011) (codified as amended at 35 U.S.C. § 6). These bodies are referred to as the "Board."

action in federal district court. *See* 35 U.S.C. §§ 141(a), 145.[6] If the Board disagrees with the

rejection, it may reverse the decision or remand the application to the examiner. 37 C.F.R.

§ 41.50(a). Remand is not considered final agency action for purposes of appeal. 37 C.F.R.

§ 41.50(e).

## B.

A summary of the general nature of plaintiff's patent applications—and their

unprecedented length and complexity—is essential to an understanding of the parties' dispute.

Plaintiff's pending patent applications are some of the longest-pending patent applications at the

PTO. Almost all of plaintiff's applications were filed prior to June 8, 1995, the effective date of

certain amendments to the patent laws. In December 1994, as part of the implementation of the

Uruguay Round of the General Agreement on Tariffs and Trade ("GATT"), Congress amended

several statutory provisions, including the provisions relating to patent terms.[7] Before the GATT,

a patent's term ran, in general, for seventeen years from the date the patent was issued. But as

part of the GATT, Congress amended this provision to extend the patent term, in general, to

twenty years from the date the application is filed. *See Gilead Scis., Inc. v. Lee*, 778 F.3d 1341,

1343–44 (Fed. Cir. 2015).[8]

As the effective date of these patent law changes—June 8, 1995—drew near, plaintiff

---

[6] In contrast to a direct appeal to the Federal Circuit under § 141, a patent applicant who files a § 145 action in district court may present new evidence not previously presented to the PTO. *Kappos v. Hyatt*, 566 U.S. 431, 435 (2012) (citing *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999)).

[7] *See* Uruguay Round Agreements Act, Pub. L. No. 103-465, §§ 531-34, 108 Stat. 4809, 4982–90 (1994).

[8] Importantly, "in 1999, Congress enacted provisions under which patent applicants may seek [patent term adjustments] for delays caused by the PTO between the filing and issuance dates of the patent application." *Gilead Scis., Inc.*, 778 F.3d at 1344 (citing Pub. L. No. 106–113, § 1000(a)(9), 113 Stat. 1501, 1536 (1999)). Specifically, "the term of a patent shall be extended 1 day for each day" (A) that the PTO does not meet certain response deadlines, (B) that the PTO fails to issue a patent three years after the application's filing date, subject to certain limitations, and (C) that an interference, secrecy order, or successful appeal delays issuance of a patent. 35 U.S.C. § 154(b)(1)(A)–(C). But significantly, these provisions do not apply to plaintiff's pre-GATT applications.

began submitting substantial numbers of patent applications to the PTO. Importantly, patent applications filed before the effective date of the GATT changes remain subject to the pre-GATT patent term. *See Hyatt v. U.S. Patent & Trademark Office*, 797 F.3d 1374, 1377 (Fed. Cir. 2015) (holding that special circumstances justified disclosure of confidential application information). Thus, any patent issued based on plaintiff's applications filed before June 8, 1995 would receive a guaranteed term of seventeen years from the date of issuance.

The filing dates of plaintiff's patent applications are far from their only notable characteristics. As the Federal Circuit has observed, plaintiff's nearly 400 applications filed prior to June 8, 1995 "feature extremely large claim sets, [with each application] containing, on average, 116 independent claims and 299 total claims." *Id.* By the PTO's 2015 estimate, plaintiff's then-pending applications included "45,000 independent claims and 115,000 total claims when combined." *Id.* Notwithstanding the extraordinary number of claims in plaintiff's pending patent applications, plaintiff's applications rely on "only 12 distinct specifications." *Id.* And plaintiff's applications "incorporate[ ] by reference, and claim[ ] the benefit of priority from, a network of earlier-filed applications dating back to the 1970s." *Id.*

The length, complexity, and interrelatedness of plaintiff's patent applications are also evident from the record of one of plaintiff's prior challenges to the PTO's handling of his patent applications. In 2014, plaintiff sued the PTO, alleging that the PTO was unreasonably delaying examination of 80 of his then-pending 400 patent applications. *See Hyatt I*, 146 F. Supp. 3d 771, 780 (E.D. Va. 2015). The PTO denied that it was unreasonably delaying examination of plaintiff's patent applications and, in support, noted the unprecedented length and complexity of plaintiff's applications. Specifically, as the record in *Hyatt I* reflects, plaintiff's original applications at issue there contained 20 to 100 claims per application, but plaintiff's subsequent

amendments added hundreds of claims per application, which resulted in "some of the largest claim sets the PTO has ever encountered" and "added significant complexity in terms of the substantive changes made and the number of claims amended." *Id.* at 776. As noted in *Hyatt I*, the growth of Application 08/458,143 from 20 claims to 408 claims, the growth of Application 08/418,211 from 24 claims to 310 claims, and the growth of Application 07/541,988 from 90 claims to 297 claims was "generally characteristic of the growth in the number of claims for all of the 80 patent applications in issue" in *Hyatt I. Id.*

Also important is that the extraordinarily lengthy specifications for plaintiff's patent applications "run many hundreds of pages." *Id.* And further adding significantly to the complexity of plaintiff's patent applications is the fact, as noted in *Hyatt I*, that plaintiff's patent applications typically "claim[ ] the benefit of priority to . . . numerous earlier-filed applications often dating back to the early 1970s." *Id.* at 776. As the PTO observed with respect to one application at issue in *Hyatt I*, there were "38 different possible dates to which [plaintiff] may be entitled to maintain priority . . . for a given claim." *Id.* at 777.

The *Hyatt I* record also reflects that far from refusing to process plaintiff's complex applications, in October 2012 the PTO formed Art Unit 2615, a special group of twelve examiners dedicated to the task of reviewing and processing plaintiff's patent applications. *See id.* at 778. Additionally, in August 2013, the PTO began to issue a series of Requirements for Information (hereinafter, the "Requirements") applicable to plaintiff's patent applications in order to aid and facilitate examination of plaintiff's extraordinarily lengthy patent applications. *Id.* The Requirements identified several factors that, in the PTO's view, made examination of plaintiff's applications "unmanageable," namely

> (i) the number of pending applications in the same "family" (*i.e.* group of related claims) of applications,

8

(ii) the length of the specifications and number of applications incorporated by reference,

(iii) the degree of overlap in priority with other applications and with patents already issued to the same specification,

(iv) the number of claims,

(v) the multiplication of claims over the course of prosecution,

(vi) the similarity of claims, and

(vii) the lack of clear demarcation between the claims in applications sharing a common specification.

*Hyatt I*, at 778 & n. 15. To address these obstacles to effective and expeditious examination of plaintiff's patent applications, the Requirements instructed plaintiff (i) to select a number of claims from each family, not to exceed 600 claims absent a showing that more claims are necessary, (ii) to identify the earliest possible priority date and supporting disclosure for each selected claim, and (iii) to present a copy of the selected claims to the PTO. *Id.* Even so, as described in greater detail *infra*, the extraordinary length and complexity of plaintiff's patent applications continue to hinder the examination process of plaintiff's patent applications.

## C.

The instant dispute is not the plaintiff's first suit against the PTO; to the contrary, he has filed a number of cases against the PTO, a few of which are relevant to understanding the instant dispute.

In *Hyatt I*, plaintiff unsuccessfully sought a declaration that the PTO had unreasonably delayed final agency action on 80 patent applications and injunctive relief compelling PTO action. *Id.* at 780. In the end, summary judgment in *Hyatt I* was granted in the PTO's favor because the record there reflected that examination of plaintiff's patent applications at issue was underway, albeit at a slower pace than plaintiff desired. *See id.* at 783; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) ("[T]he only agency action that can be compelled under

the APA is action legally *required*.") (emphasis in original). Thus, plaintiff in *Hyatt I* was not

entitled to relief under 5 U.S.C. § 706(1) based on any past delay because the PTO's active

examination of plaintiff's patent applications left "nothing to be judicially compelled." *Hyatt I* at

783. Plaintiff did not appeal the judgment in *Hyatt I*.

 Other challenges by plaintiff to the PTO's examination procedures have resulted in

Federal Circuit decisions of note here. Months prior to the decision in *Hyatt I*, the Federal Circuit

in 2015 held that the PTO Director did not abuse her discretion when she found that special

circumstances—plaintiff's extraordinarily complex and long applications—justified the PTO's

disclosure of confidential information. *Hyatt v. U.S. Patent & Trademark Office*, 797 F.3d at

1384. Accordingly, the Federal Circuit rejected plaintiff's challenge to the Requirements as a

violation of 35 U.S.C. § 122. *Id.* Specifically, the Federal Circuit reasoned that "[g]iven the

extraordinary number and duplicative nature of Mr. Hyatt's various pending applications, all

drawn from the same 12 specifications, it was reasonable for the PTO to be concerned that the

claims did not 'differ substantially from each other,' and that some claims were 'unduly

multiplied.'" *Id.* at 1384 (quoting 37 C.F.R. § 1.75(b)).

 After *Hyatt I*, plaintiff brought suit seeking the repeal of MPEP § 1207.04, which

provides that an examiner may, "with approval from the supervisory patent examiner, reopen

prosecution to enter a new ground of rejection in response to appellant's brief." *Hyatt v. United

States Patent & Trademark Office*, 904 F.3d 1361, 1367 (Fed. Cir. 2018) (quoting MPEP

§ 1207.04). This challenge was rejected by the Federal Circuit. *Id.* at 1374–75 (holding that

Board review is not required where a procedural prerequisite, such as "an examiner's decision

not to reopen prosecution," is not satisfied). The Federal Circuit also significantly noted that

there was no evidence in the record of that case "that, in the wake of [*Hyatt I*] PTO examiners

have repeatedly reopened prosecution of Mr. Hyatt's applications for the purpose of further delaying PTAB review." *Id.* at 1375.

Plaintiff has also filed various actions under § 145,[9] and the decisions in these actions are informative. In 2007, the Federal Circuit in *Hyatt v. Dudas*, 492 F.3d 1365 (Fed. Cir. 2007), reversed a district court's decision in a § 145 action and held that where an examiner's rejection makes clear what "was missing by way of written description," the burden properly shifts to an applicant "to cite to the examiner where adequate written description could be found, or to make an amendment to address the deficiency." *Id.* at 1371. In 2008, the Federal Circuit in *Hyatt v. Dudas*, 551 F.3d 1307 (Fed. Cir. 2008), affirmed a district court's § 145 decision and made clear that the Board may only consider a single claim to be representative of a group of claims rejected for lack of written description where those "claims share a common limitation that lacks written description support." *Id.* at 1313. And in 2012 the Supreme Court held in *Kappos v. Hyatt*, 566 U.S. 431 (2012), (i) that patent applicants may introduce new evidence subject only to the Federal Rules of Evidence and the Federal Rules of Civil Procedure in § 145 proceedings and (ii) that the district court must make *de novo* findings where a patent applicant presents new evidence on a disputed fact question in a § 145 action. *Id.* at 444.

An ongoing appeal involving several of plaintiff's § 145 actions is also noteworthy because it may further elucidate the legal principles governing prosecution laches and the written description requirement—grounds for rejection frequently asserted in office actions addressing plaintiff's patent applications. *See Hyatt v. Iancu*, No. 18-2390 (Fed. Cir.). Between 2005 and

---

[9] Section 145 "grants a patent applicant whose claims are denied by the [PTO] the opportunity to challenge the PTO's decision by filing a civil action against the Director of the PTO in federal district court." *Hyatt*, 566 U.S. at 433.

2009, plaintiff filed four § 145 actions in the District Court for the District of Columbia.[10] In the

course of those proceedings, the PTO argued that plaintiff's prosecution conduct across hundreds

of applications and over decades warranted forfeiture of plaintiff's claims based on prosecution

laches, an equitable doctrine that provides the PTO with the authority to reject applications for

patents that would be unenforceable because those patents were "obtained after an unreasonable

and unexplained delay in prosecution." *In re Bogese*, 303 F.3d 1362, 1367 (Fed. Cir. 2002)

(citing *Symbol Technologies, Inc. v. Lemelson Medical*, 277 F.3d 1361, 1368 (Fed. Cir. 2002)

(same, in the context of a patent infringement suit)). After four separate bench trials in these

§ 145 actions—one on prosecution laches and three on plaintiff's patent applications[11]—the D.C.

district court rejected the PTO's prosecution laches defense in the four applications, ordered that

patents issue for some of plaintiff's claims, and affirmed rejections of other claims. *Hyatt v.

Iancu*, 332 F. Supp. 3d 113, 138–39 (D.D.C. 2018) (holding that plaintiff's conduct from 1995 to

2003 did not constitute prosecution laches); *Hyatt v. Iancu*, 332 F. Supp. 3d 83, 112–113 (D.D.C.

2018) (concluding that certain claims were patentable). Following the PTO's appeal and

plaintiff's cross-appeal to the Federal Circuit in *Hyatt v. Iancu*, the case was submitted after oral

argument. *See Hyatt v. Iancu*, No. 18-2390 (Fed. Cir. Feb. 6, 2020).[12]

---

[10] At the time plaintiff filed these § 145 actions, § 145 provided for venue solely in the United States District Court for the District of Columbia. Pursuant to a 2011 amendment, § 145 now provides for venue solely in the United States District Court for the Eastern District of Virginia. Pub. L. 112-29, § 9 (Sept. 16, 2011).

[11] A separate bench trial was not held in plaintiff's fourth § 145 action because the bench trial on the PTO's prosecution laches defense resolved the only genuine dispute of material fact remaining after disposition of the parties' summary judgment motions. *See Hyatt v. Iancu*, 332 F. Supp. 3d 83, 90 n. 6 (D.D.C. 2018).

[12] As the parties noted at oral argument in this case, the Federal Circuit's forthcoming decision in *Hyatt v. Iancu* may have some bearing on the issues presented here, but it is unlikely to be dispositive of those issues. May 15, 2020 Oral Arg. Tr. 35:6–9. Thus, it is not necessary to await the Federal Circuit's decision in *Hyatt v. Iancu* to resolve plaintiff's sole remaining claim in this suit.

It is also worth noting that plaintiff filed a separate suit in the Eastern District of Virginia challenging the PTO's dismissal of petitions to withdraw holdings of abandonment in several of plaintiff's patent applications. *See Hyatt v.*

**D.**

As noted, plaintiff argues in the instant action that the PTO has a current, *de facto* rule, order, or policy to refrain from issuing plaintiff any patents based on his currently existing applications and to prevent plaintiff from obtaining judicial review of his currently existing applications regardless of the merits of his patent applications. In contrast with the claim in *Hyatt I*, where plaintiff alleged unreasonable PTO delay, plaintiff argues here that the PTO has unlawfully withheld action on plaintiff's patent applications.[13]

Given plaintiff's claim, it became necessary to consider whether limited, focused discovery was appropriate in this case. Although discovery beyond the administrative record is rare in APA cases, some courts have sensibly noted that "there may be circumstances to justify expanding the record or permitting discovery." *Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1336 (4th Cir. 1995) (quoting *Public Power Council v. Johnson*, 674 F.2d 791, 793 (9th Cir. 1982)). Because this is such a case, plaintiff was permitted to conduct limited discovery in the form of an evidentiary hearing in open court by selecting two PTO employees to be deposed and requiring the PTO to designate a third witness to be deposed pursuant to Rule 30(b)(6), Fed. R. Civ. P. *Hyatt v. U.S.P.T.O.*, 1:18-cv-546 (E.D. Va. May 13, 2019) (Order). The witnesses selected were (i) Gregory Morse, the Supervisory Patent Examiner of Art Unit 2615, the unit chiefly responsible for examining plaintiff's applications, (ii) Tariq Hafiz, the group director of Technology Center 3600, and (iii) Pinchus Laufer, a senior patent attorney in the Office of Patent Legal Administration who provided legal advice in connection with the examination of

---

*United States Patent & Trademark Office*, 1:20-cv-487 (E.D. Va.). Plaintiff filed this separate suit after his Motion to Amend the complaint in the instant action was denied. *Hyatt v. U.S.P.T.O.*, 1:18-cv-546 (E.D. Va. January 15, 2020) (Order). Nothing in this Memorandum Opinion is intended to be taken, nor should it be taken, as expressing any view as to the merits of plaintiff's claims in his separate suit against the PTO.

[13] *See Hyatt v. U.S.P.T.O.*, 1:18-cv-546, slip op. at 2 (E.D. Va. March 26, 2019) (Order) ("Previously, plaintiff challenged the PTO's delay; now, he challenges the PTO's alleged refusal to issue him patents.").

13

plaintiff's patent applications.

Of particular importance here is the testimony of Gregory Morse, who has led Art Unit

2615 since March 2013. On several occasions during the evidentiary hearing, Morse firmly

denied the existence of a current, *de facto* rule, order, or policy to refrain from issuing plaintiff

any patents based on his currently existing applications or to prevent plaintiff from obtaining

judicial review of his currently existing applications regardless of his applications' merits:

> The Court: As the head of the Unit, is there any order, rule, or requirement by the PTO
> not to issue Mr. Hyatt any patent on any of his applications?
> The Witness: No, Your Honor.
> The Court: Have you issued such an order?
> The Witness: No, Your Honor.
> The Court: Has anyone in the PTO issued such an order?
> The Witness: I'm not aware of any such order, no; and I've—I'm in the position that I
> would have been told if that were the order.
> The Court: Would such an order be legal?
> The Witness: I don't think so.

A12–A13 (Evid. Hr'g Tr. 12:19–13:6).[14] According to Morse, review of plaintiff's patent

applications is made more difficult by plaintiff's amendments increasing the number of claims

included in a single application, the specifications' length, plaintiff's failure to provide written

description support in the specification for claims, and plaintiff's amendments that rewrite claims

in response to office actions. A51–54 (Evid. Hr'g Tr. 51:22–52:16; 52:20–54:4).

At the time of the evidentiary hearing, the Board had not taken jurisdiction of an appeal

in plaintiff's applications since Morse began supervising Art Unit 2615. A61–62 (Evid. Hr'g Tr.

61:23–62:3). During Morse's tenure, three of plaintiff's patent applications in which plaintiff had

prevailed in part before the Board in 2007—Applications 08/471,799, 08/470,897, and

---

[14] *See also* A28–29 (Evid. Hr'g Tr. 28:22–29:12) (same, with respect to Application 08/471'799); A30–31 (same,
with respect to three specified applications); A40 (Evid. Hr'g Tr. 40:14–17) (same); A56 (Evid. Hr'g Tr. 56:19–25)
(same); A61 (Evid. Hr'g Tr. 61:8–20) (same). All citations beginning with an "A" refer to a page or pages in the
Administrative Record in this case.

08/470,075—had yet to receive any further office actions as of the date of the evidentiary hearing. A30 (Evid. Hr'g Tr. 30:6–17); *see also* A24–30 (discussing App. '799's transaction history). On several occasions, Morse gave guidance to Art Unit 2615 examiners about rejecting plaintiff's claims, but Morse did not recall providing written guidance to examiners about allowing plaintiff's claims. *See* A87–88 (Evid. Hr'g Tr. 87:20–88:10); *see also* A83–98; A236–55 (compiling Morse's written guidance to Art Unit 2615 examiners). Morse was also aware that one Art Unit 2615 examiner, Walter Briney, created an image labeled "THE SUBMARINE PROSECUTION CHOKEHOLD" that superimposes plaintiff's face and a dollar sign onto the body of professional wrestler choking an opponent whose shoulder bears the PTO's seal. A99–100 (Evid. Hr'g Tr. 99:24–100:4); A230–235 (emails from Briney containing the image). In the context of patent applications, the term "submarine patent" refers to "a secret patent application pending for an extended period of time . . . [before] it issue[s] into a mature industry." A102 (Evid. Hr'g Tr. 102:19–21). It appears that PTO personnel generally consider a submarine patent "to be a bad thing." A102 (Evid. Hr'g Tr. 102:24).

Following limited discovery in the form of an evidentiary hearing, the Court in this case twice ordered the PTO to provide lists of actions taken on plaintiff's patent applications during specific time periods.[15] These lists show that between June 3, 2019 and January 17, 2020, the PTO issued 82 final rejections, 17 examiner's answers, 7 nonfinal rejections, and 132 petition decisions. In connection with these lists of actions, the PTO also described the overall status of plaintiff's application portfolio. The PTO concluded as of January 17, 2020 that plaintiff had abandoned 188 of the 408 patent applications pending before the PTO in 2013.[16] Of the 188

---

[15] These lists of PTO actions on plaintiff's applications have been filed under seal as docket entries 94 and 145.

[16] Abandonment of a patent application is discussed *supra* in Part I.A at page 4.

applications the PTO considers abandoned, plaintiff has filed post-abandonment petitions in approximately half of those applications.[17] Four of plaintiff's patent applications are involved in plaintiff's ongoing appeal to the Federal Circuit. The PTO contended that 216 applications remained pending before the PTO: 117 awaiting action by the PTO and 99 awaiting action by plaintiff.[18] Of those 216 patent applications, 46 were involved in the administrative appeal process to the Board. Of those 46 applications, 28 awaited examiner's answers to plaintiff's appeal briefs, 11 awaited plaintiff's reply briefs in response to examiner's answers, 4 had been fully briefed and awaited scheduling of Board hearings, 2 had completed briefing and had hearings set for February 10, 2020, and 1 had been fully briefed and argued orally on January 9, 2020 and was thus ripe for disposition by the Board. *See* PTO's February 14, 2020 Response.

On March 18, 2020, an Order issued stating that the Administrative Record for judicial review in this case properly includes the following material:

(i) the transcript of the June 20, 2019 evidentiary hearing in this matter;

(ii) the exhibits introduced at the June 20, 2019 evidentiary hearing;

(iii) the papers connected to the PTO's office actions from December 1, 2019 to January 15, 2020 designated by the PTO; and

(iv) papers related to Applications 08/471,799, 08/470,897, and 08/470,075, to include (a) PALM records for all three applications that provide the same information for Applications 08/470,897 and 08/470,075 that Plaintiff's Exhibit 6, which was introduced at the June 20, 2019 evidentiary hearing, provided for Application Number 08/471,799; (b) the Board decisions regarding each of the three applications; and (c) any documents from the file histories of the three applications that the PTO designates as necessary for

---

[17] The parties are not in agreement as to the number of petitions in opposition to abandonment that plaintiff has filed; the PTO contends that plaintiff has petitioned for withdrawal of abandonment in 94 of those applications, whereas plaintiff contends that he has petitioned for withdrawal of abandonment in 102 of those applications. *See* Plaintiff's February 21, 2020 Combined Response at 7 n. 10.

[18] Plaintiff contends that the proper number of patent applications pending before the agency is 223, not 216. *See* Plaintiff's February 21, 2020 Combined Response at 7. This dispute appears to stem from the parties' disagreement as to the number of applications the PTO has regarded as abandoned and whether the applications at issue in the § 145 actions currently on appeal to the Federal Circuit are properly characterized as pending before the PTO.

providing context for the PTO's actions on these applications.

*Hyatt v. U.S.P.T.O.*, 1:18-cv-546 (E.D. Va. March 18, 2020) (Order). The Administrative Record thus included materials that would be probative of the truth or falsity of the sole allegation that remains at issue here, namely that the PTO has a current, *de facto* rule, order, or policy to refrain from issuing plaintiff any patents based on his currently existing applications and to prevent plaintiff from obtaining judicial review of his patent applications. *See id.* at 7–8.[19] The 9,342-page Administrative Record was submitted by the PTO on April 24, 2020. The March 18, 2020 Order also scheduled a hearing on the merits for Friday, May 15, 2020. *See Hyatt v. U.S.P.T.O.*, 1:18-cv-546 (E.D. Va. March 18, 2020) (Order) ("It is further ORDERED that a hearing on the merits in this matter is SCHEDULED for Friday, May 15, 2020 at 10:00 a.m.").

At oral argument, counsel for plaintiff argued that additional extra-record discovery is warranted in this case because plaintiff contends a strong showing has been made of bad faith or improper behavior by the PTO. Specifically, plaintiff seeks (i) Morse's written communications with each director and PTO management regarding plaintiff and the examination of plaintiff's patent applications, (ii) Morse's communications with Art Unit 2615 examiners on the allowance of claims, and (iii) Morse's communications with Art Unit 2615 examiners on any instructions or encouragements to reject claims. In plaintiff's view, the extra-record discovery already afforded to plaintiff—namely the evidentiary hearing where plaintiff's counsel deposed Morse and two other PTO employees—is insufficient because plaintiff was not able to question Morse based on any written discovery and Morse's testimony was not worthy of credence. Plaintiff further

---

[19] Plaintiff's argument that the Administrative Record should include the complete file histories of plaintiff's applications was rejected, as were plaintiff's arguments that declarations from former PTO employees and deposition testimony taken in the course of plaintiff's § 145 actions should be included in the Administrative Record. *See Hyatt v. U.S.P.T.O.*, 1:18-cv-546, slip op. at 8–10 (E.D. Va. March 18, 2020) (Order).

argued that after extra-record discovery is conducted, summary judgment briefing and, if necessary, a bench trial should follow. *See New York v. Department of Commerce*, 345 F. Supp. 3d 444, 449 (S.D.N.Y. 2018) (collecting cases where bench trials were held on APA claims).[20]

During the merits hearing, the PTO argued that the evidence in the Administrative Record demonstrates that there is no current, *de facto* rule, order, or policy to refrain from issuing plaintiff any patents based on his currently existing applications or to prevent plaintiff from obtaining judicial review of his currently existing applications regardless of the merits of his patent applications. According to the PTO, Morse's testimony at the evidentiary hearing makes clear that far from carrying out any such rule, order, or policy, Art Unit 2615 is working diligently to process plaintiff's unusual and inordinately complex applications. The PTO further argued that the Administrative Record shows that the PTO has taken significant steps to move plaintiff's patent applications through the examination and appeal process. The PTO also represented that this progress is ongoing. Specifically, the PTO represented that as of May 11, 2020 50 of plaintiff's applications were in the Board appeal process. May 15 Hr'g Tr. 15:2–4. Of those 50 applications, 19 await examiner's answers, 21 await reply briefs by plaintiff, and 10 have been fully briefed. *Id.* at 15:4–6. Of the 10 fully briefed applications, hearings had been held on 3 applications, hearings had been waived or postponed in 4 applications, and hearings had yet to be scheduled for 3 applications. *Id.* at 15:6–10.

## II.

The customary summary judgment standard under Rule 56(c), Fed. R. Civ. P., does not apply in the case of judicial review on the basis of an administrative record. This is so because the administrative record sets forth the facts. The presence or absence of a genuine dispute of

---

[20] Plaintiff's request for additional discovery is further addressed *infra* at Part V.

material fact is thus not at issue. Instead, summary judgment in an APA challenge based on the administrative record "serves as the mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA" and the applicable substantive law. *Hyatt I*, at 780 (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)); *cf. Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015) (conducting APA review of patentability determinations based on the grounds in the administrative record). These familiar principles of APA review apply where, as here, an administrative record consisting of material before the agency is supplemented through authorized discovery.[21]

Although the parties were not invited to file and brief cross-motions for judgment on the administrative record, judgment on the administrative record may be granted without a party's formal motion. *See* Fed. R. Civ. P. 56(f)(3) (providing that "[a]fter giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute"). Here, the March 18, 2020 Order required the production of the Administrative Record setting forth the facts material to plaintiff's claim and provided the parties with notice and an opportunity to argue orally the merits of plaintiff's claim. Indeed, "a hearing on the merits in this matter [was scheduled] for Friday, May 15, 2020 at 10:00 a.m." *Hyatt v. U.S.P.T.O.*, 1:18-cv-546 (E.D. Va. March 18, 2020) (Order). That hearing was held as scheduled. Accordingly, this matter is now ripe for disposition on the basis of the Administrative Record and the parties' arguments.

---

[21] *See Boston Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47–48 (1st Cir. 2016) (applying the APA standard, not the ordinary summary judgment standard, where parties conducted additional discovery to supplement the administrative record); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 54–56 (D.C. Cir. 2015) (applying APA standard of review where motion to supplement rulemaking record was granted in part).

## III.

Analysis properly begins with the principles that govern plaintiff's challenge to the PTO's administrative action under § 706(2), § 706(1), and the All Writs Act, 28 U.S.C. § 1651(a).[22] The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Under § 704, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Agency action is defined as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent denial thereof, or failure to act." 5 U.S.C. § 551(13). Final agency action may be challenged pursuant to § 706(2)(A), which provides that a reviewing court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). For agency action to be considered final, two conditions must be met: (i) "the action must mark the consummation of the agency's decisionmaking process" and (ii) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

Here, plaintiff claims that the PTO has taken final agency action subject to review under § 706(2)(A) because the PTO has implemented a *sub rosa* rule, order, or policy to prevent plaintiff from obtaining any patents or judicial review of his patent applications. Importantly, plaintiff does not contend that this rule, order, or policy is openly acknowledged; rather, plaintiff argues that the PTO's inaction and pretextual rejections by the PTO are evidence of such a rule, order, or policy.

---

[22] *See* Complaint, Counts IV–VI.

An agency's failure to act may be challenged pursuant to § 706(1), which provides that a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). As the Supreme Court has made clear, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original). Because § 706(1) limits relief to legally required action, a reviewing court may only "compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *Id.* at 64 (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)). In this respect, § 706(1)'s limitation on relief is identical to the limitation on relief available through the common law writ of mandamus. *See S. Utah Wilderness All.*, 542 U.S. at 63 (noting that "[t]he mandamus remedy was normally limited to enforcement of 'a specific, unequivocal command'") (quoting *ICC v. New York, N.H. & H.R. Co.*, 287 U.S. 178, 204 (1932)). If a plaintiff successfully demonstrates that agency action has been unlawfully withheld, a reviewing court "must award injunctive relief to secure an agency's compliance." *South Carolina v. United States*, 907 F.3d 742, 758 (4th Cir. 2018) (enjoining the Department of Energy to remove one metric ton of defense plutonium from South Carolina by a date certain following Department's failure to meet statutory deadline).[23] Here, plaintiff argues that the PTO is unlawfully withholding legally required action on plaintiff's patent applications and that plaintiff is entitled to injunctive relief compelling PTO action.

Because plaintiff seeks mandamus, it is important to note that mandamus is a "drastic"

---

[23] The Ninth and Tenth Circuits have reached the same conclusion. *See Vietnam Veterans of America v. Central Intelligence Agency*, 811 F.3d 1068, 1079 (9th Cir. 2016) (enjoining defendant to warn persons exposed to chemical or biological substances for testing purposes of risks of exposure); *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) (enjoining defendant to designate a critical habitat after failure to meet statutory deadline).

remedy that is warranted "only in extraordinary situations." *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 402 (1976); 28 U.S.C. § 1651(a) (codifying the common law writ of mandamus). A party seeking mandamus must satisfy three conditions: First, the party must show that he lacks "other adequate means to attain the relief he desires." *Id.* at 403. Second, as with § 706(1), the party must show that he has a "clear and indisputable" right to relief. *Id.* (quoting *Banker's Life & Cas. Co. v. Holland*, 346 U.S. 379, 384 (1953)). Third, if the first two conditions are met, the "issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 381 (2004). Plaintiff contends here that the PTO's failure to take legally required action on his applications warrants mandamus.

The same assertion underpins plaintiff's § 706(2)(A) claim, § 706(1) claim, and request for mandamus, namely that the PTO is violating its legal obligations by implementing a *de facto* rule, order, or policy to refrain from issuing plaintiff any patents based on his currently existing applications and to prevent plaintiff from obtaining judicial review of his currently existing applications regardless of the merits of his patent applications. Accordingly, to determine whether plaintiff is entitled to relief based on any of his claims, it is necessary to identify clearly what the law requires of the PTO with respect to a patent application.

The actions legally required of the PTO upon submission of a patent application are set forth in 35 U.S.C. § 131. Specifically, "[t]he Director [of the PTO] shall cause an examination to be made of the application and the alleged new invention; and if on such examination it appears that the applicant is entitled to a patent under the law, the Director shall issue a patent therefor." 35 U.S.C. § 131. Put another way, § 131 requires the PTO to take two actions: (i) to examine a patent application and (ii) to issue a patent if the applicant is legally entitled to one. Accordingly, there is no doubt that § 131 would be violated by a PTO rule, order, or policy to deny issuance of

a patent without regard to the merits of plaintiff's patent applications or an outright refusal to examine plaintiff's patent applications for compliance with patentability criteria.

Importantly, an evaluation of whether the PTO has satisfied its statutory duty to "cause an examination to be made of" plaintiff's patent applications does not extend to a consideration of whether the PTO correctly decided to reject a given claim on one or more grounds. 35 U.S.C. § 131. In this regard, it is important to recall that a challenge to agency action unlawfully withheld only permits a reviewing court to compel an agency "to take action upon a matter, without directing *how* it shall act." *S. Utah Wilderness All.*, 542 U.S. at 64 (emphasis in original) (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)). In other words, § 706(1) "does not provide a court with a license to substitute its [judgment] for that of an agency merely because the agency is charged with having unreasonably withheld" making that judgment. *Am. Ass'n of Retired Pers. v. EEOC*, 823 F.2d 600, 605 (D.C. Cir. 1987). Accordingly, the inquiry here focuses on whether the PTO has "cause[d] an examination to be made of" plaintiff's patent applications by taking actions that measure plaintiff's patent applications against applicable patentability criteria—statutory and nonstatutory[24]—not whether the PTO reached legally correct results in its examinations and analyses of plaintiff's applications. § 131. To proceed otherwise and interrogate the correctness of the PTO's actions under the guise of conducting APA review would amount to an end-run around the procedure for obtaining judicial review of patentability determinations. *See* §§ 141; 145 (providing for judicial review of the Board's patentability determinations in the Federal Circuit or a district court).

## IV.

The Administrative Record here does not support plaintiff's contention that the PTO is

---

[24] For example, prosecution laches is an equitable doctrine, not a statutory ground of rejection.

unlawfully withholding agency action that would result in the issuance of patents to plaintiff or

withholding agency action that would permit plaintiff to obtain judicial review of his patent

applications. More specifically, the Administrative Record reflects that there is no rule, order, or

policy, *de facto* or otherwise, to refrain from issuing a patent to plaintiff or to prevent plaintiff

from obtaining judicial review of his patent applications. Rather, as the Administrative Record

reflects, the PTO is taking steps necessary to permit plaintiff to obtain Board review of twice-

rejected applications by filing examiner's answers and to move the examination process forward

on plaintiff's other pending applications by filing office actions. Far from disregarding the merits

of plaintiff's patent applications, the PTO's actions reflect that the PTO is engaging with the

merits of plaintiff's patent claims and addressing plaintiff's arguments in favor of the multitude

of claims plaintiff asserts in the applications.

   To begin with, the Administrative Record provides two clear examples of examiner's

answers filed in response to plaintiff's appeal briefs to the Patent Trial and Appeal Board. The

examiner's answers and corresponding appeal briefs in the Administrative Record illustrate the

length and complexity of plaintiff's applications and show that an examiner's task in addressing

one of plaintiff's appeal briefs is no small undertaking. For example, the December 19, 2019

examiner's answer in Application 08/454,878 ("App. '878") demonstrates the complexity of

plaintiff's applications. ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ The PTO's 116-page examiner's

answer in Application '878 responds to plaintiff's 110-page appeal brief and 114 pages of

Appendices filed on November 8, 2018. *See* Examiner's Answer, App. '878 at A2868–2983;

Appeal Brief, App. '878 at A2984–3093. Similarly, the January 2, 2020 examiner's answer addresses Application 08/285,669 ███████████████████████████████ ██████████████████████████████████████████. The PTO's 123-page examiner's answer in Application '669 responds to plaintiff's 131-page appeal brief and 782 pages of Appendices filed on March 22, 2019. *See* Examiner's Answer, App. '669 at A5869–5991; Appeal Brief, App. '669 at A5992–6122. Thus, the PTO's extensive examiner's answers in response to plaintiff's appeal briefs clearly reflect that the PTO is dedicating time and resources to process plaintiff's patent applications.

As noted in Part I.A *supra*, the filing of an examiner's answer determines whether and when the Board's appellate jurisdiction vests. Thus, although the Board is not precluded from remanding an application to an examiner, *see* 37 C.F.R. § 41.50(a), the PTO's filing of an examiner's answer enables the Board to render a decision favorable to plaintiff or a decision that is subject to judicial review pursuant to §§ 141 or 145. The Administrative Record also reflects that because the PTO has filed examiner's answers, several of plaintiff's appeals are now ripe for Board disposition. Specifically, the Administrative Record discloses that oral argument was held on one of plaintiff's appeals to the Board and oral argument was scheduled in two other appeals. Board Oral Arg. Tr., App. 08/469,939 at A7302–35; Oral Arg. Notice, App. 08/418,213 at A7761–66; Oral Arg. Notice, App. 08/465,173 at A8383–88. And, as counsel for the PTO represented at oral argument in this case, 10 of plaintiff's applications were fully briefed as of May 11, 2020. Accordingly, the Administrative Record clearly reflects that the PTO is taking actions necessary for plaintiff to obtain Board decisions on his pending patent applications.

The Administrative Record also makes clear that the PTO is filing numerous office actions on plaintiff's applications. Indeed, from June 3, 2019 to January 17, 2020, the PTO filed

82 final rejections and 7 nonfinal rejections on plaintiff's applications. The following examples included in the Administrative Record reflect that the PTO is dedicating substantial time and resources to preparing office actions in order to advance the examination process relating to plaintiff's applications:

- In Application 07/774,159, which is based on an 841-page specification ████████, the PTO filed a 288-page final rejection on December 6, 2019 that responds to plaintiff's October 1, 2019 reply comprised of 53 pages of remarks and 133 pages of claims and amendments. Final Rejection, App. '159 at A2257–2544; Reply, App. '159 at A2545–2732.

- In Application 08/465,198, which is based on a 576-page specification ████████, the PTO filed a 206-page final rejection on December 19, 2019 that responds to plaintiff's November 26, 2018 reply comprised of 13 pages of remarks seeking withdrawal of the Requirements' 600 claim per family limit and 198 pages of claims and amendments. Final Rejection, App. '198 at A3637–3842; Reply, App. '198 at 3843–4053.

- In Application 08/469,580, which is based on a 576-page specification ████████, the PTO filed a 269-page final rejection on December 30, 2019 in response to plaintiff's January 7, 2019 Reply comprised of 359 pages of claims and 57 pages of remarks. Final Rejection, App. '580 at A5179–5447; Reply, App. '580 at A5448–5868.

- In Application 08/419,590, which is based on an 841-page specification ████████, the PTO filed a 175-page nonfinal rejection on January 9, 2020 responding to 41 pages of remarks sent on August 17, 2016 and 313 pages of claims and amendments filed on May 2, 2019. Nonfinal Rejection, App. '590 at A6773–947; Claims and Remarks at A6948–7301.

This representative sampling of office actions in the Administrative Record shows that the back-and-forth process of patent examination is ongoing in plaintiff's patent applications and that each party is producing lengthy filings as part of that process. Because twice-rejected claims may be appealed to the Board, the PTO's office actions in the Administrative Record demonstrate progress toward plaintiff obtaining Board review in those applications. *See* 35 U.S.C. § 134. Accordingly, the PTO's filing of office actions further supports the conclusion that plaintiff is

26

not entitled to mandatory or injunctive relief here.

In opposing this conclusion, plaintiff invites the Court to engage in an impermissible analysis of the merits of these office actions. Specifically, plaintiff argues that although the PTO is issuing office actions addressing plaintiff's patent applications, the PTO's sluggish production of rejections fails to fulfill the PTO's statutory duties because these rejections are pretextual and indicative of a rule, order, or policy to prevent plaintiff from obtaining patents regardless of the merits.

This argument is unpersuasive; in making this argument, plaintiff impermissibly invites the Court to assess the merits of the PTO's office actions generated during the back-and-forth examination process. These office actions are not final agency actions subject to judicial review and thus an inquiry into the merits of these office actions is beyond the scope of APA review on the Administrative Record. *See S. Utah Wilderness All.*, 542 U.S. at 64 ("[Section] 706(1) empowers a court only to compel an agency . . . 'to take action upon a matter, without directing *how* it shall act.'") (emphasis in original) (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)). And contrary to plaintiff's argument, the Administrative Record is replete with evidence of the PTO advancing detailed arguments regarding the patentability of plaintiff's claims. Specifically, the PTO's office actions addressing issues such as prosecution laches, undue multiplicity, written description deficiencies, and obviousness make clear that the PTO is fulfilling its statutory duty to examine plaintiff's patent applications.

Significantly, in every office action in the Administrative Record, the PTO argues that plaintiff's claims are forfeited under the doctrine of prosecution laches[25] based on plaintiff's

---

[25] Recall that prosecution laches permits the PTO to reject a patent application where a patent issued based on that

"widespread, longstanding pattern of behavior across nearly 400 interrelated patent applications." *See, e.g.,* Examiner's Answer, App. '878 at A2886. In addition to citing plaintiff's conduct across his entire application portfolio, the PTO's prosecution laches rejections also identify specific evidence of delay in the application under examination. For example, the PTO's 116-page Examiner's Answer in Application '878 asserts

> (i) that plaintiff "filed this application in June of 1995, some 25 years after the date on which some of the current claims are said to have been described in a parent application,"

> (ii) that in 2017, plaintiff "made amendments that completely rewrote 200+ claims, introducing for the first time claims drawn to [new subject matter]," and

> (iii) that Application '878 claims priority to several earlier-filed applications, creating "a 22-year delay from the 1973 priority date of [a parent] application to the filing date of this application in 1995 and a 25-year delay from the earliest claimed priority date."

Examiner's Answer, App. '878 at A2896–98; *see also* Examiner's Answer, App. '669 at A5891–92 (identifying subject matter-altering amendments and a series of continuation applications).[26] Thus, the Administrative Record reflects that the PTO provides specific arguments for applying the doctrine of prosecution laches in particular applications filed by plaintiff.[27] In this respect, the Administrative Record further reflects that the PTO is performing its statutory examination duties with respect to plaintiff's patent applications.

Also illustrative of the PTO's performance of its statutory examination duty is that the PTO has argued in many, if not all, of plaintiff's applications that plaintiff's claims are unduly

---

application would be unenforceable because of "an unreasonable and unexplained delay in prosecution." *In re Bogese*, 303 F.3d at 1367 (citation omitted).

[26] Indeed, plaintiff's own filings indicate that the examiner's answers in the Administrative Record are not unique in citing characteristics specific to the individual application addressed. *See* Extension Request, App. 08/419,682 at A2802 ("Quite a few of the positions expressed in the examiner's answer, even as to laches and undue multiplicity (which are being made globally), raise issues specific to this application or its claims, so only some arguments are common or overlapping with previously drafted reply briefs.").

[27] *See, e.g.,* Final Rejection, App. 08/435,906 at A1607–21; Final Rejection, App. 07/774,159 at A2528–32; Final Rejection, App. 08/457,208 at A7994–8005.

multiplied such that when the claims are read "in light of the specification and prosecution history, they fail to inform those of ordinary skill in the art, with reasonable certainty, about the scope of the invention." *See* Final Rejection, App. 08/471,695 at A906–07.[28] The PTO's undue multiplicity rejections do not merely rely on the sheer number of claims in plaintiff's application portfolio; rather, the PTO identifies characteristics of individual applications that, in the PTO's view, warrant an undue multiplicity rejection. For example, the Administrative Record shows that with respect to Application '695, █████████████████████████████ ████████████████████████████ the PTO specifically analyzed that application's unduly multiplied claims. Final Rejection, App. '695 at A889–98. In response to 238 pages of claims and 63 pages of remarks filed by plaintiff, the PTO's 214-page final rejection in Application '695 provides several tables to support the assertions

> (i) that "in this application, there is a pattern of repetition of claim elements (the same type of pattern identified in the Requirements) throughout the independent claims,"

> (ii) that "this pattern of repetition of claim elements can be seen among the approx[imately] 100 applications in this family," and

> (iii) that "numerous claims in this application comprise subject matter that falls under the scope of the description of other copending applications in the subject matter table."

Final Rejection, App. '695 at A957–60. Accordingly, the PTO's rejections for undue multiplicity provide detailed explanations regarding the PTO's position and hence reflect that the PTO is performing its statutory examination duty.[29]

---

[28] In this respect, the office action recites the Supreme Court's standard for definiteness under 35 U.S.C. § 112, ¶ 2. *See Nautilus, Inc. v. Biosig Industries, Inc.*, 572 U.S. 898, 901 (2014). Undue multiplicity rejections made under § 112 ¶ 2 are warranted where "the net result of [unreasonable number of repetitious and multiplied claims] is to confuse rather than to clarify" the invention's nature and scope. MPEP § 2173.05(n).

[29] PTO office actions in connection with other applications also cite difficulties created by plaintiff's applications that contain unduly multiplied claims. *See, e.g.,* Final Rejection, App. 08/435,894 at A490–96; Final Rejection, App. 08/469,565 at A1942–50; Final Rejection, App. '159 at A2383–92; Examiner's Answer, App. '669 at A5930–45; Final Rejection, App. 08/457,208 at A7860–65.

The PTO's written description rejections also engage with the merits of plaintiff's patent applications. In Application 08/461,572, ███████████████████████████████████ ████████████████████████ the PTO filed a 227-page final rejection responding to 200 pages of claims and amendments and 49 pages of remarks. Final Rejection, App. '572 at A3257. The final rejection included written description rejections based on the examiner's review of the disclosure, "which encompasses 841 pages of specification and 96 pages of drawings," for "support that would demonstrate that [plaintiff] possessed the various claimed embodiments." Final Rejection, App. '572 at A3257–58. Although the examiner identified some of the claimed elements in the specification, the examiner determined that the specification did not show that plaintiff "possessed the particular claimed combination of individual elements" and failed to describe "the individual claim elements" for certain claims. Final Rejection, App. '572 at A3258 (citing 37 C.F.R. § 1.71(b)). ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████ The PTO's other office actions making written description rejections engage in similar analyses of plaintiff's applications' specifications.[30] These actions in the Administrative Record clearly reflect that the PTO is not refusing to perform its statutory duty to examine plaintiff's patent applications.

Similarly, the PTO's obviousness rejections under 35 U.S.C. § 103 also reflect that the

---

[30] *See, e.g.*, Final Rejection, App. '894 at A384–429; Examiner's Answer, App. '878 at A2959–64; Final Rejection, 08/469,001 at A4671–82; Final Rejection, App. '208 at A7782–7798; Final Rejection, App. 08/469,077 at A8397–406.

PTO is evaluating plaintiff's claims on their merits in fulfillment of its duty under § 131. In

Application 08/469,001, ████████████████████████████████████████████

████████████████████ the PTO filed a 247-page final rejection after plaintiff submitted

256 pages of claims and 28 pages of remarks. The final rejection identifies specific prior art

references, asserts that the elements of plaintiff's claimed invention are disclosed in those prior

art references, and argues that those prior art references provided a reason for combining those

elements in the manner proposed by plaintiff's claims. *See* Final Rejection, App. '001 at A4782–

96. The PTO's office actions addressing plaintiff's other applications provide similar analyses of

prior art references that the PTO argues render plaintiff's claims unpatentable as obvious.[31]

By completing examiner's answers and other office actions that analyze plaintiff's patent

applications, the PTO is clearly fulfilling its duty under § 131 to "cause an examination to be

made of" plaintiff's patent applications. Accordingly, there is no legally required action for a

reviewing court to compel with respect to plaintiff's patent applications. The PTO's actions

reflected in the Administrative Record thus do not support plaintiff's contention that the PTO has

adopted a rule, order, or policy, *de facto* or otherwise, to reject plaintiff's applications without

regard for their merit. It bears repeating that the above discussion and conclusion that the PTO is

examining plaintiff's patent applications is not a pronouncement that the PTO's actions are

unassailably correct determinations of the patentability of plaintiff's claims. But because the

Administrative Record reflects that the PTO is performing its nondiscretionary duty to examine

plaintiff's patent applications, plaintiff cannot demonstrate a basis for obtaining relief under the

APA or in the form of mandamus.

---

[31] *See, e.g.,* Final Rejection, App. '894 at A591–606; Final Rejection, App. '565 at A2406–71; Final Rejection, App. '198 at A3727–31; Final Rejection, App. '208 at A7874–907; Final Rejection, App. '077 at A8485–91.

31

Seeking to avoid this result, plaintiff next argues that the PTO's actions support the existence of an illegal rule, order, or policy because the PTO has failed to act within the time constraints the PTO represented it would endeavor to meet in its summary judgment briefing in *Hyatt I. See id.* at 779–80 (identifying the PTO's representations about its plans to address plaintiff's applications at issue). This argument is unpersuasive. The PTO's activity at the time of the decision in *Hyatt I* formed the basis for granting summary judgment in the PTO's favor, not the PTO's representations regarding future actions on plaintiff's applications. *Hyatt I* at 783 ("Thus, the PTO has already done what it is statutorily required to do, namely to cause an examination to be made of the applications."). Importantly, for the pre-GATT applications in issue, the PTO is under no obligation to complete an examination in any particular span of time. *Hyatt I* at 783. Here, the PTO is currently acting on plaintiff's patent applications in accordance with the requirements of § 131, and plaintiff's dissatisfaction with the PTO's pace of producing examiner's answers and other office actions does not alter this result.

It is fair to note that the Administrative Record reflects that both parties bear some responsibility for the slow progress in examining plaintiff's patent applications. As described above, plaintiff's lengthy, complex, and interrelated patent applications and prosecution conduct create significant obstacles to speedy and efficient examination. But the slow pace of examination also appears to be attributable to the PTO's use of compact prosecution, an examination procedure in which the PTO attempts to raise all possible problems with a patent application in its office actions. *See* App. '669 at A5876 ("The examiner has attempted to comply with the principles of compact prosecution as well as the circumstances permit by presenting all appropriate, non-cumulative grounds of rejection . . . ."). In *Hyatt v. Iancu*, the D.C. district court suggested that a departure from the compact prosecution procedure for

32

plaintiff's patent applications may have been warranted because the extraordinary situation presented by plaintiff's applications "required [the PTO] to employ and embrace atypical procedures for addressing the challenge before them." 332 F. Supp. 3d at 133.

Notwithstanding the debatable[32] possibility that a departure from the PTO's standard practice of compact prosecution might expedite the examination process, it is important to note that the PTO is under no legal obligation to engage in or to refrain from applying the compact prosecution procedure. Thus, an order compelling the PTO to cause an examination to be made of a patent application could not permissibly specify the examination procedure that the PTO must apply to that patent application. *See S. Utah Wilderness All.*, 542 U.S. at 64 (noting that under § 706(1), a court may compel an agency "to take action upon a matter, without directing *how* it shall act") (internal quotation marks and citation omitted).

Finally, plaintiff has argued that the PTO's filing of examiner's answers and other office actions during the pendency of this action points toward, not away, from the conclusion that judicial intervention is warranted because, in plaintiff's view, the PTO will only endeavor to work quickly if a reviewing court is evaluating the PTO's actions. *See* Plaintiff's Response to the PTO's July 26, 2019 Status Update at 5. But the PTO's actions on plaintiff's patent applications are the reason this suit must end, not a reason to permit this suit to continue. To hold otherwise would ignore the constraints on judicial review and relief available under § 706(2)(A), under § 706(1), and through the writ of mandamus.

In summary, the Administrative Record assembled here makes unmistakably clear that the PTO has not adopted, instituted, or promulgated any illegal rule, order, or policy with respect

---

[32] The PTO, for its part, would likely contend that refraining from using compact prosecution would result in inefficient, piecemeal examination. *See* Examiner's Answer, App. '669 at A5876 (urging the Board to address all grounds in light of "the appeal history of this extended family of applications").

to plaintiff's patent applications. Rather, it appears from the Administrative Record that the PTO is fulfilling its statutory duty to "cause an examination to be made of" plaintiff's patent applications and that the length, complexity, and interrelatedness of plaintiff's patent applications has plainly adversely affected the pace of that examination. 35 U.S.C. § 131. Because the Administrative Record leaves no doubt that the PTO is examining plaintiff's patent applications, there is no need for further discovery in this matter. Accordingly, relief under the APA or in the form of mandamus is unwarranted, and judgment must be entered in favor of the PTO and against plaintiff.

## V.

At oral argument, plaintiff argued that additional discovery is warranted in light of the completed Administrative Record. In support, plaintiff cites *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), in which the Supreme Court noted that the proper time to determine whether extra-record discovery is warranted is after assembly of the complete administrative record. *Id.* at 2574. In plaintiff's view, additional discovery beyond the Administrative Record assembled here should be permitted because plaintiff has made a "strong showing of bad faith or improper behavior" by the PTO,[33] namely that the PTO's stated reasons for rejecting or delaying action on plaintiff's applications are pretextual. No such showing is reflected in this Administrative Record.

In APA cases, discovery beyond the administrative record "is the exception, not the rule." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (noting

---

[33] *See Citizens of Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487–88 (D.C. Cir. 2011) ("[I]f a party makes a significant showing—variously described as a strong, substantial, or prima facie showing—that it will find material in the agency's possession indicative of bad faith or an incomplete record, [the party] should be granted limited discovery.").

that a strong showing of bad faith or a deficient record may justify extra-record discovery) (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)). Significantly, plaintiff has already been afforded an opportunity to conduct limited discovery in the form of an evidentiary hearing where plaintiff examined Gregory Morse, Art Unit 2615's supervisory patent examiner, and two other PTO officials. Yet plaintiff argues that this evidentiary hearing was insufficient and that further discovery regarding Morse's communications to PTO leadership and examiners would demonstrate that the PTO has prejudged plaintiff's applications. As with discovery beyond the administrative record in general, supplementation of the administrative record with deliberative documents is rare but may be permitted based on a showing of "bad faith or improper behavior." *New Mexico v. EPA*, 114 F.3d 290, 295 (D.C. Cir. 1997). But notably, there is a high bar that must be overcome to obtain discovery regarding an agency's deliberative process, and for good reason that high bar is difficult to clear. As the Supreme Court has noted,

> [t]he deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance "the quality of agency decisions" . . . by protecting open and frank discussion among those who make them within government.

*Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975)) (internal citation omitted).

Yet, plaintiff contends that he has made a strong showing of prejudgment necessary to justify additional discovery and to pierce the deliberative process privilege. But to show impermissible prejudgment, a plaintiff must establish "that the decision maker is 'not capable of judging a particular controversy fairly on the basis of its own circumstances.'" *NEC Corp. v. United States*, 151 F.3d 1361, 1373 (Fed. Cir. 1998) (quoting *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976)). In this regard, plaintiff emphasizes several aspects of the Administrative Record that, in plaintiff's view, establish that the PTO has

35

prejudged plaintiff's patent applications. But a review of the Administrative Record as a whole and the specific items emphasized by plaintiff discloses no persuasive basis for concluding that plaintiff has made the requisite strong showing of prejudgment by the PTO and thus no persuasive reason to conclude that additional discovery is warranted.

Specifically, plaintiff argues that conduct and comments of Walter Briney, an Art Unit 2615 examiner, show that the examination of plaintiff's patent applications is pretextual. In this respect, plaintiff contends that Briney's creation of an image labeled "THE SUBMARINE PROSECUTION CHOKEHOLD" is probative of the PTO's prejudgment of plaintiff's applications. Plaintiff also urges an inference of bad faith based on the similarity of the language appearing in the image to statements in the PTO's office actions.[34] In plaintiff's view, Morse's decision not to view the image after he learned of its existence[35] and Briney's continued service as a patent examiner show that the PTO condoned improper behavior toward plaintiff. A99–100 (Evid. Hr'g Tr. 99:7–100:5). Plaintiff also argues that Briney has made other inappropriate comments about plaintiff.[36] These actions do not warrant the inference that plaintiff urges, namely that the PTO is not evaluating plaintiff's patent applications on their merits. As noted, plaintiff's applications pose an unprecedented challenge to patent examiners, and it is

---

[34] *See* A100 (Evid. Hr'g Tr. 100:21–25) (stating that "choke hold of prosecution" appears in office actions as part of prosecution laches rejections); A104 (Evid. Hr'g Tr. 104:8–12) (discussing the PTO's use of the term "submarine" in plaintiff's patent applications); *see also* Final Rejection, App. '695 at A1046 (citing Steve Blount, *The Use of Delaying Tactics to Obtain Submarine Patents and Amend Around a Patent that a Competitor Has Designed Around*, 81 J. Pat. & Trademark Off. Soc'y 11, 24–27 (1999)).

[35] At the evidentiary hearing, Morse stated that the image was "described to [Morse] in reasonable terms." A99 (Evid. Hr'g Tr. 99:23).

[36] On March 10, 2016, Briney authored an email to co-workers stating that an article about plaintiff's divorce "provides a unique glimpse into Hyatt's mind and the value he places on his patent applications." *See* Complaint at Exhibit 1, *Hyatt v. United States Patent & Trademark Office*, 346 F. Supp. 3d 141 (D.D.C. 2018) (18-cv-234). In Freedom of Information Act litigation seeking disclosure of a reply to Briney's email, the D.C. district court stated that Briney's email "can be read in such a way as to call into question" the "necessary objectivity" that patent examiners must display in performing their duties. *Hyatt*, 346 F. Supp. 3d at 152.

understandable that patent examiners would feel and express some frustration. Accordingly, nothing raised by plaintiff warrants additional discovery because the Administrative Record contains adequate evidence bearing on whether the PTO is performing its statutory duty to examine plaintiff's patent applications.[37]

Next, plaintiff argues that Morse's guidance to Art Unit 2615 examiners shows that the PTO has prejudged all of plaintiff's applications. To be sure, the Administrative Record contains several emails from Morse to examiners providing guidance about writing rejections and no emails about allowance. *See* A236–255 (compiling Morse's guidance emails). But the explanation for this dichotomy is simple; examiners apply the MPEP, which "identifies a set of grounds of rejection and allowance is the absence of other issues with the case." A87–88 (Evid. Hr'g Tr. 87:20–88:10); *see also* A97–98 (Evid. Hr'g Tr. 97:15–98:1). In other words, allowance is "a residual outcome." A88 (Evid. Hr'g Tr. 88:9–10). Thus, the absence of emails about allowance does not provide persuasive evidence of prejudgment.

Plaintiff insists that Morse's emails go beyond merely discussing rejections and explicitly instruct examiners to reject claims. Specifically, plaintiff relies on the following message:

> I've seen a couple actions lately where you (in the abstract) pick a reasonable date as the "not before this date", and then the art rejection look[s] like you're trying to beat a 1970 date. Have the courage to beat the date you identify. If you do the best you can with the support he shows, you write a rejection on the date you identify, and then he comes back and shows you an earlier date and a different spec, we'll write a new rejection and go final. He was already required to show earlier support....

A246. Morse addressed this email in his testimony at the evidentiary hearing, stating that the

---

[37] *See Theodore Roosevelt Conservation P'ship*, 616 F.3d at 514 (affirming denial of discovery where administrative record was not deficient); *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487–88 (D.C. Cir. 2011) (affirming denial of extra-record discovery regarding prejudgment where evidence of "intra-agency discord" prior to new rule's promulgation did not show prejudgment and legitimate reasons explained delay in union election that resulted in new rule's application).

email's purpose was not to tell examiners "to write a rejection no matter what," but rather to communicate that examiners "have to pick a date for the claim and search for art for that date and find it or not, but they can't try and anticipate every possible response." A87 (Evid. Hr'g Tr. 87:15–17). Morse testified that he wrote "we'll write a new rejection and go final" because he "was supposing that the examiner went back and found different art." A87 (Evid. Hr'g Tr. 87:11–12).

Plaintiff contends that Morse's testimony about this email and others was not worthy of credence and that additional discovery regarding Morse's emails to examiners would reveal evidence of prejudgment. This argument fails to persuade; a supervisory patent examiner's expression of skepticism about plaintiff's ability to prevail in certain patent applications where examiners had already recommended rejections does not render the supervisory examiner or the other examiners incapable of judging those applications fairly based on new evidence or legal authority. *See NLRB v. Donnelly Garment Co.*, 330 U.S. 219, 236–37 (1947) (holding that a hearing examiner's prior adverse ruling did not prevent same examiner from adjudicating same case on retrial after examiner's initial decision was reversed for improper exclusion of evidence). Nor do a patent examiner's doubts about the patentability of certain patent applications show a fixed opinion regarding the merits of future cases involving plaintiff's other patent applications. *See FTC v. Cement Inst.*, 333 U.S. 683, 700–01 (1948) (holding that commission members' prior investigation and statements to Congress about policy issues did not "necessarily mean that the minds of [the] members were irrevocably closed on the subject" raised in later proceeding). Moreover, to parse Morse's guidance to patent examiners regarding particular patent applications would impermissibly invite a reviewing court to evaluate the merits of plaintiff's patent applications and the PTO's office actions. *See Am. Ass'n of Retired Pers.*, 823 F.2d at 605

("Section 706(1) does not provide a court with a license to substitute its discretion for that of an agency merely because the agency is charged with having unreasonably withheld action."). Accordingly, Morse's guidance emails to examiners do not singly or collectively satisfy the strong showing of bad faith or improper behavior necessary to justify ordering further discovery in this matter.

Plaintiff also argues that the pretextual nature of Art Unit 2615's examination is evident from the PTO's treatment of Applications '799, '897, and '075. After plaintiff prevailed in part before the Board in 2007 in these three applications, the PTO completed no office actions in these applications until it issued nonfinal rejections on Applications '897 and '075 on April 20, 2020. Plaintiff contends that office actions should have been completed long ago on these applications, which have not been amended since 2007. *See* A67 (Evid. Hr'g Tr. 67:18–21). Plaintiff also argues that the nonfinal rejections' inclusion of written description rejections under § 112 ¶ 1 are "identical" to the rejections reversed by the Board's 2007 decisions and show that the Board's decisions are not being accorded finality. May 15, 2020 Oral Arg. Tr. 7:7–16; *see also* Nonfinal Rejection, App. '897 at A9184–97; Nonfinal Rejection, App. '075 at A9328–36.[38]

Again, the PTO's actions in these applications do not warrant further discovery in this case. Although there has been a significant delay in the PTO's action on these applications, under the then-existing pre-June 8, 1995 applicable legal regime the PTO is not required to complete examination of plaintiff's applications within a specified time. *See Hyatt I*, at 783. Plaintiff also mischaracterizes the recent nonfinal office actions' written description rejections. To be sure, the 2007 Board decisions in Applications '897 and '075 reversed § 112 ¶ 1

---

[38] Section 112 ¶ 1 "contains two separate description requirements: a 'written description [i] of the invention, *and* [ii] of the manner and process of making and using ['the invention']." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1344 (Fed. Cir. 2010) (en banc) (emphasis and alterations in original).

enablement rejections,[39] but the Board's decisions also explicitly suggested further analysis of those applications' written descriptions.[40] Accordingly, contrary to plaintiff's argument, the PTO's written description rejections under § 112 ¶ 1 in Applications '897 and '075 do not show that the PTO is disregarding the Board's decisions, nor do they show that the PTO has an illegal rule, order, or policy to reject or not to examine those applications.

Next, plaintiff argues that the PTO's assertion of prosecution laches in the *Hyatt v. Iancu* § 145 actions shows the PTO's prejudgment of all of plaintiff's applications. A58 (Evid. Hr'g Tr. 58:9–14). In a brief in *Hyatt v. Iancu*, counsel for the PTO wrote: "[t]hus the USPTO has begun issuing prosecution laches rejections across all of [plaintiff's] pending applications at the USPTO, and has begun raising prosecution laches in all of his court cases." A289. Contrary to plaintiff's argument, this statement merely reflects that the PTO and plaintiff dispute whether plaintiff's prosecution conduct constitutes prosecution laches and does not provide persuasive evidence of a rule, order, or policy to deny plaintiff patents. Following a Board decision, plaintiff may seek judicial review of any grounds for rejection affirmed by the Board, including a potential prosecution laches rejection. Thus, the PTO's prosecution laches rejections in plaintiff's patent applications do not justify further discovery here.

Finally, plaintiff argues that the pretextual nature of the PTO's examination is apparent

---

[39] *See* Board Decision, App. '897 at A9115–17; Board Decision, App. '075 at A9243–46.

[40] Specifically, the 2007 Board decision in Application '075 states:

> The Examiner may wish to review the question of whether the application on appeal and the ancestor applications provide written description support for the claimed combinations of elements in light of the recent decision in *Hyatt v. Dudas*, 492 F.3d 1365, 1371 (Fed. Cir. 2007). We express no opinion on this question one way or another.

Board Decision, App. '075 at A9249; *see also* Board Decision, App. '897 at A9114 (suggesting that the examiner "may wish to review . . . the sufficiency of the disclosure of the application on appeal" with respect to certain claims).

when the PTO's positions are contrasted with the D.C. district court's decision in the *Hyatt v. Iancu* § 145 cases, which held that several claims in the applications at issue were patentable. To be sure, in that case the D.C. district court disagreed with the PTO's evaluation of the patent applications at issue there. But as the record in *Hyatt v. Iancu* reflects, additional evidence presented for the first time during three separate trials—evidence not presented to the PTO during the examination process—proved crucial in the end to plaintiff's success on certain issues presented there:

> The Court's finding written description support for certain claims in this instance is thus not a moral judgment of any sort as to examiners' or the Board's diligence—indeed, it took many hours of expert testimony over many weeks of trial for the Court to be able to make these findings. Rather, the Court's findings rely heavily upon the *new evidence presented at trial*, in the form of expert testimony, establishing that certain of Mr. Hyatt's claims have adequate written description support.

*Hyatt v. Iancu*, 332 F. Supp. 3d at 98–99 & n. 22 (emphasis added).

In the event the PTO and the Board reject one or more of plaintiff's claims, plaintiff will have an opportunity to file a § 145 case and present new evidence of patentability. But the D.C. district court's evaluation of new evidence related to three applications there in issue does not show that the PTO has engaged in any bad faith or improper behavior. Thus, the district court's decision in *Hyatt v. Iancu* does not demonstrate that plaintiff in this case is entitled to conduct additional discovery here.

In summary, none of plaintiff's arguments for conducting additional discovery in this matter is persuasive. Because the Administrative Record is adequately complete and makes clear that the PTO is adequately fulfilling its statutory obligation to examine plaintiff's patent applications, additional discovery is unwarranted.

## VI.

The Administrative Record reflects that there is no rule, order, or policy to deny plaintiff

41

any patents based on his existing patent applications or to deny plaintiff judicial review of his existing patent applications regardless of the merits of plaintiff's patent applications. Plaintiff is understandably disappointed that the PTO is not processing plaintiff's applications at a faster pace, but plaintiff must accept that the length, complexity, and interrelatedness of his patent applications are significant contributing factors to the slow pace of examination.

The Administrative Record is adequately complete and reflects that the PTO is satisfying its statutory obligation to examine plaintiff's patent applications, and the PTO's satisfaction of its legal obligation compels the denial of plaintiff's APA claims and request for mandamus. Accordingly, judgment must be entered in favor of the PTO and against plaintiff, and Counts IV, V, and VI of plaintiff's Complaint must be dismissed.

An appropriate Order will issue separately.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
August 19, 2020

/s/
T. S. Ellis, III
United States District Judge